UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED - GR**
February 5, 2018 4:20 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: __mkc__   SCANNED BY: ꞈꞈꞈ

DANIEL WILLIAM RUDD,

    Plaintiff,

v.

THE CITY OF NORTON SHORES;
MAYOR GARY NELUND,
individually and in his official capacity;
POLICE CHIEF DANIEL SHAW,
individually and in his official capacity;
SERGEANT MATTHEW RHYNDRESS,
individually and in his official capacity;
OFFICER MICHAEL WASSILEWSKI,
individually and in his official capacity;
MARK MEYERS, individually and as city manager;
-----
F/LT. CHRIS MCINTIRE, Michigan State Police
only in his individual capacity;
------
ATTORNEY DOUGLAS HUGHES,
Individually and acting on behalf of his law firm;
WILLIAM HUGHES, PLLC
A Michigan law firm.
-------
ATTORNEY MELISSA MEYERS,
Individually and acting on behalf of her law firm;
ATTORNEY MICHELLE MCLEAN,
Individually and acting on behalf of her law firm;
ATTORNEY JOEL BAAR,
Individually and acting on behalf of his law firm;
BOLHOUSE, BAAR & HOFSTEE PC;
A Michigan law firm.
                Defendants.

**1:18-cv-124**
**Gordon J Quist**
**U.S. District Judge**

Case No.

Hon.

**COMPLAINT & DEMAND**
**FOR A JURY TRIAL**

Plaintiff, Daniel W. Rudd (a non-lawyer)
Is presently without representation.
201 S Lake Ave. Spring Lake, MI 49456
231-557-2532, daniel@stock20.com

### Nature of the Case:

1) This case is about a coordinated effort by the Norton Shores Police Department and City Government, to retaliate against a vulnerable citizen who alleged misconduct by police officers, criticized department policy, and alleged some of these individuals had broken the law.

### Plaintiff:

2) Plaintiff, Daniel W. Rudd resides in Ottawa County, Michigan. The Muskegon County Family Court awarded plaintiff sole custody of his children in 2014 due to substantiated abuse, neglect, domestic violence and chronic alcohol abuse in the mother's home. Plaintiff has been subjected to extensive scrutiny in the child custody proceedings. The record of those proceedings unequivocally demonstrates that plaintiff has acted in good faith and for the benefit of his children at all times. No evidentiary findings suggest otherwise. Plaintiff has never been convicted of any crime or been involved in any adverse interactions with law enforcement prior to the events alleged herein. Plaintiff is not a lawyer and hopes to retain counsel as soon as possible.

### Defendants:

3) Upon information and belief, all defendants conduct business in Muskegon County and reside in Muskegon County, Ottawa County, or Kent County.

4) Attorney Melissa Meyers has represented the opposing party (non-custodial mother) in plaintiff's child custody proceedings for many years. During this time, Melissa Meyers has relentlessly accused plaintiff of criminal activity without any support for these allegations. At all relevant times, Melissa Meyers has been married to the city manager of Norton Shores. Attorney Melissa Meyers is private actor who conspired with the Norton Shores Defendants to injure plaintiff under color of state law.

5) Mark Meyers has been employed as the Norton Shores city manager for many years. He is one of the highest city executives with substantial authority over employment determinations which impact Norton Shores Police officers.  Mark Meyers is the husband of Melissa Meyers.

6) At all relevant times, Officer Michael Wassilewski was an officer of the Norton Shores Police Department and maintained a personal relationship with Melissa Meyers and Mark Meyers.

7) At all relevant times, Sergeant Matthew Rhyndress was a supervisory police officer for the City of Norton Shores and maintained a personal relationship with Melissa Meyers and Mark Meyers.  When Sergeant Rhyndress testified against plaintiff in Octoboer of 2013, he failed to disclose that Melissa Meyers was representing him in his own contentious divorce proceedings (which included a similar PPO request against the opposing party in that case).

8) Daniel Shaw was the Chief of the Norton Shores Police department in on 7/20/13 when plaintiff was seeking assistance from the Norton Shores Police Department. He retired in November of 2014.

9) Jon Gale hired as the new chief in November of 2014 but has been employed in a supervisory capacity with the Norton Shores Police Department for many years.

10)    At all relevant times, Gary Nelund was the Mayor of Norton Shores.  Mr. Nelund participated in the conspiracy at various points and did not take remedial action upon becoming aware of constitutional violations.

11)    At all relevant times, Attorney Douglas Hughes was acting as corporate counsel for the City of Norton Shores. Attorney Hughes is a senior partner and executive decision-maker for his firm, Williams Hughes, PLLC.  The firm may be liable for some portion of damages.

12)   The City of Norton Shores is a Michigan municipality responsible for the proper training and discipline of the Norton Shores Police officers.  The misconduct alleged herein reflects customs and policies adopted or tacitly approved by the city government.  Plaintiff also alleges that the highest ranking Norton Shores officials conspired together with private actors to retaliate against plaintiff.  Government resources, authority, and influence were used to further a conspiracy to retaliate and silence plaintiff.  Accordingly, the City of Norton Shores is liable for damages.

13)   At all relevant times F/LT Chris McIntire was employed as the commander of the Rockford Post for the Michigan State Police.  It appears that defendant McIntire acted in violation of MSP policy and without approval from any superior officer.  Unless evidence indicates otherwise, Lt. McIntire is sued only in his individual capacity.

14)   Attorney Michelle McLean substituted into plaintiff's custody proceedings in 2014.  She was fully aware of an extensive body of evidence which contracted the false allegations against plaintiff.  In spite of this knowledge, Attorney McLean conspired with the other defendants to retaliate against plaintiff, abuse legal process and institute a baseless prosecution of criminal contempt proceedings against plaintiff.  Attorney McLean was a partner with the firm "Bolhouse, Baar & Hofstee, P.C" out of Grandville, MI.  Attorney Melissa Meyers was hired into this firm at some point in 2014.

