UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL WILLIAM RUDD,

                Plaintiff,

      v.

CITY OF NORTON SHORES, et al.,
.

              Defendants.

Case No.  1:18-cv-124

Honorable Gordon J. Quist
U.S. District Court Judge

---

Daniel William Rudd
Plaintiff, Pro Se
201 S. Lake Ave.
Spring Lake, MI 49456
(231) 557.2532, daniel@stock20.com

Robert A. Callahan (P47600)
rcallahan@plunkettcooney.com
Michael S. Bogren (P34835)
mbogren@plunkettcooney.com
Lisa A. Hall (P70200)
lhall@plunkettcooney.com
PLUNKETT COONEY, P.C.
950 Trade Centre Way, Ste. 310
Kalamazoo, MI 49002, (269) 226.8822
Attorneys for Defendants:
City of Norton Shores, Mayor Nelund,
Jon Gale, Daniel Shaw, Matthew Rhyndress,
Michael Wassilewski, Douglas Hughes
Mark Meyers & Williams Hughes PLLC

Michelle M. McLean (P71393)
michellem@bolhouselaw.com
Richard L. Bolhouse (P29357)
rickb@bolhouselaw.com
BOLHOUSE, HOFSTEE & MCLEAN PC
Grandville State Bank Bldg. 3996 Chicago Dr. SW,
Grandville, MI 49418   (616) 531-7711
Attorneys for Defendants:
Michelle McLean, Joel Baar,
& Bolhouse, Hofstee & McLean
(f/k/a Bolhouse Baar & Hofstee)

Steven Daniel Schultz (P63177)
sschultz@tanisschultz.com
TANIS SCHULTZ
85 Campau Ave NW, Suite R305
Grand Rapids, MI 49503 (616) 608-7149
Attorney for Defendant:
Melissa L. Meyers

---

**PLAINTIFF'S AMENDED/CORRECTED BRIEF IN OPPOSITION TO**
City Defendants: MOTION for judgment on the pleadings (ECF No. 60)
Bolhouse Defendants: MOTION to dismiss for failure to state a claim (ECF No. 53)
Def. Melissa Meyers:  MOTION to dismiss for failure to state a claim (ECF No. 58)

Filed (as amended) by: Daniel Rudd, Plaintiff (Pro Se) on October 17, 2018
Oral Arguments Requested

# Table of Contents

**Table of Contents** ...................................................................................................... ii

Table Of Authorities .................................................................................................. iii

SUMMARY OF ISSUES & ARGUMENT ................................................................ 1

I.      First Amendment Claims against the City: ................................................. 2

a.      In 2013, Plaintiff's requests for police assistance and plaintiff's reports of criminal activity were protected conduct. ................................................................... 2

b.      Adverse Actions Against Plaintiff on 7/21/13: ......................................... 4

c.      The adverse acts reflect a <u>shared objective</u> to chill Plaintiff's petitioning. ........................... 5

d.      Plaintiff's challenge to the ex parte PPO and his requests for exculpatory records from the City were also protected activity......................................................................... 9

e.      The City's participation in the Stalking/PPO litigation and spoliation of evidence constituted adverse actions against Plaintiff. ............................................................. 12

II.     Plaintiff's Protected Conduct in 2015, also resulted in Adverse Actions by the City. ......... 13

a.      The City's unorthodox handling of Plaintiff's 7/20/15 Citizen Complaint constitutes adverse actions against Plaintiff.................................................................................. 16

b.      Chief Gale's continued disclosures constitute adverse acts which also demonstrate joint action........................................................................................................................ 17

c.      The unauthorized LEIN entry against Plaintiff was an adverse act. .................................... 20

d.      The City's 11/5/15 Cease & Desist Letter was an adverse act. ........................................... 24

III.    Statements made by the private party Defendants and the City Defendants establish shared retaliatory motivations, common objectives, and joint participation. .............................. 27

a.      Allusions to the "Custody Proceedings" are unfounded pretext........................................... 27

b.      Def. Melissa Meyers was "reacting" to Plaintiff's protected conduct. .................................. 29

c.      The Bolhouse Defendants were also reacting to protected conduct. .................................... 32

IV.     Shared Objectives – Symbiotic Relationship – Joint Conduct ......................................... 34

V.      State Law Claims ................................................................................................. 36

a.      Abuse of Process .................................................................................................. 36

b.      Michigan's Litigation Privilege is not applicable. ................................................... 38

c.      Intentional Infliction of Emotional Distress ............................................................ 38

d.      Malicious Prosecution ........................................................................................... 39

Conclusion: ................................................................................................................ 39

# Table Of Authorities

**CASES**

*Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015)................................... 35

*Barrett v. Harrington*, 130 F.3d 246 (6th Cir.1997) ...................................................... 13

*Bart v. Telford*, 677 F.2d 622 (7th Cir.1982), ....................................................... 13, 35

*Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 246 (6th Cir. 2015)..................... 5

*Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir. 1998) ............................................. 3, 13

*Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) .......... 5

*Fritz v. Charter Township of Comstock*, 592 F.3d 718 (6th Cir. 2010)........................ 13

*Gregory v. City of Chicago,* 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969.... 5, 30

*Lawrence v. Burdi*, 886 N.W.2d 758, 314 Mich. App. 203 (Ct. App. 2016)................ 39

*McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005 ............................... 36

*Multimedia Holdings Corp. v. Circuit Ct. of Fla., St. Johns Cnty.*, 544 U.S. 1301, 1306, 125

    S.Ct. 1624, 161 L.Ed.2d 590 (2005) ..................................................................... 36

*Paige v. Coyner,* 614 F.3d 273, 281-82 (6th Cir. 2010) ............................................. 13

*Roberts v Auto-Owners*, 374 N.W.2d 905, 908-09 (Mich. 1985)................................ 39

*Smith v. Thornburg*, 136 F.3d 1070 (6th Cir. 1998) at 1090-1091 .............................. 35

*Sykes v. Anderson*, 625 F.3d 294, 311-12 (6th Cir. 2010) ......................................... 14

**STATUTES**

MCL 750.213..................................................................................................................... 38

**RULES**

MCR 3.706.................................................................................................................. 22, 24

## SUMMARY OF ISSUES & ARGUMENT

All three of the dispositive briefs have either ignored or distorted the substance of material factual allegations by Plaintiff.  While it is true that Plaintiff's initial complaint did not supply the necessary level of detailed factual allegations to show that F/Lt. McIntire was aware of and participated in a First Amendment violations[1], the same cannot be said of the remaining Defendants. Plaintiff's factual allegations adequately supply the basis for an inference of shared retaliatory intent and joint action.

Plaintiff's original complaint sets forth a substantial number of factual allegations which support the inference of joint activity between the City Defendants, Defendant Melissa Meyers (Ms. Meyers) and the Bolhouse Defendants.  However, as it pertains to direct acts of retaliation by the City, Plaintiff need not establish a conspiracy.  The City may independently be held liable for using government resources and government influence to suppress the protected speech of a private citizen.  Although this Court's 8/8/18 Opinion set forth a concise recitation of many of those factual allegations, the City has simply failed to address them.  Several of the alleged adverse actions by the City Defendants (in 2013 and 2015), inherently convey a plausible connection to the protected conduct which Plaintiff had (or was) engaged in. The City has failed to come forward with alternative non-retaliatory explanations for these actions.

The First Amendment Claims are at the heart of this lawsuit.  The pending state law claims largely relate to the conduct which was designed to punish and silence Plaintiff's petitioning activity.  Plaintiff has focused primarily on these claims and, requests the opportunity to file a supplemental brief regarding the state law claims.

NOTE: any citation comprised only of paragraph numbers, such as "(¶3)" or "(¶¶22-31)" should always be in reference to Plaintiff's original complaint (ECF No. 1).

---

[1] Plaintiff has advised the remaining Defendants that he is diligently working on his amended complaint, but that this work is delayed by the present dispositive motions). These briefs are very difficult to write.

## I.      First Amendment Claims against the City:

For Plaintiff's First Amendment Claims to proceed, Plaintiff's factual allegations, taken as true, must give rise to a plausible inference that: (1) Plaintiff engaged in constitutionally protected conduct; (2) he suffered an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated, at least in part, by the plaintiff's protected conduct.

> We start our analysis on this aspect of the retaliation claim from the premise that [a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper. We also note that proof of an official's retaliatory intent rarely will be supported by direct evidence of such intent. See *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir.1979) (reversing the district court's dismissal of the plaintiff's claim, holding that it will often be difficult to support a claim requiring a showing of the defendant's state of mind with direct evidence in a complaint). Accordingly, claims involving proof of a [defendant's] intent seldom lend themselves to summary disposition.

*Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir. 1998) (some internal quotes and cites omitted). "When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Id.*

### a.   In 2013, Plaintiff's requests for police assistance and plaintiff's reports of criminal activity were protected conduct.

Plaintiff claims that he requested emergency assistance from the Norton Shores Police Department (NSPD) on July 20, 2013—alleging a high-risk parental abduction. (ECF No. 1 at PageID.5-6; ECF no. 1-1 at PageID.31-32.)    Rudd insisted that this was not a "custody and parenting time dispute," but a truly dangerous situation for the children. Rudd provided credible evidence of severe risk factors involving domestic violence, assaultive criminal convictions, substance abuse, and CPS substantiations (*Id.*).

The following day, July 21, 2013, Rudd reported that the children were still missing and in danger.  Rudd asked that a missing person report would be entered in the LEIN database and requested that officers would review evidence that Attorney Melissa Meyers was actually

encouraging and assisting the mother in concealing the children (*Id.*).  Rudd asked the officers to review the extortionate text messages he was receiving because they appeared to be drafted by Attorney Meyers. Rudd also informed officers that Melissa Meyers had a personal friendship with the Noncustodial Mother who had previously brought Rudd's children to spend time in the Meyer's home.  Finally, "Rudd requested that an officer would speak to Attorney Meyers so that she would effectuate the immediate return of my children instead of illegally supporting and assisting her client in efforts to prolong the ordeal while trying to negotiate an agreement." (PageID.32 at ¶4).  Officer Wasilewski advised that the NSPD would not even discuss the matter with Melissa Meyers unless Plaintiff physically observed the Meyers residence and discovered evidence that his children could be present there.  Plaintiff agreed to do this while Officer Wasilewski attempted to call the Noncustodial Mother's cellular phone. Per Wasilewski's direction, Plaintiff located the Meyer's home and parked his car a short distance down the street while he awaited a return phone call from Officer Wasilewski (PageID.32 at ¶13). Plaintiff remained in his car without disturbing anyone or even seeing anyone from the neighborhood. There appears to be no dispute that Plaintiff's efforts to obtain police assistance constitutes protected conduct. Plaintiff also alleges that was still engaged in constitutionally protected activity while peacefully parked in the street near the Meyers' residence because (1) he had a legitimate purpose; (2) he was not in violation of any law or ordinance; (3) he was cooperating with the directions of Officer Wasilewski in efforts to locate his missing children; and (4) Plaintiff's was gathering information necessary for continued assistance from Officer Wasilewski (¶36 at PageID.8).  It would have been clear to any law enforcement officer that all these actions were reasonable under the circumstances and constitutional protected activities.