15)   At all relevant times, Attorney Joel Baar was a senior and managing partner of Bolhouse, Baar & Hofstee, PC.  Attorney Baar became involved in the prosecution of criminal contempt against plaintiff and participated in the conspiracy even after it became clear that the legal action was unwarranted and unjust.  On information and belief, Joel Baar conspired with the Norton Shores defendants to pursue common goals.

16)     At all relevant times, Bolhouse, Baar & Hofstee, P.C was a Michigan Law firm. The firm appeared in the PPO litigation against plaintiff and continued to pursue the litigation after it became clear that the claims against plaintiff were unwarranted. The firm is liable because the managing partner(s) in this firm approved and supported the actions alleged herein.

17)     This Honorable Court has jurisdiction because this case involves federal questions and violations of civil rights under 42 U.S.C. § 1983.  Plaintiff requests that this court would exercise supplemental jurisdiction over the related state law claims.

### Background Information:

18)     In July of 2013, plaintiff, Daniel W. Rudd requested assistance from the Norton Shores Police Department.

19)     Along with several other credible witnesses, plaintiff offered substantial evidence indicating that his children were in danger due to a volatile domestic violence situation between the children's mother and her third husband (whom she had just left).

20)     Plaintiff, and members of the mother's immediate family expressed great concern that the mother had been behaving erratically for several days, had absconded with the children, and had hidden them away from plaintiff (their father) and all of her immediate family members.

21)     NSPD officers reviewed court orders regarding the mother's parenting time, confirmed the recent assaultive criminal history of the stepfather, verified the CPS substantiations for abuse and neglect in the mother's home, and reviewed the language of MCL 750.350a, which designated the mother's actions a felony.  All objective and verifiable sources of information demanded prompt action.

22)  However, the department refused to conduct a criminal investigation, refused to properly question witnesses who could have identified the location of the children, and refused to enter a missing or endangered child report in the LEIN database.

23)  The NSPD refused to take reasonable steps which could have quickly diffused a dangerous and traumatic situation. They refused to conduct the investigation and complete a report which is required by MCL 764.15c.

24)  By the following morning, the situation had grown more volatile. It also became apparent that the mother's attorney was helping the mother draft extortionate messages (demanding specific legal concessions before the children would be returned or even allowed to speak on the phone).

25)  On 7/21/15, Plaintiff reported this to the Norton Shores Police Department, reiterated the risk factors and respectfully insisted that this was not just a "parenting time" squabble which could be ignored or addressed by a motion in family court.

26)  The Norton Shores Police Department ignored the evidence, refused to help and ultimately threatened plaintiff with an unwarranted arrest. These actions were retaliatory.

   a) Plaintiff had persistently asked the Norton Shores Police Department to uphold the law and to discharge their statutory duties. This persistence was perceived as a challenge to the department's policy or custom of "not getting involved" when a custodial parent accuses the other custodial parent of a crime.

   b) Plaintiff had accused a prominent attorney, Melissa Meyers, of intentionally placing innocent children in a dangerous situation for the purpose of illegal extorting a more favorable custody agreement. 3 of the officers involved had a personal relationship with the attorney. She was also the wife of the city manager (highest ranking Norton Shores executive).

27)    Upon information and belief, Mark Meyers (city manager), Chief Daniel Shaw, and supervising officer Matthew Rhyndress conspired together to chill plaintiff's petitioning activity.

28)    Sergeant Rhyndress briefly detained plaintiff (without probable cause) and aggressively informed plaintiff that the Norton Shores Police Department would not be investigating anything or providing any assistance.  When plaintiff sought an explanation, Sergeant Rhyndress threatened an unlawful arrest and issued a "trespass warning."

29)    Because the Norton Shores Police Department refused to take appropriate action, the dangerous and stressful ordeal was unnecessarily extended until a different police agency intervened and eventually facilitated the safe return of the minor children.

30)    Attorney Melissa Meyers was able to continue her efforts to extort a more favorable custody agreement for several more hours, subjecting the children to greater risk.

31)    Shortly thereafter, orders were entered restricting the mother's parenting time, however, the court process was overwhelmed and delayed by the barrage of false allegations stemming from the abusive PPO litigation brought by Melissa Meyers.

**Norton Shores assists Melissa Meyers in abusive PPO litigation:**

32)    From July-November of 2013, substantial NSPD resources were deployed to support the efforts of Melissa Meyers in alleging that plaintiff had been stalking and harassing her.  She improperly obtained an ex parte PPO against plaintiff by fabricating claims and failing to notify plaintiff's counsel.  Therafter, the PPO litigation became valuable leverage for Melissa Meyers.  This was especially true once the PPO case was inexplicably reassigned to Judge Pittman, a long-time resident of Norton Shores who was also presiding over plaintiff's custody proceedings.

33) Officer Wassileski and officer Rhyndress falsified their reports by excluding all mention of the risk factors which had been credibly presented to the department. This was a deliberate effort to cover up the departments failure to comply with statutory requirements regarding complaints involving domestic violence. This also served to cover up the participation of their friend, Melissa Meyers, in a custodial abduction for the purpose of extorting a more favorable custody agreement.

34) Officer Rhyndress created a "supplemental report" which fabricates critical details to support of the false narrative created by Melissa Meyers. For example, Sergeant Rhyndress claimed that plaintiff had announced his intention to use his vehicle to "block" people from leaving the Meyers home. This was completely false and contrary to any logical interpretation of the facts. The intent was to portray plaintiff as a dangerous vigilante. However, the documented actions of the NSPD officers demonstrates that they had ZERO concern that plaintiff actually posed any risk to anyone.