### b. Adverse Actions Against Plaintiff on 7/21/13:

Plaintiff's allegations collectively support the inference that Wasilewski was already in communication, or immediately communicated with Mark and/or Melissa Meyers regarding Plaintiff's allegations of criminal conduct.  While Plaintiff waited for a return call from Officer Wasilewski, a different plan was formulated.  Upon the request of Mark Meyers and Chief Daniel Shaw, Sgt. Rhyndress located Plaintiff's vehicle, activated his flashers and briefly detained Plaintiff there on the street (¶¶26-28).

Sgt. Rhyndress advised Plaintiff that: (1) he was Wasilewski's supervisor (2) Plaintiff would not be hearing back from Wasilewski or receiving any assistances from the NSPD; (3) The NSPD would not investigate anything; (4) Plaintiff had been issued a "trespass warning" and was ordered to leave the area immediately; (5) Plaintiff would be arrested on site if he returned to the area.

The arbitrary denial of police services, the refusal to investigate crimes involving domestic violence, the refusal to enter a missing person report in the LEIN database, the issuance of a trespass warning against Plaintiff (when no trespass had occurred), and the threat of an unwarranted arrest were all adverse actions capable of chilling further petitioning activity.[2]

> Because the "right to `peaceably to assemble, and to petition the Government for a redress of grievances' is specifically protected by the First Amendment," *Gregory, 394 U.S.* at 119, 89 S.Ct. 946 (Black, J., concurring), the espousal of views that are disagreeable to the majority of listeners may at times "necessitate police protection," *Edwards*, 372 U.S. at 237, 83 S.Ct. 680. "Liberty can only be exercised in a system of law which safeguards order." *Cox*, 379 U.S. at 574. It is "a police officer's ... duty ... to enforce laws already enacted and to make arrests... for conduct already made criminal." *Gregory*, 394 U.S. at 120, 89 S.Ct. 946 (Black, J., concurring).[3]

*Bible Believers v. Wayne Cty., Mich*., 805 F.3d 228, 246 (6th Cir. 2015) (en banc).  Even if Sgt. Rhyndress had believed that Plaintiff was creating a disturbance or public safety concern, he was

---

[2] Although not a necessary element for a First Amendment claim, these actions did in fact chill Plaintiff's petitioning activity on 7/21/13 (¶29-30).

[3] *Gregory v. City of Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963);

still obligated to effectuate a solution which showed deference for Plaintiff's right to petition the government. For instance, Sgt. Rhyndress could have approached Plaintiff and asked him to come down to department headquarters for the purpose of making a complete report. If Sgt. Rhyndress, or anyone other NSPD officer had actual concerns that Plaintiff might pose a safety risk, the department would have engaged Plaintiff further, allowing for more scrutiny of Plaintiff.

### c. The adverse acts reflect a <u>shared objective</u> to chill Plaintiff's petitioning.

On 7/21/13, Sgt. Rhyndress was the highest ranking *decision-maker* on duty. He advised Plaintiff that further petitioning would be futile, issued an unwarranted "trespass warning", and threatened to arrest Plaintiff on site if he was seen in the area (¶28, at PageID.7). The acts themselves clearly stand in direct opposition to the petitioning activity which Plaintiff was engaged in. This sufficiently establishes a First Amendment Violation. However, Plaintiff has also alleged a shared opposition to Plaintiff's petitioning activity. While some of the City Defendants were personally offended by allegations of criminal conduct against their friend/wife/lawyer,[4] Melissa Meyers (¶26b); All of the City Defendants were hostile toward Plaintiff's continued persistence in requesting police intervention—after being told "it was a civil matter."

> ¶26(a) Plaintiff had persistently asked the Norton Shores Police Department to uphold the law and to discharge their statutory duties. This persistence was perceived as a challenge to the department's policy or custom of "not getting involved" when a custodial parent accuses the other custodial parent of a crime.

Plaintiff has also alleged that the actions of Sgt. Rhyndress where the result of an agreement between Mark Meyers, Daniel Shaw, Melissa Meyers and Officer Wasilewski—an agreement reached via "back-channel" communications instead of the formal dispatch mechanisms.

After Officer Wasilewski advised Plaintiff to check the Meyers' residence for signs of his children, Melissa and Mark Meyers were informed of the allegations which Plaintiff had raised. Mark Meyers called Chief Shaw who called Sgt. Rhyndress. None of this was documented through

---

[4] Melissa Meyers was also representing Sgt. Rhyndress in his own contentious divorce (¶7).

the official computer aided dispatch system.  The result of these discussions was the intervention by Sgt. Rhyndress, the complete denial of police services, an unwarranted "trespass warning" and threats that Plaintiff would be arrested if seen in the area (¶27). (see also PageID.32-33).[5]

In this case, the adverse actions which Plaintiff has alleged could not have occurred without joint action. Mark Meyers, Melissa Meyers, Chief Shaw, Sgt. Rhyndress all knew that the intervention by Rhyndress would deter Plaintiff from requesting any further assistance or investigation (¶29 at PageID.7).  The record of the state court proceedings clearly establishes that all of City Defendants were offended by Plaintiff's challenge to department practices and his allegations that a well-connected local attorney was engaging in criminal activity. If a citizen is explicitly advised that his petitioning activity is futile and threatened with arrest, the causal connection is inherently expressed and nothing more is needed.

Instead of addressing what Plaintiff has *actually alleged* regarding these events, the City sets forth a very selective listing of paraphrased allegations which purports to be "the *only* actual facts the plaintiff alleges against [the City]."  This listing distorts several material factual allegations and omits all mention of the risk factors to the children, domestic violence, and Plaintiff's reports that Melissa Meyers was engaged in criminal activity, and threats of arrest by Sgt. Rhyndress.[6]

---

[5] The sequence of these communications is reasonably well established in the transcripts of the state court proceedings, where each of these NSPD officers (and Mark Meyers) gave testimony.

[6] City's Brief: Once the conclusory assertions and subjective speculation are discounted *the only actual facts the plaintiff alleges against the Norton Shores defendants are these.*

  -The Norton Shores City Manager, Mark Meyers, is married to Melissa Meyers, the attorney who represented the plaintiff's ex-wife in the custody dispute.

  -Norton Shores Police Officer Michael Wasilewski had a personal relationship with Melissa Meyers.

  -Norton Shores Police Sergeant Matthew Rhyndress had a personal relationship with Melissa Meyers and Mark Meyers and was represented by Melissa Meyers in his own divorce proceedings.

  **-In July 2013 plaintiff requested assistance from the Norton Shores Police Department to recover his children from their mother (his ex-wife) but his request was refused.**

  -Wasileski and Rhyndress prepared police reports that contained false or inaccurate descriptions of plaintiff's conduct.  (ECF No.61, at PageID.438)

It is disingenuous for the City to assert that these are the "only actual facts the plaintiff alleges against the Norton Shores defendants" while leaving out critical factual allegations which are plainly acknowledged in this Court's recent Opinion (ECF No. 50, at p.2).  It appears that all of the City's omissions and misrepresentations of factual allegations pertain to those which would be most detrimental to the City's arguments (accepted as true and construed in Plaintiff's favor). Several pages later, the City misleads this Court in a similar manner (emphasis added):

> Here, plaintiff offers nothing more than conclusions and opinions to claim there was a meeting of the minds among the alleged conspirators.  **All plaintiff has alleged** is that a contentious custody dispute existed in which ***both parties went to the local law enforcement agency*** with complaints of criminal conduct.

(PageID.441) There simply was no dispute regarding the custody orders.  No one other than Plaintiff "went to the local law enforcement agency with complaints of criminal conduct."  There is no official record of anyone making any kind of complaint *against* Plaintiff at all.  The City's false narrative of a "he-said/she-said" situation is incompatible with departments own records, and could be more accurately characterized as the *opposite* of what Plaintiff has alleged.  The mother would not answer her phone for police—or anyone else (except Melissa Meyers).

(¶19) **Along with several other credible witnesses**, plaintiff offered substantial evidence indicating that his children were in danger due to a volatile domestic violence situation between the children's mother and her third husband (whom she had just left).

(¶20) Plaintiff, **and members of the mother's immediate family** expressed great concern that <u>the mother had been behaving erratically for several days, **had absconded with the children, and had hidden them away**</u> from plaintiff (their father) *<u>and all of her immediate family members.</u>*

(¶21) NSPD officers **reviewed** court orders regarding the mother's parenting time, **confirmed** the recent assaultive criminal history of the stepfather, **verified** the CPS substantiations for abuse and neglect in the mother's home, and reviewed the language of MCL 750.350a, which designated the mother's actions a felony**. All objective and verifiable sources of information demanded prompt action.**

(ECF No. 1-1, at PageID.31): The Norton Shores Police Department <u>had absolutely no reason to doubt the truth of what I was saying.</u>

(ECF No. 1-1, at PageID.34):  If Mr. Meyers—or anyone else- had offered some evidence to Chief Shaw which contradicted my allegations, <u>then this evidence should have been appropriately documented per Department policy.</u>

There was not any countervailing interests, disagreement over orders, or conflicting evidence. This is what makes the City's treatment of Plaintiff's complaint so egregious. The City wishes to avoid an adverse inference by way of these fabricated "allegations." Such an argument, if made in good faith, might be more appropriate on a different legal standard. However, on a Rule 12(c) challenge, it is especially egregious for the City to advise the Court that: (1) This is *what Plaintiff has alleged*; and (2) This is *ALL Plaintiff has alleged*.

The City's brief (at PageID.429) opens by acknowledges that "The Court has set forth a detailed recitation of the facts alleged in plaintiff's Complaint." The City has drawn quotes from various other portions of the 8/18/18 Opinion and is therefore without excuse for discarding the factual allegations identified by this Court regarding the same set of allegations:

> Rudd informed the NSPD that the situation was an abduction and not simply a "custody and parenting time dispute," and indicated that the children's stepfather had a history of assaultive behavior. Rudd reported that he had received text messages (presumably from his ex-wife) attempting to extort a more favorable custody agreement as a condition of returning the children. Rudd also reported that he believed that Melissa Meyers had assisted Rudd's ex-wife in the abduction in order to obtain a more favorable custody agreement. In spite of Rudd's pleas, NSPD personnel refused to take any action.