35) Although department police requires a recording to be made whenever an officer interacts with a civilian, these recordings were destroyed, concealed, or otherwise made unavailable by the intention of the department.

36) In October of 2013, Chief Daniel Shaw sent an e-mail to a subordinate officer authorizing the disclosure of LEIN information to Mark Meyers for the sole purpose of assisting Melissa Meyers in her efforts to portray plaintiff as a dangerous stalker. It is important to note that on the morning of 7/21/13, the department was fully aware of plaintiff's location because plaintiff was pleading for their help and was following their instructions. During this period of time, NONE of the defendants expressed any concern that plaintiff might have a weapon in his vehicle. No one inquired about this until months later when Mark Meyers was subpoenaed to testify regarding the PPO.

Whatever the motive, it was illegal for Chief Shaw to authorize the disclosure of ANY LEIN information to Mark Meyers. (also, plaintiff did not have any weapons)

37) The department also destroyed, concealed or improperly withheld phone records which, along with the police recordings, would have clearly proven many of the claims made by Melissa Meyers to be false. In spite of the fact that 4 Norton Shores employees (including top level executive and supervisory staff) were dedicating significant time to testify on this matter, the department mysteriously failed to preserve any of the records which would have objectively settled material disputes in the proceedings.

38) In the weeks prior to the second PPO hearing (November 2013), Melissa Meyers indicated that she would be ending her involvement in plaintiff's child custody case and also filed motions urging the judge to refer the parties to an outside agency for a comprehensive resolution of the custody issues (instead of setting the matter for a custody trial).

39) On 11/26/15, the PPO hearing was cut short by Judge Pittman. Acknowledging that the parties had not yet presented all their witness Judge Pittman stated his intention to give both parties a little bit of what they needed:

a) The PPO would remain in place for a few weeks while the contested motion for a custody evaluation was litigated. The judge emphasized his strong preference for resolving the custody issues through the referral proposed by Melissa Meyers, instead of setting the matter for trial as plaintiff's attorney had requested.

b) Judge Pittman specifically and repeatedly advised Melissa Meyers that the PPO would be terminated PRIOR to the original six-month term which had been set based upon the (false) allegations in an ex parte hearing.

c) Judge Pittman instructed that this would be a prophylactic measure and that the order would be terminated early. He instructed that the order should include wording which allowed him to terminate the PPO early (without conducting another hearing) after the upcoming custody hearings.

40) In spite of the substantial help which she received from the Norton Shores Police Department, Melissa Meyers did not establish by evidence that ANY of her false claims of stalking/harassment were true.

41) In December of 2013, the Norton Shores Police Department assisted Melissa Meyers in her efforts to initiate frivolous criminal contempt proceedings against plaintiff in December of 2013. This was simply intended to harass plaintiff and create leverage in the custody proceedings.

42) In January of 2014, Melissa Meyers sued plaintiff for costs/sanctions, claiming that plaintiff had offered perjured testimony and moved to terminate the PPO for the sole purpose of harassing Melissa Meyers. This also was completely frivolous.

43) The court rejected these claims (1/23/14) and found in plaintiff's favor:

THE COURT: Well, I think by virtue of the decision that this Court reached, and whether you agree or not, that's certainly your prerogative, but by virtue of simply the idea that the term of the order was modified indicates that there was some arguable merit. **That I made a decision based upon that merit to shorten the term of the PPO's existence**... Mr. Rudd did receive some relief as he was seeking here. **There was a modification.** Of course you have the right to disagree that I was correct in finding that merit, but I have not heard that argument."

44) The exhaustive custody evaluation requested by Melissa Meyers took approximately six months to be completed. The evaluator conducted extensive collateral interviews, document review and psychological testing. The findings unequivocally contradicted the false allegations which Melissa Meyers and her client had been manufacturing for years.

45)  The evaluator, who had been hand-picked by Melissa Meyers, specifically rejected

the "stalking" narrative which Melissa Meyers had fabricated with the assistance of

the Norton Shore Police Department.

> There is plenty of evidence to warrant Daniel's concerns about child welfare, It isn't
> common in high conflict custody disputes such as this to have an overwhelming
> amount of evidence such as criminal records, CPS investigations, collateral reports,
> and text/email feeds to confirm and validate Daniel's concerns, This isn't a simple "he
> said, she said" case-Daniel presents copious and reliable data beyond his self-report,
> In fact, the psychological testing suggests that although he may have some emotional
> reactivity/dramatization to data/facts, his self-report of factual information is
> reliable, He doesn't have a psychological profile suggestive of lying, deceiving, and
> manipulating information. (Randy Flood Report, 5/2014 p. 25).

> We read in the news about children being abused and witness to violence in families
> where domestic violence, alcohol abuse, love triangles, and custody disputes exist.
> Sometimes the writing is on the wall, but often people will comment on how they
> didn't see it coming. Daniel is aware, smart, and analytical while also possessing deep
> love and care for his children. <u>Although no severe or lethal violence has occurred in
> this case, the risk factors were present. (Randy Flood Report, 5/2014 p. 26).</u>

46)  At this point, even Melissa Meyers's client (the mother) indicated that the referral

to the Fountain Hill Center had been a wakeup call.  She testified that she now

appreciated plaintiff's advocacy for the children, that he was great dad, and that he

always prioritized the needs of the children.  Regarding the domestic violence issues

which Melissa Meyers had adamantly denied for years, the mother conceded that:

> I can see where Randy Flood would come to that conclusion because, you know, with
> [the stepfather] drinking, you know, his temper gets out of control sometimes. And
> that's why I am doing whatever it takes to make sure my boys are in a safe and stable
> environment. And I am willing to be done with [the stepfather] if he can't stick to this
> plan and put my boys first. (7/11/14, 27)

47)  The mother advised the court that the stepfather had started an intensive

outpatient substance abuse program and that he would pursue follow up care for the

rest of his life.  She also testified that she was aggressively pursuing the therapeutic

objections regarding her role in minimizing and covering up the issues which had

compromised the welfare of her children.