(8/8/18 Opinion, ECF No.50, at page 2, internal citations omitted). It is the moving party's burden to address what has actually been alleged and establish that no material disputes remain. The City has instead ignored central claims and relied upon conclusory rhetoric:

> "The only thread that connects the defendants is the fact that Mark Meyers, the City Manager, is married to Melissa Meyers. That gossamer string will not bear the weight of plaintiff's conspiracy theory." (City Brief, at PageID.440).

> "…plaintiff offers nothing more than conclusions and opinions to claim there was a meeting of the minds among the alleged conspirators. All plaintiff has alleged is that a contentious custody dispute existed in which both parties went to the local law enforcement agency with complaints of criminal conduct. The coincidental fact is that the attorney for one of the parties was the spouse of the City Manager. (City Brief, at PageID.441).

However, Plaintiff has stated a great number of factual allegations connecting the actions and intentions of various Defendants (while also showing shared retaliatory motive).

**While I was waiting** to hear back from Officer Wasilewski, City Manager **Mark Meyers contacted** the chief of Police directly **to make requests of his own**. *From that point on, NSPD did not follow statutory requirements*, department protocols, or internal procedure.

…The Norton Shores Police Department had no reason whatsoever to ignore my request for help. But *once the city manager **Mark Meyers made a call** to the police chief, the officers began to treat me very differently.* Instead of helping me ensure the safe return of my children, my efforts were hindered by the police.

(See ECF No. 1-1 at PageID.34).   The record of testimony and evidence in the state court proceedings will bear out these allegations more fully.  The City has never come forward with a plausible, non-retaliatory explanation for treating a legitimate emergency in this manner. The communications between City officials immediately *after* Plaintiff requested an investigation of Melissa Meyers are beyond dispute.  Plaintiff has alleged that Sgt. Rhyndress intervened as a product of these communications. (¶25-30, at PageID.6-7). Plaintiff's Complaint specifically alleges a shared objective to prevent any investigations or litigation pertaining to "Melissa Meyer's participation in her client's parental kidnapping, her assistance in drafting extortionate messages…" (¶113 at PageID.25).  Plaintiff has also alleged retaliatory animus by NSPD officers. Accepted as true, these allegations sufficiently establish plausible claims on the First Amendment Violations in July of 2013 and a running cover-up conspiracy thereafter.

### d.  Plaintiff's challenge to the ex parte PPO and his requests for exculpatory records from the City were also protected activity.

Plaintiff alleges (¶32 at PageID.7) that Melissa Meyers obtained an ex parte PPO by defrauding the court with false allegations and material omissions. Plaintiff challenged these claims by moving to terminate the ex parte Stalking/PPO[7] and by requested exculpatory records from the

---

[7]  In considering an ex parte application for stalking/ppo, the petitioner's claims are accepted as true. However, the statute requires that a respondent be afforded the opportunity for a name-clearing hearing before an unbiased decision-maker. The burden of proof is *supposed to* shift to the petitioner at this point. This is the process which Melissa Meyers and the City disrupted.

Norton Shores Police Department. Plaintiff sought these records to show that his conduct on had been lawful, appropriate, reasonable, and constitutionally protected activity. Plaintiff's efforts to clear his name in the state court proceedings (and his records requests from the City) were also activities protected by the First Amendment.  However, Melissa Meyers and the City Defendants took issue with these activities as well.[8] More adverse actions ensued.

Plaintiff alleges that Mark Meyers, Chief Shaw, Sgt. Rhyndress and Officer Wasilewski all knew that Plaintiff's petitioning activity reflected appropriate concern for the safety of children, and that Plaintiff did not pose a threat or danger to anyone—but they worked together to portray Plaintiff as a dangerous vigilante (¶¶33-34 at PageID.8; 107, 108, 115 at PageID.23-24; see also ECF No. 1-1, ¶¶3-8, at PageID.33).

By manipulating, altering, concealing, and/or destroying department records, the City made it possible for a false narrative of an exigent public safety concern to emerge. Plaintiff alleges incongruities between the documented actions of NSPD officers, and the narrative presented by officers at the request of Mark and Melissa Meyers (¶¶33-35).  These same incongruities provide context for Plaintiff's allegation regarding the improper LEIN disclosures authorized by Chief Shaw on 10/3/13. (E-mail attached as Declaration Exhibit A)  Chief Shaw and Mark Meyers were working on a legal strategy which could "portray plaintiff as a dangerous stalker." (¶36) They both were scheduled to testify on 10/8/13. Chief Shaw needed a believable (non-retaliatory) explanation for *why* Rhyndress was sent to threaten Plaintiff instead of help Plaintiff.

> 10/3/13 email to Mark Meyers and Officer Wasilewski (from Chief Daniel Shaw)
> Mark, I checked our CAD reports for the two responses to your home regarding Mr. Rudd. I see that Ofc. Wasilewski queried Mr. Rudd's vehicle thorugh LEIN, which automatically queries his record as well. Unfortunately, I can not see the results, so I do not know If the records indicate if he had a CPL or not. Sorry.
> Maybe Ofc. Wasilewski can respond if he recalls this information.          Dan

---

[8] It is undisputed that Melissa Meyers perceived Plaintiff's motion to Terminate the ex parte Stalking/PPO as an act of pure harassment (having no legitimate purpose).

(ECF No. 73-1.)  However, if Chief Shaw could testify that Plaintiff had a concealed pistol permit, that might provide a more plausible basis for Chief Shaw to be "concerned" by Plaintiff's "behavior" instead of being concerned that two missing children were in danger.  There was no way to find out if Plaintiff DID have a CPL *without revealing that the no one at the NSPD had cared one way or the other back in July.*  This is why Mark Meyers and Daniel Shaw wanted to know if Officer Wasilewski could (illegally) provide some *insight* on the matter—based on what Wasilewski remembered from running Plaintiff's records. Chief Shaw had no actual concerns about Plaintiff's behavior—and he had no right to commandeer government resources to find one.

> (¶34) The documented actions of NSPD officers and demonstrates they had ZERO concern that Plaintiff posed any risk to anyone.

If proven true, Plaintiff's allegations establish a calculated effort (by sworn law enforcement officers) to defraud the court in a manner that undermines protections for the people who really need personal protection orders.  There are numerous indicators in the state court records, that NSPD officers and City officials were offended by Plaintiff's continued requests for assistance—after Plaintiff had been told "this is a civil matter."  The City's recently filed brief also emphasizes a belief that a law enforcement agency may afford a different standard of care to crime reports if the department infers that "custody litigation" may have some tangential bearing on what is being reported.  Plaintiff has specifically alleged that this was the basis for adverse actions (¶26).  The City has not presented a plausible alternative explanation for the denial of police services in July of 2013, OR for deploying an extraordinary police presence in subsequent months—to support the favored side of *legal proceedings which actually were* "a civil matter." [9]

---

[9] Plaintiff's 7/20/15 Citizen Complaint: "It is a telling contrast that the NSPD expended so much effort to assist the City Manager when he asked for help regarding a car parked across the street from his home - but so little effort to facilitate the safety of my children who were caught in the middle of a dangerous domestic violence situation." (¶7, at PageID.33).

### e. The City's participation in the Stalking/PPO litigation and spoliation of evidence constituted adverse actions against Plaintiff.

As it pertains to Plaintiff's First Amendment claims, Plaintiff does not have to establish that the conduct of the City officials rose to the level of independently actionable constitutional violations. "[A]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir.1998).   If the City's actions were motivated, even in part, by Plaintiff's petitioning activity, Plaintiff need only establish that the City's adverse actions would be capable of chilling a person's resolve to continue their petitioning activity.

> In *Bart v. Telford*, 677 F.2d 622 (7th Cir.1982), for example, a city employee in the mayor's office ran in an election against the incumbent mayor. Upon the employee's return to the mayor's office after losing the election, her co-workers, including the mayor, began harassing her. She consequently brought a retaliation claim under § 1983. The employee alleged, among other things, that she was harassed for bringing a birthday cake to work on a co-worker's birthday, even though the office generally encouraged this type of behavior. While noting that many of the employee's claims of harassment seemed trivial, the Seventh Circuit observed that "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." Id. at 625.

*Bloch* at 679-680.[10]   Also, citing to *Bloch,* this Court has held in *Fritz v. Charter Township of Comstock*, 592 F.3d 718 (6th Cir. 2010), that adverse actions are more likely to be held actionable where a government actor impugns the character of a private individual—because that individual has engaged in constitutionally protected activity. *Id*. at 727.   The barrage of false inference and dilatory tactics overwhelmed and frustrated the state court, causing the judge to terminate the proceedings before hearing all the evidence or closing arguments (¶39).[11]

---

[10] *Bloch* also cites to *Barrett v. Harrington*, 130 F.3d 246 (6th Cir.1997) (affirming a denial of summary judgment on qualified immunity grounds when a judge retaliated against a "disgruntled litigant" by attempting to embarrass him with claims that he was a "stalker")

[11] See also *Paige v. Coyner,* 614 F.3d 273, 281-82 (6th Cir. 2010) (holding state actor could be liable for retaliation for making false statements to plaintiff's employer causing her to be fired); *Sykes v. Anderson*, 625 F.3d 294, 311-12 (6th Cir. 2010) (applying the cat's paw theory of liability to a First Amendment retaliation clame).

Although the judge would later deem this ruling to be a determination on the merits, which was favorable to Plaintiff (See PageID.564-565); Plaintiff was still deprived of his right to a proper name-clearing hearing. In addition to substantial reputational damage (before the same Judge making custody rulings), the long-term adverse effects of an unjustified PPO could not be addressed through any adequate state court remedy.[12] If Plaintiff's allegations are proven to be true, a jury could certainly find that any one of these acts in isolation might cause a person to think twice before bringing a complaint to the NSPD (especially if complaining against a well-connected individual). The Court must also consider the <u>cumulative</u> chilling effect of the actions in total.

## II.   Plaintiff's Protected Conduct in 2015, also resulted in Adverse Actions by the City.

Plaintiff **submitted an official written complaint** in July of 2015 (7/20/15 Citizen Complaint). At Chief Gale's initiation, **Plaintiff discussed the complaint** in an hour-long interview on 7/23/15 in Chief Gale's office (¶53). Plaintiff fully relied on Chief Gale's expressions of sincere concern and empathy.

> Chief Gale thanked plaintiff for coming forward with these concerns and repeatedly emphasized his awareness that abusive litigation tactics in family court can be devastating. Chief Gale went out of his way relate that his own best friend had recently been made the target of scheme to obtain a fraudulent PPO against him for ulterior purposes. Chief Gale indicated that the PPO had been obtained through false testimony with devastating consequences for his friend. Chief Gale believed that his friend would probably lose "everything."