"I started back at counseling as soon as the report came out. I've been to see my counselor three or four times and he just recently referred me to a Dr. Dorothy Berg to help get through the recommendations that Randy Flood suggested.

48)   The mother's new attorney, Michelle Mclean, elicited this testimony AND had full access to the extensive body of objective evidence regarding plaintiff's good faith efforts to appropriately advocate for his children.   Attorney McLean did not challenge the extensive findings of the evaluator regarding plaintiff's exemplary conduct.   In fact, attorney Michelle McLean advised the court that "my coming into this case was in part because Ms. Meyers admitted she was a little too emotional. And I think the attorneys do have a lot of control. There's a lot of attorney control over our clients." (7/11/14)

49)   Plaintiff was awarded sole legal and sole physical custody of his children.  (Order Changing Custody 8/4/14). However, in spite of her numerous statements that she would no longer be involved in the case, Attorney Melissa Meyers continued to insert herself into the custody litigation—perpetually creating needless conflict and discouraging her client from making actual progress in her therapeutic objectives.

### Plaintiff's 2015 Complaint to the Norton Shores Police Department

50)   In 2015, a new police chief had assumed leadership of the Norton Shores Police Department (Jon Gale) and announced his efforts to build trust in the community through transparency and accountability.

51)   Since the court had made extensive findings exonerating plaintiff, and had already granted plaintiff sole custody of his children, plaintiff hoped that a new police chief would be able to objectively address the concerns regarding what had occurred under the previous chief in 2013.

52)   Plaintiff submitted an official complaint to Chief Gale on 7/20/2015. The complaint (attached as Exhibit A) details plaintiff's concerns regarding the

department's violations of plaintiff's constitutional rights, failure to enforce the law, and retaliatory actions in 2013. Plaintiff incorporates Exhibit A into this complaint.

53)    Chief Gale met with plaintiff in his office for approximately an hour and fifteen minutes on 7/23/15 to discuss the complaint.

   a) During the course of this meeting, plaintiff described numerous ways that Chief Gale could objectively verify the truth of plaintiff's claims regarding what had occurred.  Plaintiff emphasized his willingness to provide additional documentary evidence and subject to himself to any type of scrutiny.

   b) Chief Gale thanked plaintiff for coming forward with these concerns and repeatedly emphasized his awareness that abusive litigation tactics in family court can be devastating.  Chief Gale went out of his way relate that his own best friend had recently been made the target of scheme to obtain a fraudulent PPO against him for ulterior purposes.  Chief Gale indicated that the PPO had been obtained through false testimony with devastating consequences for his friend. Chief Gale believed that his friend would probably lose "everything."

   c) Although Chief Gale did make statements which minimized some of plaintiff's concerns, Chief Gale did not express any specific doubts about the credibility of the facts presented by plaintiff.

   d) Chief Gale assured plaintiff that he would conduct a fair and thorough investigation of any internal policy violations by NSPD officers who were still employed by the city.

   e) Regarding the portions of plaintiff's complaint which alleged criminal acts (i.e. destruction/concealment of evidence, unauthorized disclosure of LEIN information for the PPO litigation, cover-ups, extortion, etc..) Chief Gale advised that these matters would need to be independently investigated by someone from

the Michigan State Police who did not "know anybody" from the Norton Shores
Police Department.  Chief Gale offered to make these arrangements to ensure that
it would be performed objectively.

### Another Round of Retaliation Against Plaintiff:

54)   However, Chief Gale's representations during this meeting were false. Chief Gale
did not conduct an objective internal investigation and he did not arrange for an
independent outside investigation with the Michigan State Police.   At the time of this
meeting 7/23/15, Chief Gale had already begun collaborating with Mark Meyers,
Melissa Meyers, Mayor Gary Nelund, and the other Norton Shores defendants to
prevent plaintiff from seeking or obtaining relief in state or federal court.

55)   Although Chief Gale's sworn affidavit (Exhibit B) describes a long-standing policy
of keeping citizen complaints strictly confidential (to prevent a chilling effect upon
complainants) Chief Gale immediately circulated copies of plaintiff's 7/20/15
complaint among the civilians which plaintiff had named as the primary conspirators
(Mark Meyers, Melissa Meyers & Daniel Shaw).  Chief Gale did before taking any
steps to objectively investigate the claims offered by plaintiff.  This precluded any
opportunity for a meaningful investigation to occur.

56)   Also contrary to his representations, Chief Gale did not ever seek a referral for an
independent investigation by the Michigan State Police.  Instead, he arranged for a
trusted colleague (F/Lt. Chris McIntire) to contact plaintiff and go through the
motions of "investigating" the complaint without any documentation or scrutiny.

57)   Immediately after receiving it, chief Gale provided Mark and Melissa Meyers with
plaintiff's complaint, Melissa Meyers began conspiring with her client (non-custodial
mother) to engineer a "PPO violation" by plaintiff.  An ambush was planned for a
soccer tournament where plaintiff would be coaching his children's team.

58) Although plaintiff never saw Melissa Meyers or any of her family members at this crowded tournament and never had any credible reason to believe that Melissa Meyers was present, Melissa Meyers claimed that plaintiff's presence at the tournament constituted deliberate "unconsented contact" and the basis for a fresh batch of hysterical allegations against plaintiff.