> Chief Gale assured plaintiff that he would conduct a fair and thorough investigation of any internal policy violations by NSPD officers who were still employed by the city.

> Regarding the portions of plaintiffs complaint which alleged criminal acts (i.e. destruction/concealment of evidence, unauthorized disclosure of LEIN information for the PPO litigation, cover-ups, extortion, etc..) Chief Gale advised that these matters would need to be independently investigated by someone from the Michigan State Police who did not "know anybody" from the Norton Shores Police Department. Chief Gale offered to make these arrangements to ensure that it would be performed objectively.

---

[12] Until a recent Michigan Supreme Court ruling, ex parte PPO's have largely been considered un-appealable because they expire before the appeal is complete rendering the controversy moot. See MSC Opinion in *TM v. MZ*, No. 155398 (Mich. May 18, 2018)

(¶53(b)(d)(d), at PageID.13-14).   At Chief Gale's suggestion, **Plaintiff submitted FOIA** requests to the City and engaged in two lengthy **phone interviews with F/Lt Chris McIntire** of the Michigan State Police.  When Plaintiff started receiving new threats from Melissa Meyers, Plaintiff immediately **forwarded these messages to Chief Gale, expressing his concern** that the retaliation was starting all over again (¶¶59-68 at PageID.15-16).  Unbeknownst to Plaintiff, Chief Gale had never been conducting an investigation, but had been communicating and working closely with Mark and Melissa Meyers the entire time (¶¶54, 55, 57, 67, 68).   After realizing that he had been manipulated by Chief Gale, and also finding out the that the City had proceeded to entered a Stalking/PPO entry into LEIN (without a court order), Plaintiff **sought declaratory/injunctive relief** in the state court (¶79, ¶84).

*Each and every one of these (bolded) actions*, which are described in this section, constitute protected conduct.  However, *each and every one of these same actions* would later be identified in court filings by the Bolhouse Defendants—and described as the basis for finding Plaintiff in criminal contempt (and in violation of the Stalking statute).

In perfect synchronization with the City's 11/5/17 "Cease and Desist Letter" Melissa Meyers and the Bolhouse Defendants initiated criminal contempt proceedings and asked the state court to issue around $5000 in fines and incarcerate Plaintiff for at least 30 days (felony charges likely to follow a successful contempt ruling). Based on the overwhelming content of these filings, there can be no doubt that the adverse actions orchestrated in November of 2015 were motivated, at least in part, by Plaintiff's petitioning activity.

City Officials were simultaneously expressing their umbrage toward Plaintiff's petitioning activity through their actions and inactions (see next sections). When the subtle attempts at suppression proved ineffective, the City adopted more direct methods.  Ultimately, the City plainly expressed their resolve to take "whatever action is legally necessary" in a Cease and Desist Letter which directly addressed Plaintiff's complaints against NSPD officers and City officials (¶88).

These are not isolated, disconnected, or off-handed remarks. The various Defendants persistently expressed their profound animus toward Plaintiff's criticisms of City officials and police officers. Many of these statements include threats of adverse action against Plaintiff. The temporal proximity speaks volumes throughout the course of these events. Just a few days after Plaintiff met with Chief Gale, Ms. Meyers began communicating threats to have Plaintiff arrested at Norton Shores soccer events (7/28/15 e-mail described at PageID.16):

> (¶66) The message repeatedly conveys that Melissa Meyers is primarily motivated by the fact that plaintiff had complained to the Norton Shores Police Department on 7/20/15:
>
> > "Mr. Rudd has recently brought up issues from the past involving the events surrounding the issuance of my PPO against Mr. Rudd. He has made false, defamatory comments again about myself and my husband in a clear attempt to get my husband, the former police chief and Norton Shores Police Department into some sort trouble. In doing so he has renewed my concerns about his behavior and intent with regard to myself, my children and my husband."
>
> (¶67) The message is clear: Plaintiff must drop his complaint with the NSPD or risk an arrest every time he brings his children to a soccer event in Norton Shores.
>
> > "...I certainly do not want my family subjected to police involvement, however, if we do not figure out some sort of solution immediately, I am afraid that is exactly what will occur."

The statements in this e-mail (ECF No. 73-2), along with many others, establish the link between Plaintiff's protected activity and the subsequent adverse actions. The same message also supports the inference of joint activity. Ms. Meyers demonstrates specific knowledge of Plaintiff's complaint and conversations with Chief Gale. This knowledge could only have come from Chief Gale, in violation of the City's strict policy of keeping Citizen Complaints confidential (¶55 at PageID.14; see also ECF No. 1-1 at PageID.37-38). The 7/28/15 correspondence from Ms. Meyers further notes that "It has been brought to my attention that the continuance of the PPO was not recorded on Lien (sic) due to the fact that the proper form was never submitted to Judge Pittman." This raises a plausible inference that someone at the Norton Shores Police Department checked the LEIN database and informed Melissa Meyers that her ex parte PPO against Plaintiff had expired on 2/1/14. Both of these disclosures constitute clear violations of department policy.

### a.   The City's unorthodox handling of Plaintiff's 7/20/15 Citizen Complaint constitutes adverse actions against Plaintiff.

Plaintiff has alleged that Chief Gale put Mark Meyers, Melissa Meyers, and Daniel Shaw (all civilians) on notice of Plaintiff's allegations immediately after receiving Plaintiff's complaint (¶¶54-57 at PageID.14).  This was before he had any opportunity to discuss the matter with Plaintiff or investigate anything (¶54, ¶57) which "precluded any opportunity for a meaningful investigation to occur." (¶55.)  Chief Gale's departure from established department policy also made it possible for Mark Meyers and Melissa Meyers to set their retaliatory schemes in motion (¶57). On 7/23/15, Plaintiff met with Chief Gale.  During the interview Plaintiff disclosed his fears of retaliatory action by NSPD officers at soccer events. Plaintiff specifically described how beneficial it had been for his children to play on their specific soccer team for the past several years.  Just a few days after this conversation, Mark and Melissa Meyers attempted to stage a sham "PPO/violation" at a crowded beach soccer tournament where Plaintiff was coaching his children's' team (¶¶57-60).  Plaintiff's children had been playing for the same team (and attending this same tournament) for several years.  The email from Melissa Meyers on 7/28/15 was the very first hint of any problem.

> (¶58) Although plaintiff never saw Melissa Meyers or any of her family members at this crowded tournament and never had any credible reason to believe that Melissa Meyers was present, Melissa Meyers claimed that plaintiff's presence at the tournament constituted deliberate "unconsented contact" and the basis for a fresh batch of hysterical allegations against plaintiff.

In the same email, Melissa Meyers began threatening adverse police action against Plaintiff at any future soccer practice or game which occurred in Norton Shores.  The threats were credible because of what had occurred in 2013.

> (¶59) On 7/28/15, Melissa Meyers contacted plaintiff's attorney and alleged a criminal violation of the PPO (which had expired approximately 18 months prior).
>
> > "Upon seeing Mr. Rudd, Mr. Rudd was immediately informed of my presence and that of my family. However, rather than leaving in compliance with the PPO, Mr. Rudd chose to stay."

(¶60) This claim was absolutely baseless in every way. Among other inconsistencies, Melissa Meyers has never provided any explanation for why she did not contact plaintiff's lawyer before the tournament and work out a solution.

(¶61) The e-mail conveyed that Melissa Meyers and her client intended to create a similar situation at any future soccer events where there "is even a remote possibility" of Attorney Meyers being present.

(¶62) The e-mail to plaintiff's attorney also emphasizes the possibility that Melissa Meyers may have to put plaintiff's children "through the trauma of police interaction because Mr. Rudd is non-compliant with the PPO."

(¶63) Melissa Meyers arranged for her client to also send plaintiff messages threatening Norton Shores Police action at the children's soccer events.

### b. Chief Gale's continued disclosures constitute adverse acts which also demonstrate joint action.

Based on Chief Gales representations during their 7/23/15 meeting, Plaintiff, naively assumed that Chief Gale had been investigating the 7/20/15 Citizen complaint, and word of the investigation must have been leaked back to Mark Meyers & Melissa Meyers.

Plaintiff wanted Chief Gale to be aware that similar plans to retaliate appeared to be in progress AND plaintiff hoped that Chief Gale would take measures to prevent NSPD officers from showing up at a soccer practice to effectuate the bidding of Melissa Meyers.

**Plaintiff's 7/28/15 Messages to Chief Gale stated:**

> I wanted to make you aware that Attorney Meyers launched a whole new set of allegations against me today. In a lengthy e-mail to my attorney, she specifically mentions the complaint which I brought to you.

> I also received an e-mail from my children's mother this morning which suggested that that I no longer attend my children's home games and that I find someone else to bring the children to practice. She stated very clearly that Attorney Meyers intends to call the police and request that I be arrested if she sees me at any of these soccer events. Much of what she claims is either false or presented in a misleading way. I hope you can understand some of the apprehension I have felt over the past several years.

> To be on the safe side, I have already made arrangements for someone else to bring my kids to practice this week. But I have been involved with coaching and volunteering with Sailor Soccer and Storm Soccer for many years. I have never missed one of my boys' games and I will be working hard to get some resolution on this soon.

> This is not the first time I have been the subject of these kind of false accusations from Attorney Meyers.  I also, I am learning that I am by no means the only person she has subjected to these type of tactics. The previous false accusations are well documented.  I have nothing to hide and I am willing to make my life an open book to any police agency.

Chief Gale did not offer any assurances regarding these threats.  However, the next day Chief Gale sent an email with F/Lt. McIntire's contact information, and a cursory notification that his investigation was closed. "If you wish if you wish to pursue a complaint against the Norton Shores city staff.  Lt. McIntire is the region commander and will speak to you regarding any issue with our city." As to Plaintiff's allegations of corruption, cover-ups, falsification of evidence and retaliation, Chief Gale advised:

> I have reviewed police reports regarding your complaint and spoken with the officers involved. The police officers you requested to speak with will not be subject to questioning by you regarding this civil matter.  They have written official police reports and have testified in court under oath.  This civil matter is closed and will need to be handled in civil court if you wish.

The "closure" of Plaintiff's complaint, without any substantial effort to either validate or refute the serious allegations, was a jarring revelation for Plaintiff based on the representations Chief Gale had made during their 7/23/15.   Over time the next several days, Chief Gale's silence regarding Melissa Meyer's threats of police involvement would confirm that her knowledge of Plaintiff's Complaint and communications was no accident. Plaintiff had naively provided Chief Gale with a *retaliation roadmap* and Chief Gale was making sure that Mark and Melissa Meyers could make good use of it.   While Chief Gale never responded to Plaintiff's 7/28/15 concerns regarding renewed threats of retaliation, *he did provide a copy of it to Melissa Meyers* (¶¶68-69 at PageId.16):

> ¶68) Plaintiff reported this extortion attempt to Chief Gale. Chief Gale relayed that information to Melissa Meyers.