59) On 7/28/15, Melissa Meyers contacted plaintiff's attorney and alleged a criminal violation of the PPO (which had expired approximately 18 months prior).

> "Upon seeing Mr. Rudd, Mr. Rudd was immediately informed of my presence and that of my family. However, rather than leaving in compliance with the PPO, Mr. Rudd chose to stay."

60) This claim was absolutely baseless in every way. Among other inconsistencies, Melissa Meyers has never provided any explanation for why she did not contact plaintiff's lawyer before the tournament and work out a solution.

61) The e-mail conveyed that Melissa Meyers and her client intended to create a similar situation at any future soccer events where there "is even a remote possibility" of Attorney Meyers being present.

62) The e-mail to plaintiff's attorney also emphasizes the possibility that Melissa Meyers may have to put plaintiff's children "through the trauma of police interaction because Mr. Rudd is non-compliant with the PPO."

63) Melissa Meyers arranged for her client to also send plaintiff messages threatening Norton Shores Police action at the children's soccer events.

64) Although she claims that plaintiff is violating a PPO, Melissa Meyers also indicated that she had been advised (via Chief Gale) that her 2013 ex parte PPO had expired and been removed from the LEIN database a long time ago.

65)   The 7/28/15 e-mail attempts to remedy this issue by demanding that plaintiff
agree to stipulated entry of a court order authorizing the Norton Shores Police
Department to enter a non-expiring Stalking/PPO record into the LEIN database
against plaintiff.

66)   The message repeatedly conveys that Melissa Meyers is primarily motivated by the
fact that plaintiff had complained to the Norton Shores Police Department on
7/20/15:

> "Mr. Rudd has recently brought up issues from the past involving the events
> surrounding the issuance of my PPO against Mr. Rudd. He has made false, defamatory
> comments again about myself and my husband in a clear attempt to get my
> husband, the former police chief and Norton Shores Police Department into some sort
> trouble. In doing so he has renewed my concerns about his behavior and intent with
> regard to myself, my children and my husband."

67)   The message is clear: Plaintiff must drop his complaint with the NSPD or risk an
arrest every time he brings his children to a soccer event in Norton Shores.

> "…I certainly do not want my family subjected to police involvement,
> however, if we do not figure out some sort of solution immediately,
> I am afraid that is exactly what will occur."

68)   Plaintiff reported this extortion attempt to Chief Gale. Chief Gale relayed that
information to Melissa Meyers.

69)   On 7/30/15, Melissa Meyers responded with another message to plaintiff's
attorney regarding plaintiff's failure to comply with her demands. This message also
concludes with an ominous threat:

**"Additionally, I will be taking any/all necessary steps to ensure Mr. Rudd's compliance"**

70)   Melissa Meyers then began conspiring with attorney Michelle McLean to
fraudulently obtain a court order authorizing the Norton Shores Police Department to
enter a Stalking/PPO record into the LEIN database.

71)     On or about 8/2/15, Attorney Michelle McLean filed a motion on behalf of
Melissa Meyers, claiming that a "clerical error" had occurred which needed to be
corrected by the court. Under this pretense, she supplied the judge with a prepared
order and requested that he sign it immediately and without a hearing.

72)     This was a fraudulent scheme to manipulate the courts and deprive plaintiff of
any semblance of due process.

73)     Plaintiff's attorney filed a response on 8/5/2015 citing specific rulings in the
record which clearly contradicted Attorney Mclean's suggestion that the court
intended to expand the duration of the 6 month ex parte PPO which Melissa Meyers
had been granted in July of 2013. Plaintiff's attorney requested sanctions and
scheduled a hearing.

74)     On 8/12/2015, Attorney Mclean filed another motion asking Judge Pittman to
authorize LEIN entry by the NSPD (without conducting a hearing or making any of
the necessary findings to justify a stalking/ppo). This motion alleged that plaintiff
had committed several acts of felony aggravated stalking and violated the 2013 PPO
by submitting his complaint to the Norton Shores Police Department:

> On Monday July 20, 2015, Respondent began engaging in a willful course and pattern
> of conduct directed toward and involving Petitioner and her family that defined by
> MCR 750.411(h) (sic) constitutes harassment which caused and continues to cause
> Petitioner and her family to feel harassed, embarrassed, threatened and emotionally
> distressed as follows:

75)     The motion then proceeds to list several pages of excerpts from plaintiff's
7/20/15 written complaint—along with quotations from a recording of the meeting
with Chief Gale on 7/23/15. Without any support, the motion alleges that plaintiff
was repeatedly advised that his complaints had been fully investigated and found to
be false. However, if this was the case, the Norton Shores Police Department should
have charged plaintiff with falsely reporting a felony.

76)   Chief Gale, Attorney McLean, Attorney Meyers, and the NSPD LEIN operator where all fully aware of the statutory requirements for entering a stalking/ppo record into the LEIN database.  That is why defendants Mclean and Meyers submitted a petition to Judge Pittman asking for such an order to be entered.

77)   Both of Michelle McLean's motions provided a proposed order which included the required components.  They requested that Judge Pittman would immediately enter the order because this was the only way that such an entry could be permitted.

78)   However, the department decided to bypass this due process protection shorlty after plaintiff submitted a FOIA request to the Norton Shores Police Department seeking documents which pertained to his 7/20/15 complaint. (8/25/15)

79)   A few days later (8/28/15), the Norton Shore Police Department decided to enter the stalking/PPO record into the LEIN database without a valid court order.