> ¶69) On 7/30/15, Melissa Meyers responded with another message to Plaintiff's attorney regarding Plaintiff's failure to comply with her demands. This message also concludes with an ominous threat: **"Additionally, I will be taking any/all necessary steps to ensure Mr. Rudd's compliance"**

Initially, Chief Gale had gone to great lengths in his efforts to earn Plaintiff's trust with sincere expressions of empathy and concern (¶53b).  However, by 7/29/15, City officials had discussed the matter at length and decided to silence Plaintiff through the Stalking/PPO litigation (¶¶114, 115, 122, 124).  At this point there was no longer any need to maintain the pretense that Chief Gale was investigating Plaintiff's concerns.  From 7/29/15 forward, City officials *wanted* Plaintiff to realize that he had been manipulated during the 7/23/15 interview in Chief Gale's office.  They wanted Plaintiff to realize that the "planned ambush" at the soccer tournament could only have been accomplished with Chief Gale's assistance (in violation of a strict confidentiality policy).  They wanted Plaintiff to realize that Melissa Meyers could make extortionate threats because the City would indemnify her.  These realizations were intended to deter Plaintiff from taking his complaints any further.   City officials knew that once Plaintiff came to realize that he had been manipulated by Chief Gale's from the beginning—the arbitrary handling of Plaintiff's Citizen Complaint would cause Plaintiff to question whether or not he should seek help from any other government agency.

This analysis does not require speculation or conjecture.  According to Chief Gale's sworn affidavit (attached to Plaintiff's complaint (PageID.37-38), the policy of keeping Citizen Complaints confidential is based on the Chief Gale's understanding that to do otherwise would chill petitioning activity.  According to the City, every other Citizen Complaint has been subject to the policy and kept under lock and key in the Chief's office. This policy covers the complaint itself, and extends to all records associated with that investigation. The City has not offered any explanation of why this policy would not apply (more than ever) to citizen complaint which alleged constitutional violations, a cover-up and retaliation. However, in this one instance, Chief Gale promptly disclosed the Complaint itself, all subsequent communications, and even the recording of Chief Gale's interview with Plaintiff to the individuals who had been accused of retaliating.

Chief Gale knew or should have known that the information would trigger further retaliation. He absolutely <u>did know</u> this was occurring by 7/28/15 at the latest (¶¶74,75). It is difficult to imagine a more chilling way to handle the citizen complaint process, than what occurred here. Based on the statements made by Chief Gale himself, it is difficult to imagine that this was not the intent.

### c.  The unauthorized LEIN entry against Plaintiff was an adverse act.

In order to provide expedient protection to vulnerable individuals, Michigan has a mechanism which allows law enforcement officers to confirm the existence of an active Stalking/PPO in the LEIN database and effectuate an immediate warrantless arrest on a respondent who is reported to be in violation. To ensure the safety of arresting officers and prevent unwarranted arrests, there are strict safeguards which regulate the entry of these orders into the LEIN database. The order must be signed by a judge, must clearly state what type of behaviors are enjoined, and how long the injunction will last (expiration date). LEIN entry is absolutely prohibited if any of these elements are missing from a document which purports to be a restraining order.

Chief Gale was fully aware that the ex parte PPO obtained by Melissa Meyers in July of 2013 had expired on February 1, 2014 (¶64). At the very latest, Chief Gale became aware that Melissa Meyers was attempting to obtain a court order authorizing LEIN entry on 7/28/15 when he received a copy of the message Ms. Meyers had sent (forwarded by Plaintiff).

Plaintiff's Complaint alleges that the state court **never** ordered or even contemplated an extension of the 6-month ex parte PPO Melissa Meyers had obtained from the judge on duty. Instead, Judge Pittman ruled that he would allow it to continue for a brief period of time (as a prophylactic measure) and then terminate it early (¶39). This matter is discussed more fully in the state court filings (See Exhibit C, PageID.533-537, 553-560). However, the same rulings are referenced in Plaintiff's complaint (¶¶42-43 at PageID.10).

(¶42) In January of 2014, Melissa Meyers sued plaintiff for costs/sanctions, claiming that plaintiff had offered perjured testimony and moved to terminate the PPO for the sole purpose of harassing Melissa Meyers. This also was completely frivolous.

(¶43) The court rejected these claims (1/23/14) and found in plaintiff's favor:

> **THE COURT**: Well, I think by virtue of the decision that this Court reached, and whether you agree or not, that's certainly your prerogative, but by virtue of simply the idea that the term of the order was modified indicates that there was some arguable merit. That I made a decision based upon that merit to shorten the term of the PPO's existence... Mr. Rudd did receive some relief as he was seeking here. There was a modification. Of course you have the right to disagree that I was correct in finding that merit, but I have not heard that argument."

The Interlocutory Order entered on 12/17/13 (ECF No. 53-2) is admittedly ambiguous when read in isolation from the statutory requirements which govern issuance, continuation, extension and termination of Personal Protection Orders under Michigan law. However, that ambiguity is easily resolved by a review of the transcripts which contain the rulings made by the state court. The claim that this order reflects a ruling to indefinitely extend the 7/21/13 ex parte PPO[13] is completely false and absolutely incompatible the record of the state court proceedings. (Exhibit C, ECF No. 73-3)

The state court filings in August of 2015, also establish that Melissa Meyer and the Bolhouse Defendants knew that the interlocutory order, entered on 12/17/2013, did not authorize any police department to make an entry (or modify an entry) in the LEIN Database. Ms. McLean establishes this beyond dispute in her state court filings. Although her 7/31/15 "Motion For Nunc Pro Tunc Order To Bring Personal Protection Order Into Compliance With MCR 3.706" is egregiously misleading in many respects, it does correctly acknowledge that the 12/17/13 Interlocutory Order does not contain "the information necessary pursuant to MCR 3.706" and "is not in an approved form accepted for Placement on LEIN as required by 3.706." It is reasonable to infer that Ms. Meyers and Ms. Mclean had already asked Chief Gale to enter a Stalking/PPO against Plaintiff based on this order.

---

[13] Both Ms. Meyers and the Bolhouse Defendants assert this verifiably false claim in their respective briefs (PageID.402; PageID.360): "Plaintiff subsequently moved to have the Personal Protection Order set aside or terminated. Rather than terminate the Personal Protection Order, Judge Pittman extended it indefinitely."

21

Any police officer who had been trained on LEIN policy would fully agree with Ms. McLean's original position (7/31/15) that the 12/17/13 Order could not authorize a LEIN entry. The only thing that changed over the next month was the City's willingness to bend the rules:

> (¶76) Chief Gale, Attorney McLean, Attorney Meyers, and the NSPD LEIN operator where all fully aware of the statutory requirements for entering a stalking/ppo record into the LEIN database. That is why defendants Mclean and Meyers submitted a petition to Judge Pittman asking for such an order to be entered.

> (¶77) Both of Michelle McLean's motions provided a proposed order which included the required components. They requested that Judge Pittman would immediately enter the order because this was the only way that such an entry could be permitted.

> (¶78) However, the department decided to bypass this due process protection shortly after plaintiff submitted a FOIA request to the Norton Shores Police Department seeking documents which pertained to his 7/20/15 complaint. (8/25/15)

> (¶79) A few days later (8/28/15), the Norton Shore Police Department decided to enter the stalking/PPO record into the LEIN database without a valid court order.

The City's unauthorized modification of the LEIN database was, in effect, similar to forging a warrant for Plaintiff's arrest and entering into LEIN. All the Defendants knew that an authorizing order had been requested (twice) and the state court Judge had declined to sign it. Accepting Plaintiff's allegations as true, this act constitutes an independent constitutional violation. However, under the First Amendment framework—and in light of the totality of circumstances—the City's action easily qualifies as an adverse action. The City attempts to gloss over these factual allegations by presenting a misleading paraphrase of *what Plaintiff has alleged* in his complaint (ECF No.61, PageID.439):

- Following the meeting Chief Gale provided a copy of plaintiff's written complaint to Mark Meyers, Melissa Meyers and Dan Shaw.
- **Attorney Michelle McLean obtained a PPO against plaintiff on behalf of Melissa Meyers.**
- **The Norton Shores Police Department entered the PPO into the LEIN.**
- On November 5, 2015 the City Attorney sent plaintiff an e-mail expressing concern about plaintiff's behavior toward Mark Meyers and stating "we will take whatever action is legally necessary to protect the professional and privacy rights of Mr. Meyers."…

This is a serious misrepresentation *of Plaintiff's pleadings* which impacts an issue at the center of the controversy.[14] In purely unchoreographed fashion, Ms. Meyers and the Bolhouse Defendants offer a very similar distortion.  However, neither of these defendants have offered anything to overcome the barrier which Plaintiff identified in his original complaint (¶76). The Bolhouse Defendants obviously knew that the 12/17/13 order did not meet the criteria set forth in MCR 3.706. Otherwise, they would not have made two requests for a new order (by way of a motion that plainly described the deficiency).  No one has explained what changed between 7/31/15 and 8/28/15 when suddenly the very same order DID meet the criteria for LEIN entry.

Based on the sequence of events, and the flow of information between the City and Ms. Meyers; it can be reasonably inferred that Chief Gale originally refused to modify the LEIN database based on the 12/17/13 Interlocutory Order.  However, as it became clear that the state court was unlikely to issue the order proposed by Ms. McLean's order, and as Plaintiff persisted in his protected conduct (including FOIA requests, ¶78), Chief Gale changed his position. Michelle McLean then <u>unilaterally</u> cancelled[15] the state court hearing which had been set on the matter to ensure there would be no judicial review.

The City officials, Melissa Meyers, and the Bolhouse Defendants all knew that Plaintiff would receive notice of the entry by the Michigan State Police (see ¶81) and knew that this would escalate the fears of retaliatory police action which Plaintiff had described to Chief Gale on 7/20/15, 7/23/2015, and 7/28/2015.

---

[14] Plaintiff immediately notified counsel of the error by e-mail and mailed a draft of a Rule 11 motion (9/21/18). Counsel for the City declined to remedy the matter.