80)   Attorney McLean then contacted plaintiff's lawyer and requested that the 9/8/15 hearing regarding the PPO would be cancelled because Melissa Meyers was withdrawing her request. Attorney Mclean knew, but did not disclose that the Norton Shores Police Department had circumvented the courts and entered a stalking/PPO order against plaintiff already.

81)   Plaintiff did not learn about the LEIN entry until 9/10/15 when he received an automated letter from the Michigan State Police.  The letter advised that a recent disposition/order the 14th Circuit Court had resulted in the entry of a "Stalking/PPO" against plaintiff.

82)   Plaintiff immediately contacted the Norton Shores Police Department advising that the 14th Circuit Court had certainly not authorized the entry of such an order in spite of numerous requests.  Plaintiff explained the circumstances and was assured that these concerns would be immediately reviewed by Chief Gale.

83)   Chief Gale did not take any corrective action.  Attorney Melissa Meyers and
Attorney Michelle Mclean continued to use the fraudulent Stalking/PPO as a leverage
in plaintiff's custody proceedings AND as a vehicle to intimidate plaintiff from
bringing an action against the City of Norton Shores in federal court.

**Plaintiff seeks declaratory relief—Defendants retaliate:**

84)   On 10/20/2015, plaintiff filed a motion in the circuit court seeking a declaratory
ruling regarding unauthorized entry of a stalking/PPO record in the LEIN database
and the false allegations of harassment, criminal contempt and aggravated stalking.
Plaintiff obtained a hearing date and served notice.

85)   Attorney Mclean responded with several frivolous filings, totaling around 145
pages with exhibits.  The pleadings were comprised of approximately 46 pages
(single spaced) primarily rehashing the same in more dramatic form.  Once again,
plaintiff's complaint to the Norton Shores Police Department was a central theme.

86)   Attorney McLean asked the court to initiate criminal contempt proceedings
against plaintiff, seeking 30 days of incarceration and around $5000 in fines and
costs.

87)   Attorney McLean's sworn affidavit falsely claimed that she could offer competent
testimony regarding her first-hand knowledge that plaintiff had willfully violated the
courts orders and the aggravated stalking statute (a felony).  In addition to providing
more leverage against plaintiff, Attorney McLean scheduled her contempt hearing on
top of the hearing which plaintiff had scheduled for declaratory relief.

**Norton Shores ALSO will "take whatever action is legally necessary"**

88)   Plaintiff received Judge Pittman's order authorized criminal contempt proceedings

on 11/5/15.  On the same day, Attorney Douglas Hughes and his staff began sending

plaintiff numerous copies of a threatening letter (emphasis added):

> RE: Mark Meyers
>
> Dear Mr. Rudd
>
> This office represents the City of Norton Shores. **Their Mayor has asked us to monitor your conduct and behavior as it relates to the employment of Mark Meyers** as the City Administrator for the City of Norton Shores.
>
> We have information that leads us to believe that you have made serious defamatory and disparaging remarks about Mr. Meyers, as well as other members of the Norton Shores Police Department. **Please treat this letter as notice to you that we will take whatever action is legally necessary to protect the professional and privacy rights of Mr. Meyers.**
>
> **You are to cease and desist from any further contact or conversation with him. Also be mindful that the statements you make to others about Mr. Meyers.** [sic] If you have had hired legal counsel, please make a copy of this letter and give it to that individual and instruct him to contact me.
>
> Sincerely, Douglas M. Hughes, City Attorney for the City of Norton Shores

89)   After receiving a third copy of the letter on 11/7/15, plaintiff responded to Mr.

Hughes, advising that he (plaintiff) had not <u>ever</u> had contact with or conversation

with Mark Meyers.  With that being the case, plaintiff advised that the misinformed

and vague statements in the letter were coming across as intimidating.

90)   Plaintiff indicated that he did not consent to further communication unless

Attorney Hughes could send something more productive or helpful in articulating

what it was he wanted.

91)   Mr. Hughes responded by promptly sending another vague and ominous message:

| **Doug Hughes** <doughughes@williamshugheslaw.com> To: Daniel Rudd <daniel@stock20.com> | Sat, Nov 7, 2015 at 9:20 PM |
|---|---|
| Good. Stay away from the Meyer's and we will get along just fine. Take care. *Sent from my Verizon Wireless 4G LTE DROID* | |

92) Doug Hughes sent the above response to plaintiff at 9:20pm on a Saturday night (11/7/15). Doug Hughes proceeded to <u>immediately</u> forward Chief Gale a copy of the message indicating plaintiff (Daniel Rudd) felt intimidated. Commenting on plaintiff's message Doug Hughes wrote to Chief Gale(9:23pm 11/7/15):

> "Check this out. I will share w mark tomorrow. I told Daniel, good, stay away from The Meyer's and he and will get along just fine." (sic)

**Attorney McLean & Attorney Baar seek a "global resolution"**

93) Two days later (11/9/2015), plaintiff met with Attorney Michelle McLean and Attonrey Joel Baar, managing partner of Bolhouse, Baar & Hofstee, P.C.; Attorney Baar had requested a meeting just prior to the contempt hearing for the purpose of reaching a "global resolution on all issues in the case."

94) Attorneys Baar and McLean repeatedly indicated that plaintiff could avoid incarceration by agreeing that he would no longer engage in "conduct" which was "concerning" to Melissa Meyers and Mark Meyers—specifically referring to plaintiff's 7/20/15 complaint and corresponding FOIA requests.

95) Mr. Baar specifically stated that they were looking for an agreement that plaintiff would not take "any action" against Mark Meyers or Melissa Meyers. Attorney Mclean specifically asked plaintiff if he was willing to "stop going to the city."