[15] Plaintiff respectfully clarifies that the hearing on Ms. Mclean's motion for an order authorizing LEIN entry was <u>not</u> cancelled by mutual agreement. This is an understandable assumption, stated in this Court's 8/8/18 Opinion ("Meyers thereafter contacted Rudd's attorney and requested that the hearing regarding the PPO be cancelled because Meyers was withdrawing her request. Rudd apparently agreed to do so…") (p.5, ECF No.50.)  However, it is standard practice in this particular state court to immediately remove a hearing from the docket if the moving party withdraws their motion (even if the other party has raised their own issues in response).  In this case, the hearing was removed from the docket before Plaintiff's attorney was given notice.

The temporal proximity of these events, in the context of statements made by Ms. Meyers and the Bolhouse Defendants, creates a strong inference that the unauthorized LEIN entry against Plaintiff was motivated, at least in part by Plaintiff's petitioning activity.  The inference of a joint agreement between the private parties and the City officials is also well supported. If there had formerly been any doubt in Plaintiff's mind, it was now clear that the threats of police action against Plaintiff—although made by a private actor (Melissa Meyers)—were fully cloaked in the power of governmental authority.  Plaintiff's allegations also foreclose the possibility that this was simply a good-faith clerical error by the NSPD, which just happened to evade supervisory review.

> (¶82) Plaintiff immediately contacted the Norton Shores Police Department advising that the 14th Circuit Court had certainly not authorized the entry of such an order in spite of numerous requests. Plaintiff explained the circumstances and was assured that these concerns would be immediately reviewed by Chief Gale.  (¶83) Chief Gale did not take any corrective action.

Importantly, the City maintained the improper LEIN entry for approximately six months until they were served with a court order directing them to remove the entry (¶105).  During that period of time, the City would have had numerous opportunities to remedy this error.  If proven true, the City's actions amount to an inexcusable and malicious abuse of governmental power.  Unless the City can come forward with a plausible (and verifiable) explanation, this may be an issue which warrants judgement on the pleadings in Plaintiff's favor.

### d.  The City's 11/5/15 Cease & Desist Letter was an adverse act.

On 10/20/2015, plaintiff filed a motion in the circuit court seeking a declaratory ruling regarding the unauthorized entry of a Stalking/PPO record in the LEIN database and the corresponding false allegations harassment/stalking/PPO violations (¶84, PageID.19; see also Dec. Exhibit C).  Plaintiff could no longer afford representation at this point, but had been advised by his attorneys to prioritize removal of the unauthorized LEIN entry before pursuing any other legal remedies.  Once again, Plaintiff's petitioning activity was offensive to City officials and the private

party Defendants. Shortly thereafter, and in perfect synchronization, the Bolhouse Defendants

initiated the prosecution of criminal contempt proceedings and City Attorney Doug Hughes sent a

letter to Plaintiff.

---

¶88) Plaintiff received Judge Pittman's order [authorizing] criminal contempt proceedings on 11/5/15.  On the same day, Attorney Douglas Hughes and his staff began sending plaintiff numerous copies of a threatening letter (emphasis added):

RE: Mark Meyers

Dear Mr. Rudd

This office represents the City of Norton Shores. **Their Mayor has asked us to monitor your conduct and behavior as it relates to the employment of Mark Meyers** as the City Administrator for the City of Norton Shores.

We have information that leads us to believe that you have made serious defamatory and disparaging remarks about Mr. Meyers, as well as other members of the Norton Shores Police Department.
**Please treat this letter as notice to you that we will take whatever action is legally necessary to protect the professional and privacy rights of Mr. Meyers.**
You are to cease and desist from any further contact or conversation with him.
**Also be mindful that the statements you make to others about Mr. Meyers.** [sic]
If you have had hired legal counsel, please make a copy of this letter and give it to that individual and instruct him to contact me.

Sincerely, Douglas M. Hughes, City Attorney for the City of Norton Shores

---

(PageID.19-22) Plaintiff's complaint alleges that this letter fit within a calculated plan to silence

Plaintiff's petitioning activity through a coordinated sequence of actions: **(1)** <u>**11/4/15**</u> The

Bolhouse Defendants initiate criminal contempt proceedings against Plaintiff (¶¶86-87);

**(2)** <u>**11/5/15**</u> Plaintiff receives *choreographed* correspondence from the City, placing him on notice

that the full force of governmental resources and influence will support the efforts to have him

incarcerated for *at least* 30 days.[16] (¶¶88-91); **(3)** <u>**11/9/15**</u> Attorneys Baar and McLean step in with

last minute threats of incarceration and an offer to *defer contempt charges* **if** Plaintiff agrees to

drop all complaints against the City, Mark Meyers, and Melissa Meyers. (¶¶93-100).

---

[16] The contempt filings are very obviously drafted to establish the basis for a felony conviction under MCL 750.411i (Aggravated Stalking), criminal proceedings under this statute often immediately follow an adjudication of contempt on PPO violations. See discussion by this Court (1:04-cv-00249 ECF Nos. 31, 37).

If all else failed, the City officials and Bolhouse Defendants planned to make sure Plaintiff could not be heard regarding the unauthorized LEIN entry or other declaratory relief—which is just what occurred (PageID.582-587).

Once again, the inference of joint action and shared objectives is unavoidable. The common animus toward Plaintiff's petitioning activity is plainly stated in the letter sent by Doug Hughes and the contempt filings authored by the Bolhouse Defendants:

| 11/5/15 Letter From the City | 11/4/15 Bolhouse Def. Contempt Filings |
|---|---|
| Dear Mr. Rudd, This office represents the City of Norton Shores. Their Mayor has asked us to monitor your conduct and behavior **as it relates to the employment of Mark Meyers** as the City Administrator for the City of Norton Shores. | Respondents **interference with Petitioner's husband's employment** and defamatory, disparaging and slanderous comments about Petitioner and her husband, **City Manager, Mark Meyers** to the Police Chief on July 23, 2015 **is a violation of Petitioner's PPO.** |
| We have information that leads us to believe that you have made serious **defamatory and disparaging remarks about Mr. Meyers as well as other members of the Norton Shores Police Department.** | On 7/20/15 Respondent begin anew his pattern of harassment of Petitioner and her family by filing a frivolous complaint with the Norton Shores Police Chief alleging criminal, unethical and civil violations perpetrated by by the Norton Shores City Manager and Petitioner's husband, Mark Meyers, Police Chief, Dan Shaw, Sargent Matt Rhyndress, and Officer Wasilewski. |
| Also be mindful that the statements you make to others about Mr. Meyers. | …Respondent remains undeterred by these two respected [agency] findings and **continues his investigative harassment** still to date |
| Please treat this letter as notice to you that <u>we will take whatever action is legally necessary</u> to protect the professional and privacy rights of Mr. Meyers. | Respondents pattern of continued unconsented contacts and harassment must be stopped. It is clear from Respondents actions that Respondent will only respond to this Courts contempt powers. |
| You are to cease and desist from any further contact or conversation with him. | Respondent must further be enjoined from writing, communicating slanderous, defamatory, libelous, disparaging comments and statements about Petitioner and any member of her family to other individuals |

III.  **Statements made by the private party Defendants and the City Defendants establish shared retaliatory motivations, common objectives, and joint participation.**

All three of the Defendant's dispositive briefs deny any connection between the criminal contempt proceedings and Plaintiff's petitioning activity.   All three also assert that Plaintiff has failed to plead facts which support the inference of joint action.

  a. **Allusions to the "Custody Proceedings" are unfounded pretext.**

The City claims (emphasis added):

> Simply put, while the plaintiff's Complaint is littered with a plethora of speculation, innuendo and subjective musings, **nowhere is there a single factual allegation showing the defendants agreed to "a single plan"** to retaliate against plaintiff or that the defendants "shared the same general conspiratorial objective." In spite of the fact that *this entire litigation arises from a state court child custody dispute, plaintiff completely disregards that as the basis for his interactions with Attorneys Meyers, McLain and Baar.* Instead, plaintiff attributes "a single plan" to these attorneys and the Norton Shores defendants to retaliate against him for exercising his First Amendment rights. **The hubris this exhibits is stunning.**

But the City does not explain <u>how</u> Plaintiff's "interactions" with these attorneys could possibly have any relation to Plaintiff's custody proceedings.   There is no portion of the voluminous contempt filings which supports this premise.   Shortly after the first criminal contempt hearing, the Noncustodial Mother asked Ms. Meyers and Ms. McLean to withdraw from representing her in the custody proceedings.[17]   Ms. Meyers and the Bolhouse Defendants do not identify any specific custody related motivation for their actions.   They generally claim that all actions taken against Plaintiff were lawful and necessary *because* Plaintiff was an "obsessive" and "erratic" opposing party who had grown "disgruntled" by adverse custody rulings.   These descriptions of Plaintiff are repeated like a mantra without any factual support (See PageID.400 at ¶3):

> "Plaintiff's allegations are more congruent with a disgruntled respondent and/or party in a pending family law matter who is unhappy with the findings and holdings of the presiding court."

---

[17] When the court appointed therapists became aware of the attempt to have Plaintiff arrested at the soccer tournament they urged the Noncustodial Mother to find new counsel.

Plaintiff has alleged that the family court rulings overwhelmingly favored Plaintiff (¶¶2, 43-49).  Although the Stalking/PPO proceedings were adjourned before the full presentation of evidence (¶39), Plaintiff also received a favorable modification of the PPO, based on the merits of his motion to terminate (¶¶42-43). At this stage Plaintiff's factual allegations must be accepted as true, however Plaintiff has also cited specific rulings from the record of the state court proceedings. Defendants have not presented anything from the record which persuasively refutes these claims. Ms. Meyers spent several years attempting to persuade the family court judge to accept a narrative similar to what is presented now (¶4).  Ms. Meyers "hand-picked" a reputable custody evaluator and successfully urged the judge to order an exhaustive six-month evaluation—which included extensive psychological testing and collateral contacts (¶45).  This was one of many evaluations by objective experts which occurred as part of the custody proceedings.  All of these experts consistently made findings which were favorable to Plaintiff. It is not often that a petition to modify a 50/50 joint custody arrangement results in an award of sole legal and sole physical custody to the father (¶49).  Protracted custody litigation tends to expose whatever "dirt" can be dug up regarding an litigant's character and honesty.  Plaintiff was examined under oath by Ms. Meyers and Ms. McLean several times and also subjected to invasive discovery requests. There are more than a thousand pages of transcripts alone in the custody proceedings and a substantially larger number of documents and records disclosed through the state court litigation.  The Defendants have access to all of this yet have not come forward with anything to contradict Plaintiff's claim:

> "The record of those proceedings unequivocally demonstrates that plaintiff has acted in good faith and for the benefit of his children at all times. No evidentiary findings suggest otherwise."  (¶2)

All three Defendants rely heavily on the fact that Plaintiff was involved in custody proceedings, but none of the Defendants explain why those circumstances justify any of the acts or omissions which are alleged in this suit.