96) Plaintiff indicated that attorney Mclean had certainly misconstrued plaintiff's actions in submitting a complaint to Norton Shores, but advised that nothing related to that complaint had anything to do with violations of the ex parte PPO which had been obtained by Melissa Meyers in July of 2013.

97) Attorneys Mclean and Baar disagreed and advised that Police Chief Jon Gale, First Lieutenant Chris McIntire (Michigan State Police), Attorney Doug Hughes and city manager Mark Meyers were outside in the hall and prepared to testify that plaintiff

had been engaging in very concerning behavior.  These attorneys knew that their false allegations could damage plaintiff's credibility before Judge Pittman, who also presided over plaintiff's custody case.

98)   Attorney McLean specifically stated that since Judge Pittman had authorized criminal contempt "this could turn into an arraignment today."

99)   Attorney Baar made several references to Judge Pittman's reputation for unpredictable and hasty rulings (i.e. "who knows what Pittman will do?").

100)  Throughout the meeting, attorneys Baar and Mclean repeatedly attempted to coerce plaintiff into dropping any complaints against the city of Norton Shores. Plaintiff ultimately advised Joel Barr and Michelle Mclean that this was completely inappropriate. No agreements were reached.

### Dramatic Norton Shores presence at the contempt hearing:

101)  Attorney Doug Hughes, Chief Gale, city Manager Mark Meyers, and Lt. Christ McIntire all appeared at the hearing.  Their presence alone sent a strong message to plaintiff, confirming their unified commitment to damage, intimidate, and silence plaintiff:

> "I will be taking **any/all necessary steps to ensure Mr Rudd's compliance**." (Melissa Meyers, 7/30/15 e-mail)

> We have information that leads us to believe that you have made serious defamatory and disparaging remarks about Mr. Meyers, as well as other members of the Norton Shores Police Department. Please treat this letter as notice to you that **we will take whatever action is legally necessary to protect the professional and privacy rights of Mr. Meyers.**  (Attorney Dough Hughes, 11/5/15 letter)

102)  Attorney McLean's claims were immediately found meritless by Judge Pittman, however the dramatic show of force from high ranking Norton Shores officials predictably caught Judge Pittman's attention.  The record indicates that the meritless criminal prosecution would have been dismissed on that day if it had not been for the

veneer of credibility provided by these influential witnesses. These actions also furthered several objectives of the conspiracy:

a) Plaintiff was intimidated. A person of ordinary firmness would certainly been chilled from engaging in any more petitioning activity.

b) Plaintiff, who had scheduled the hearing, was deprived of any opportunity to be heard, or to make a record regarding what had occurred.

c) The adjournment allowed the defendant to maintain their leverage through a continuous threat of an unjustified arrest.

d) Contrary to the court rules, Judge Pittman ordered the parties to mediate the dispute. This was **exactly** what Melissa Meyers, Joel Baar, and the Norton Shores Defendants needed in order to continue their efforts to silence plaintiff.

103) Shortly after this hearing, Melissa Meyers was replaced by a new lawyer in the custody proceedings. This eliminated the only remaining pretense for maintaining these actions against plaintiff. However, with the approval of managing partners, Bolhouse, Baar & Hofstee continued in their efforts to keep this abusive litigation alive. The ulterior purpose behind these efforts is plainly evident in written correspondence between plaintiff and the firm.

104) The malicious prosecution and abusive litigation was maintained until Judge Pittman dismissed all charges with prejudice. Even at this point, attorney McLean attempted to keep the criminal contempt prosecution alive, so that plaintiff would be required to mediate.

105) At plaintiff's request, the court also entered an order directing the Norton Shore Police Department to "immediately" remove the stalking/ppo record from the LEIN database.

### Summary of Constitutional Violations:

106)   Throughout the course of these events, plaintiff had a constitutional right to petition the government for help, to insist upon underline equal underline protection under the law, to seek redress for grievances, and to challenge the customs and policies of the Norton Shores Police Department.  Plaintiff had the right to persistently engage in these protected activities without fear of retaliation.

107)   Plaintiff had a right to bring good-faith complaints of criminal activity to the Norton Shores Police Department even if those allegations were directed at prominent and connected members of the Norton Shores community.

108)   If Plaintiff's complaints of criminal activity, or plaintiff's requests for police intervention were not brought in good faith, the department should have sought charges with the prosecutor for submitting false reports.  Instead the Norton Shores defendants conspired with the private actors to launch a subversive collateral assault on planitiff's ability to protect his children in family court and protect his constitutional rights in federal court proceedings.

### COUNT 1.        VIOLATION OF 42 U.S.C. 1983: CONSPIRACY
(Denial of Access to State & Federal Court Remedies)

109)   Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 108 above.

110)   The actions of all defendants, as described herein, demonstrated a deliberate and continued course of concerted effort to prevent plaintiff from pursuing any claims against Mark Meyers, Melissa Meyers, and the city of Norton Shores.

111)   The conspiracy initially targeted the relief in plaintiff sought through the Muskegon County Family Court including but not limited to:

a) Relief under the parental kidnapping statute, which includes protective orders and indemnification of losses resulting from the custodial abduction.

b) A prompt resolution of the pending custody suit, wherein the Guardian Ad Litem had already recommended that plaintiff receive sole custody of the children.

c) Sanctions and contempt proceedings against Melissa Meyers for encouraging her client to violate court orders and subject the children to risk of harm.

112) The conspiracy served to render these remedies ineffective and/or overwhelm the court to prevent a proper and timely adjudication of the disputes.  If it weren't for the actions of defendants, these state law matters would have been resolved much more quickly, with less suffering and with less expense.