If the custody proceedings **did** have any bearing on the issues raised in this lawsuit, it would only be to underscore the severity of the Defendant's misconduct—because: (1) The Defendant's intentionally sought out an opportunity to injure Plaintiff in a forum where reputational damage would inflict a greater injury upon Plaintiff; [18] and (2)  All of the Defendants had access  and opportunity to review an extensive body of objective professional findings which unequivocally established Plaintiff's credibility and good-faith.  None of the Defendants have identified evidence from the state court proceedings which would tend to support the suggestion that Plaintiff ever has, or ever would, engage in any form of harassing conduct.

There is absolutely no basis to support the idea that Plaintiff engaged in petitioning activity because he was disgruntled by (favorable) family court rulings.  However, even if that were the case, Plaintiff's motivation for engaging in protected conduct is not the question.  At this stage in the pleadings, Plaintiff must only establish a basis for the inference that his Defendants were motivated, at least in part, by Plaintiff's petitioning activity.

### b. Def. Melissa Meyers was "reacting" to Plaintiff's protected conduct.

Ms. Meyers and the Bolhouse Defendants appear to argue that *some* of Plaintiff's activities were acts of harassment and not protected conduct.  The present briefs suggest this narrative "by way of background information"—however this information contradicts Plaintiff's facts:

> …Plaintiff engaged in a series of disturbing behaviors that ultimately ended with his <u>unannounced appearance and refusal to leave Defendant Melissa Meyers home</u> during a contentious on-going custody battle wherein Defendant Melissa Meyers represented plaintiff's ex-wife in Muskegon County Circuit Court, the Honorable Gregory C. Pittman presiding.

(PageID.402, emphasis added)  If Plaintiff had actually come onto the Meyers' property and refused to leave, this could potentially raise a factual dispute regarding whether or not this particular activity was constitutionally protected conduct.  However, Plaintiff has alleged a very

---

[18] Plaintiff alleges that the Stalking/PPO litigation "was inexplicably reassigned to Judge Pittman, a long-time resident of Norton Shores who was also presiding over plaintiff's custody proceedings." (¶32)

different set of facts. At this point in the proceedings it is Plaintiff's facts which must be accepted as true. Arguably, the Defendants could come forward with court records from the Stalking/PPO proceedings to establish a different set of facts beyond dispute. There was ample opportunity for Ms. Meyers to demonstrate that Plaintiff had no legitimate purpose, that he appeared <u>at her home</u> "unannounced" and "refused to leave." However, this was certainly not established.[19]

Defendant Meyers allusions to the "incident at the soccer game" (PageID.402 at ¶2) are also out of place on this Rule 12(c) challenge. The counter facts (without evidence) can only establish the existence of a factual dispute. Plaintiff has alleged that there was no actual *incident* at the beach tournament. Plaintiff alleges that he never saw anyone from the Meyers family and had no way of knowing where they might be on the crowded beach (¶58). (See also PageID.538-540.)

Importantly, Ms. McLean did not even attempt to discuss the alleged "beach incident" during the 11/9/15 hearing when the state court judge repeatedly asked her to provide some legitimate basis for the contempt proceedings she had initiated. (See Exhibit D, PageID.576-581). Both the temporal proximity, the specific statements made by Ms. Meyers in her 7/28/15 email, and the subsequent state court filings, establish a strong inference that Plaintiff's complaints to Chief Gale were the only real concern. While all the Defendants have attempted to utilize *conduct-oriented* language, the emphasis of concern is clearly *the content* of Plaintiff's complaints.

> **November 4, 2015 Bolhouse Defendant's Brief in the Stalking/PPO proceedings:**
> Respondent's conduct in initiating and continuing a frivolous investigation while intentionally including knowingly false disparaging, defamatory and irrelevant comments about Petitioner and her husband on July 20 through this date, **is a violation of Petitioner's PPO**.
> (this is just one of many examples in the state court filings)

---

[19] Testimony from Plaintiff, Mark Meyers, Melissa Meyers, Rachel Terpstra, and Officer Rhyndress tends to support Plaintiff's claim that he remained in his car, across the street from the Meyers residence—never going on their property at all. It is uncontested that this was not "unannounced" in that the NSPD was fully apprised of Plaintiff's location at all times (which is not typical of someone intending to harass). Plaintiff testified that Officer Wasilewski required this action as a prerequisite to investigating the matter.

> **Email From Ms. Meyers to Plaintiff's Counsel on 7/28/15** (PageID.529)**:**
>
> I just wanted to send you a email to try and immediately resolve disturbing behaviors of Mr. Rudd that have recently come to be, without the necessity of police or court involvement.
>
> …I want to be perfectly clear, I want no interaction with Mr. Rudd outside of my responsibilities to my client, nor does my husband who Mr. Rudd now has dragged into his domestic affairs again for no justifiable reason.  I certainly do NOT want my children around Mr. Rudd, nor do I want to put my children or the Rudd boys through the trauma of police interaction because Mr. Rudd is non-complaint with the PPO.  **I am concerned with Mr. Rudd's actions for the following reasons:**
>
> .. 3. Mr. Rudd has <u>recently brought up issues from the past involving the events surrounding the issuance of my PPO against Mr. Rudd</u>.  He has made <u>false, defamatory comments</u> again about myself <u>*and my husband*</u> **in a clear attempt to <u>get my husband, the former police chief and Norton Shores Police Department into some sort trouble</u>.**  In doing so he has renewed his concerns about his behavior and intent with regard to myself, my children and my husband.

(7/28/15 Email, ECF No. 73-2.) In her present brief, Ms. Meyers appears to accept the 7/20/15 Citizen Complaint as "The only plausible protected conduct alleged…" (See ¶4 at PageID.400). In discussing the second prong of the First Amendment inquiry, Ms. Meyers concedes that her actions "in a vacuum and taken from the perspective of a disgruntled respondent, could constitute an adverse action."  Notably, in discussing the "allegedly adverse actions" Ms. Meyers describes those acts as being a "reaction" or "response" to "what can only be construed as defamatory statements" in Plaintiff's complaint to Chief Gale. (See PageID.401 at ¶2, emphasis added):

> Plaintiff attempts to set forth the allegedly adverse action taken by Defendant Melissa Meyer <u>in reaction to Plaintiffs complaint to Chief Gale</u>, as communicating with Plaintiffs attorney; and filing a motion to enforce the PPO previously obtained by Defendant Melissa Meyers against Plaintiff who admittedly had unconsented contact prior to termination of the PPO on February 4, 2016 and <u>who admittedly included in his July 20, 2015 complaint to the Chief Gale, what can only be construed as defamatory statements</u> as they relate to numerous Defendant's including Melissa Meyers. Defendant Melissa Meyers' <u>response to Plaintiffs continued harassment and violation of the PPPO</u> [sic], to seek legal enforcement of a valid PPO, in a vacuum and taken from the perspective of a disgruntled respondent, *could constitute an adverse action* However<u>, the more rational conclusion is that the same is a reasonable response by the Defendant Melissa Meyers to the continued harassment by the Plaintiff.</u> Plaintiffs claim lacks allegations and facts which create a logical nexus between the protected conduct alleged and the adverse action taken by Defendant Melissa Meyers.

These statements by Ms. Meyers fully confirm the nexus between Plaintiff's Complaint to Chief Gale and the (reactionary) adverse actions against Plaintiff. While it is very clear that Ms. Meyers perceives Plaintiff's petitioning activity as harassment, this **perception** does not justify a **reaction which includes the threat of governmental authority to sanction or suppress offensive speech**.

If Ms. Meyers believed that Plaintiff had made false reports to the police (in 2013 and 2015), she could have submitted a complaint of her own.[20] Defamatory statements could have been addressed in a suit for defamation. (See also PageID.580.)  However, threatening to have Plaintiff arrested by NSPD officers, if he "appears" at a soccer game, is not a lawful or reasonable response to offensive speech.

### c.   The Bolhouse Defendants were also reacting to protected conduct.

The Bolhouse Defendants also challenge the sufficiency of Plaintiff's allegations regarding causation, or the connection between the protected conduct and the adverse actions.

> "The problem with Plaintiff's claim, however, is that there is no logical nexus that could possibly be alleged between the protected conduct alleged and adverse action taken. As such, Plaintiff cannot satisfy the third and final element required to state a claim for retaliation." (Bolhouse Brief at PageID.359.)

The Bolhouse Defendant's state court filings (August-November 2015) repeatedly make reference to Plaintiff's protected activity in support of the petition for criminal contempt proceedings. These filings emphasize Plaintiff's protected conduct *more than anything else*. Like the brief recently filed in this Court by Ms. Meyers, the Bolhouse Defendant's repeatedly argued (in the state court hearing and in filings) that Plaintiff's criticisms of City officials and police officers (as well as his pursuit of an investigation) should be punished by government sanctions and enjoined by restraining orders. (See PageID.576-580; *"He has gone to the city council"* line 19 at PageID.579).

---

[20] None of the Defendants seem to be trying to establish that Plaintiff's Citizen Complaint (or complaints in 2013) included any knowingly false claims OR any malicious intent.  If there were any support for that claim, it seems that it would have been presented by now. Plaintiff addresses the issue of "sham petitioning" in his complaint at ¶75: "…if this was the case the Norton Shores Police Department should have charged plaintiff with falsely reporting a felony."

Notably, Michigan law calls for criminal contempt proceedings to be first submitted to the county prosecutor. If the county declines to prosecute, and private party may be appointed to the role of prosecutor in the criminal contempt proceedings.  In this respect, the Bolhouse Defendants are liable under the public function test (via a separate source of state law), as well as through joint action with the City Defendants. Plaintiff has sufficiently alleged facts suggesting that the criminal contempt proceedings, the threats of arrest at soccer games, and the improper modification of the LEIN database, where motivated (at least in part) by Plaintiff's petitioning activity. (¶¶66-69, 74, 75, 85, 88).  Contrary to the City's claim, there is no reason to suggest that "interactions" with Attorneys Baar and McLean on 11/9/15 were in any way related to child custody proceedings. (¶¶93-100 at PageID.21-22).