113) Another object of the conspiracy was to prevent any civil litigation or criminal investigations pertaining to Melissa Meyer's participation in her client's parental kidnapping, her assistance in drafting extortionate messages, and any efforts to obstruct law enforcement agencies by providing false information.

114) When plaintiff alleged that Norton Shores officers had had participated in these violations, common objectives began to emerge between the state actors (Norton Shores Defendants) and the private actors.

115) At all relevant times, all of the defendant knew, or should have known that plaintiff was acting in good faith and in full alignment with the state's interest in protecting vulnerable children.  Knowing this, all defendants participated in various portions of the scheme to violate plaintiff's civil rights and silence plaintiff through various abuses under color of state law.

116) This count is alleged against all defendants.

**COUNT 2.       VIOLATION OF 42 U.S.C. 1983: 1st Amendment Retaliation**

117)   Plaintiff hereby realleges and incorporates by reference paragraphs 1-116.

118)   All defendant's participated in the conspiracy to retaliate against plaintiff with the
adverse actions described in this complaint. These actions were motivated, at least in
part, by plaintiff's persistent efforts to seek assistance and the redress of grievances by
the government.

119)   Plaintiff brings this count against all defendants by way of retaliatory acts or
participation in the conspiracy to retaliate against plaintiff.

**COUNT 3.       VIOLATION OF 42 U.S.C. 1983: Malicious Prosecution**

120)   Plaintiff hereby realleges and incorporates by reference paragraphs 1-121.

121)   All defendants conspired together and participated in an effort to initiate and
maintain an unwarranted prosecution against plaintiff for criminal contempt.

122)   All defendants participated in the effort to have plaintiff prosecuted for
aggravated stalking and other criminal violations. The prosecution was intended to
retaliate against plaintiff and chill his petitioning activities.

123)   The city of Norton Shores (via Douglas Hughes) expressed an ominous warning
against plaintiff's protected activity, before devoting substantial department resources
to maintain the malicious prosecution against plaintiff.

124)   The Norton Shores defendants used their influence, authority, and department
resources to intimidate plaintiff as part of the effort by Joel Baar and Michelle
McLean to extort a "global resolution" just before the contempt hearing.  These
actions also allowed the malicious prosecution to continue for several more months
until the charges were finally dismissed in plaintiff's favor on 2/4/16.

125)   Plaintiff alleges malicious prosecution against Melissa Meyers, Michelle Mclean, Joel Baar, and their firm BOLHOUSE, BAAR & HOFSTEE PC.

126)   Plaintiff alleges conspiracy to maliciously prosecute plaintiff against all defendants.

**COUNT 4.        VIOLATION OF 42 U.S.C. 1983: Abuse of Process**

127)   Plaintiff hereby realleges and incorporates by reference paragraphs 1-127.

128)   The criminal contempt and civil proceedings were instituted and maintained under fraudulent pretenses and for ulterior purposes which were unrelated to the true nature of the legal actions which were before the court.

129)   All defendants conspired to violate plaintiff's civil rights through abusive ligation as set forth in this complaint.

130)   The defendants were attempting to pressure plaintiff into making agreements and to prevent plaintiff from taking legal action against Melissa Meyers, Mark Meyers and the Norton Shores defendants.    This ulterior purpose is plainly evident in the legal pleadings which were filed in the PPO litigation but primarily focused on plaintiff's petitioning activity.

131)   Norton Shores expressed (via Douglas Hughes letter) the intention to "take whatever action is legally necessary to protect the professional and privacy rights of Mr. Meyers." This reflects the statements and actions of the private actors.

132)   Plaintiff alleges abuse of process against Melissa Meyers, Michelle Mclean, Joel Baar, and their firm BOLHOUSE, BAAR & HOFSTEE PC.

133)   Plaintiff alleges conspiracy to abuse process against all defendants.

COUNT 5.        State Law: Abuse of Process

134)   In exactly the same terms and against the same defendants in Count 4, Plaintiff

also alleges a state law claim for abuse of process and conspiracy to abuse process.

COUNT 6.        State Law: Malicious Prosecution

135)   In exactly the same terms and against the same defendants in Count 3, Plaintiff

also alleges a state law claim for malicious prosecution and conspiracy to maliciously

prosecute plaintiff.  This count is alleged under MCL 600.2907 and common law.

COUNT 7.        State Law: Intention Infliction of Emotional Distress & Negligent
                Infliction of Emotional Distress.

136)   Plaintiff hereby realleges and incorporates by reference paragraphs 1-136.

137)   Plaintiff alleges that Melissa Meyers and Michelle McLean intentionally inflicted

emotional distress on plaintiff and others.

138)   Plaintiff alleges that the remaining defendants demonstrated gross negligence in

violation of their statutory or official duties, resulting in severe emotional distress to

plaintiff and others.

Relief Requested:

As a direct and/or proximate result of the constitutional violations and tortious

actions set forth in this complaint, plaintiff has been deprived of his liberty, subjected to

extreme distress, fear, stress, humiliation, financial hardship, damage to reputation, loss

of income, loss of income opportunity, loss of property, loss of statutory remedies, and

other substantial damages.

WHEREFORE, Plaintiff requests that this court award damages in an amount to be

determined at trial, together with costs, interest, attorney fees pursuant to 42 U.S.C. §

1988.  Plaintiff also seeks injunctive and declaratory relief to prevent these same type of

injuries from being perpetrated on other citizens.

By his signature below, the undersigned swears and affirms that the factual statements asserted herein are true and accurate to the best of his knowledge information and belief.

Respectfully submitted on 2/5/18,

_____

Daniel W. Rudd, Plaintiff (Pro Se)
201 S Lake Ave.
Spring Lake, MI 49456

**Plaintiff demands a jury trial in the above captioned matter.**