> 94) Attorneys Baar and McLean repeatedly indicated that plaintiff could avoid incarceration by agreeing that he would no longer engage in "conduct" which was "concerning" to Melissa Meyers and Mark Meyers—**specifically referring to plaintiff's 7/20/15 complaint and corresponding FOIA requests.**
>
> 95) Mr. Baar specifically stated that they were **looking for an agreement that plaintiff would not take "any action" against Mark Meyers or Melissa Meyers**. Attorney Mclean specifically asked plaintiff if he was willing to **"stop going to the city."**
>
> 97) Attorneys Mclean and Baar … advised that **Police Chief Jon Gale, First Lieutenant Chris Mclntire (Michigan State Police), Attorney Doug Hughes and city manager Mark Meyers** were outside in the hall and prepared to testify that plaintiff had been engaging in very concerning behavior.
>
> 98) Attorney McLean specifically stated that since Judge Pittman had authorized criminal contempt "**this could turn into an arraignment today.**"
>
> 90) Attorney Baar made several references to Judge Pittman's reputation for unpredictable and hasty rulings (i.e. **"who knows what Pittman will do?").**
>
> 100) Throughout the meeting, attorneys Baar and Mclean repeatedly attempted to coerce plaintiff into **dropping any complaints against the city of Norton Shores.**

## IV.     Shared Objectives – Symbiotic Relationship – Joint Conduct

The City's official correspondence, perfectly choreographed with similar statements in the contempt filings clearly evince a continuity of purpose between the private party Defendants and the City Defendants.  At this stage of the proceedings a Plaintiff is not required to set forth intricate detail on every claim. "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, and circumstantial evidence may provide adequate proof of conspiracy." *Smith v. Thornburg*, 136 F.3d 1070 (6th Cir. 1998) at 1090-1091. In this case, Plaintiff has already presented substantial direct evidence of shared retaliatory animus, cooperation, and joint action between the Defendants. The City's 11/5/15 correspondence cannot be squeezed into any kind of entirely innocent explanation.  The corresponding contempt filings, filed by the Bolhouse Defendants, repeatedly express the same animus toward Plaintiff's petitioning activity.[21]

Our circuit (along with many others) has cited with approval Judge Richard Posner's well-reasoned opinion in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982) (noting that the plaintiff needed only to show "a suggestion [in the complaint] that the subsequent campaign of petty harassments was motivated by [the plaintiff's] views" in order to survive a motion to dismiss under Rule 12(b)(6)).  The harassments complained of herein cannot be construed as petty. Judge Posner's opinion in *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) is also instructive as it pertains to the City's 11/4/15 letter.  In *Backpage.com*, Sheriff Dart used his official influence to *indirectly* orchestrate a chilling effect on speech which he disfavored.  His letter (sent on official government stationary) urged credit card companies not to do business with

---

[21] Plaintiff's Complaint also alleged that the contempt filings themselves are replete with statements expressing retaliatory animus toward Plaintiff's complaints against Mark Meyers, the City, Sgt. Rhyndress and Officer Wasilewski (all non-parties to Melissa Meyers Stalking/PPO litigation).  Ms. McLean's filings reference Plaintiff's complaints against the City extensively and include numerous lengthy quotations from Plaintiff's 7/20/15 Citizen Complaint and the recorded interview in Chief Gale's office.

Backpage.com, and bolstered these urgings with ominous allusions to the possibility they too could be subject to criminal liability and investigations. The 7th Circuit deemed these tactics to be in violation of the First Amendment, noting that:

> …while [Sheriff Dart] has a First Amendment right to express his views about Backpage, a public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment.

> The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands. E.g., *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64-72, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963);

*Id.* at 230 (internal quotes and some citations omitted).  The United States Supreme Court has stated that even "informal procedures undertaken by officials and designed to chill expression can constitute a prior restraint." *Multimedia Holdings Corp. v. Circuit Ct. of Fla., St. Johns Cnty*., 544 U.S. 1301, 1306, 125 S.Ct. 1624, 161 L.Ed.2d 590 (2005).  It does not matter that the criminal contempt proceedings were initiated by private actors. It does not matter that the extortionate threats where delivered by private actors (¶¶93-100). It cannot be denied that the City was aware of the criminal contempt proceedings when the 11/5/15 Cease & Desist Letter was sent.  They certainly were aware of what was occurring when they attended the contempt proceedings.  They maintained an unauthorized LEIN against Plaintiff for six months. The Private Parties and the City Defendants shared a symbiotic relationship. All were willing participants with their own motivations for intimidating Plaintiff.  Our circuit has consistently held that that officers can be held liable for the natural consequences of their actions even when the ultimate harm of the constitutional violation is more directly inflicted by someone else.  See *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005).

## V.   State Law Claims

In the present case, the City disfavored the content of Plaintiff's petitioning activity and wished to somehow criminalize it.  In the absence of other remedies, the PPO proceedings provided the only available vehicle. In stating the intention to protect Mark Meyers, the City did not threaten to take *"legal action"* against Plaintiff. The letter states the City will take "whereas action is legally necessary to protect Mr. Meyers…"   The City could not and did not seek charges against Plaintiff for making false crime reports, because Plaintiff's complaints were truthful.  For the same reason, the City could not and did not bring any civil action claiming "serious defamatory and disparaging remarks about Mr. Meyers, as well as other members of the Norton Shores Police Department." It would have been infinitely more appropriate for Attorney Hughes to actually file a lawsuit against Plaintiff—as opposed to wielding the ominous threat of governmental repercussions and "monitoring."  The City has not even attempted to offer another interpretation for what was meant by "we will take whatever action is legally necessary to protect the professional and privacy rights of Mr. Meyers"—or how this could possibly be appropriate under the circumstances.

### a.  Abuse of Process

Contrary to the City's argument, joint participation in planning and executing the criminal contempt proceedings *does* establish a basis for liability under state law.

> Here the claim of abuse of process against these defendants fails as a matter of law because there is not even a whiff of an allegation any of these defendants utilized any legal process. The only legal process that is alleged in the Complaint arises out of the contested custody case.[22] The attorneys and parties to that action utilized legal process – but none of these defendants did. That is fatal to plaintiff's claim and it must be dismissed.

---

[22] Neither the Stalking/PPO litigation initiated by Melissa Meyers, or the criminal contempt proceedings in 2015 arise out of the contested custody case.  The voluminous contempt filings do not give ANY indication that custody related concerns played a part in this matter at all—and no Defendant has suggested any way specific reason that would be true.

Paragraphs 93-100 of Plaintiff's Complaint (PageID.21-22) describe the threats made by Defendant Joel Baar ("Baar") and Defendant Michelle McLean ("McLean") in a meeting just prior to the 11/9/15 criminal contempt hearing.   Baar & Mclean repeatedly pressed Plaintiff for an agreement wherein Plaintiff would drop all claims against Norton Shores, Mark Meyers, and Melissa Meyers.  Baar and McLean advised Plaintiff that he was about to experience the equivalent of a criminal arraignment before a very unpredictable probate judge. They suggested a substantial possibility of Plaintiff going straight to jail (¶98, ¶99).  They clearly conveyed that Chief Gale and F/Lt. McIntire were coming to testify that Plaintiff had repeatedly submitted false reports of criminal activity against Mark & Melissa Meyers.

All of the "settlement demands" were well outside the scope of Stalking/PPO under Michigan Law.  Even after the state court judge clearly established that this was the case (11/9/15 Hearing, PageID.576-581), the Defendants continued to misuse the state court litigation in this same way. In actuality, the only thing the Bolhouse Defendants truly had a right to litigate in that case was whether or not the original 7/21/13 ex parte PPO had been "extended indefinitely." The Defendants were most certainly making settlement demands which sought "more than objectives commonly sought by claimants who initiate similar lawsuits." (See Bolhouse Brief, at PageID.362)

The demands for an agreement to stop "going to the City" where certainly *collateral to the purposes* of the underlying ex parte PPO, but *especially* collateral to the 2015 litigation in that case. Plaintiff's allegations regarding Attorney Baar and Attorney McLean's demands before the 11/9/15 hearing go beyond the bounds of abuse of process and well into the realm of extortion under Michigan statute (MCL 750.213).[23]

Plaintiff is not alleging that the City "initiated legal action" against Plaintiff. Instead, the City lent substantial support to the endeavor.  The transcript of the 11/9/15 hearing clearly indicates

---

[23] Prohibiting malicious threats to accuse another of any crime or offense with intent to compel the person so threatened to do or refrain from doing any act against his will.

that Judge Pittman delayed Plaintiff's opportunity to be heard because <u>he recognized</u> all of the well-known governmental leaders who were purportedly there to give relevant testimony (PageID.582, line 5).

This sham allowed the Bolhouse Defendants to prolong the duration of the criminal contempt proceeding while the City Defendants maintained the unlawful LEIN entry against Plaintiff (PageID.584, line 12) for nearly three more months).

### b. Michigan's Litigation Privilege is not applicable.

The Michigan Court of Appeals recently affirmed that the judicial proceedings privilege does not preclude an action for abuse of process when the when defamatory or otherwise actionable conduct is interposed for the purpose of retaliating against someone for their participation in litigation. See *Lawrence v. Burdi*, 886 N.W.2d 758, 314 Mich. App. 203 (Ct. App. 2016).

> Taking as true plaintiff's argument that defendant filed the requests to admit in retaliation for plaintiff's public statements about the case, defendant's conduct seems to turn upside down the public policy behind the privilege, that is, to permit participants in judicial proceedings to be relatively free to express themselves without fear of retaliation.

*Id.*, 758-759. Michigan courts have long held that privilege does not necessarily attach when it can be established "that statements made in the course of judicial proceedings, including pleadings and argument, have no relevance, pertinence, or materiality to the matter being litigated." Id.

### c. Intentional Infliction of Emotional Distress

If Plaintiff's allegations are true, the Defendants corruptly and deliberately misused the state court procedures in a calculated scheme to injure an innocent private citizen. These claims involve a number of lawyers and law enforcement officers who are entrusted to protect against this type of corruption. In addition to Plaintiff's injuries, abuses of this nature tend to prejudice the most vulnerable litigants who face unwarranted skepticism when they truly need protection from the courts (domestic violence victims).

38

If proven, these claims do provide a plausible basis for jury to find that the alleged conduct to be "so outrageous in character, and so extreme in degree, to go beyond all bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community." *Roberts v Auto-Owners*, 374 N.W.2d 905, 908-09 (Mich. 1985).

### d. Malicious Prosecution

Plaintiff will seek leave of the court to address the arguments regarding this claim in a separate filing.  The Bolhouse Defendants and Ms. Meyers have egregiously misrepresented proceedings in state court, and there is not adequate time (or space) to address those issues herein.


## Conclusion:

Plaintiff has asserted sufficient factual matter to survive a facial challenge, and has supported these allegations with substantial documentary evidence.  Plaintiff respectfully asks this Court to deny the pending dispositive motions.


Respectfully submitted as amended
on October 17, 2018:

         /s/ Daniel William Rudd

         Daniel William Rudd, Plaintiff (Pro Se)
         201 S  Lake Ave.  Spring Lake, MI 49456
         (231) 557-2532  daniel@stock20.com