UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL WILLIAM RUDD,

        Plaintiff,

  v.

CITY OF NORTON SHORES, et al.,
.

        Defendants.
_____/

Case No.  1:18-cv-124

Honorable Gordon J. Quist
U.S. District Court Judge

**PLAINTIFF'S BRIEF IN SUPPORT OF SANCTIONS
AGAINST THE CITY OF NORTON SHORES DEFENDANTS**

Filed by Pro Se Plaintiff, Daniel W. Rudd
On October 21, 2018

# INDEX

I. MATERIAL MISREPRESENTATIONS REGARDING THE SUBSTANCE OF PLAINTIFF'S PLEADINGS...3

II. MR. CALLAHAN HAD A HEIGHTENED DUTY OF CANDOR, IN THESE CIRCUMSTANCES................7

III. THE CITY HAS SUBSTANTIAL MOTIVATION TO DELAY DISCLOSURE OF DOCUMENTS REQUESTED ON 9/17/18..................................................................................................10

IV. OBSTRUCTIONIST CONDUCT & ABUSIVE LITIGATION TACTICS: .............................................10

# CASES

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. at 2123 (1991) ----------------------------- 11

*In Re Engle Cases*, 283 F. Supp. 3d 1174 (M.D. Fla. 2017)-------------------------------------- 7

*Peer v. Lewis*, 606 F.3d 1306, 1316 (11th Cir. 2010). ----------------------------------------- 2, 7

*Ridder v. City of Springfield*, 109 F.3d 288, 293, 298 (6th Cir.1997) ------------------------------- 7

# RULES

Fed. R. Civ. P. 11 ---------------------------------------------------------------------------------- 7, 11

Michigan Rules of Professional Conduct 3.3(a)------------------------------------------------------ 7

Michigan Rules of Professional Conduct 3.5(d)------------------------------------------------------ 6

Michigan Rules of Professional Conduct 6.5 -------------------------------------------------- 6, 11

> "Attorneys are the filter upon which courts rely
> to maintain the integrity of, and trust in, our judicial process."

*Peer v. Lewis*, 606 F.3d 1306, 1316 (11th Cir. 2010). Federal courts are tasked with the immense challenge of sifting through an extraordinary number of pro se cases every year. Because our courts do rely upon court officers in sifting through pro se claims against well-represented government bodies, the rare instance where experienced attorneys intentionally mislead the court must be met with strict remedial action.

## I.     Material misrepresentations regarding the substance of Plaintiff's pleadings.

In the present case, the facial sufficiency of Plaintiff's claim had already been *filtered* by this Court after the State Attorney General's office litigated a Rule 12(b)(6) Motion To Dismiss. The brief filed on behalf of F/Lt. McIntire raised challenges to Plaintiff's factual allegations against **all** Defendants. (ECF No. 24, emphasis added)

> Plaintiff's claims are vague, generalized allegations about the alleged conduct of the behavior of all the Defendants. (PageID.196)
>
> Plaintiff's alleged § 1983 Counts (Counts 1-4) offer conclusory statements rather than concrete factual assertions as to what any individual Defendant did. (PageID.197)
>
> All of Plaintiff's §1983 counts are some version of an alleged conspiracy by all the Defendants. However, all four of these counts fail to state a claim. (PageID.198)
>
> Plaintiff alleges all the Defendants conspired to deprive him of his civil rights. However, he has failed to provide specific facts of a single conspiracy, failed to make any specific allegations, and failed to show a connection between any overt actions of the Defendants and an injury to the Plaintiff. (PageID.198)

On 8/8/18, this Court issued a detailed sixteen-page Opinion which sets forth a thorough analysis of the sufficiency of Plaintiff's factual allegations against all the Defendants. Several of Plaintiff's claims against the non-moving Defendants were found to be insufficiently stated and dismissed by the Court. However, Plaintiff's First Amendment Retaliation claims against the City were allowed to go forward. Over the course of four pages, this Court succinctly identified the factual allegations which support Plaintiff's First Amendment claims against the City. (Opinion PageID.321-324.)

3

Importantly, Attorney Callahan recognized this fact, noting in his 9/11/18 brief that this Court had set forth "a detailed recitation of the facts alleged in plaintiff's Complaint in ruling on Lt. McIntire's motion to dismiss." (PageID.429.)

However, instead of addressing those "facts alleged" and explaining why they do not sufficiently form the basis a First Amendment retaliation claim, Mr. Callahan's motion for judgment on the pleadings relies primarily on misrepresentations of what has and has not been plead by Plaintiff. Many of the misrepresentations pertain directly to central issues of material dispute. Most of the omissions and distortions relate to factual allegations which were specifically identified by this Court in the 8/8/18 Opinion. (ECF No. 50, pp.2-5). There can be no doubt that the substance of a plaintiff's pleadings are the single most important question a Rule 12(c) challenge. In this respect, substantial omissions can be very misleading (See ¶¶2-3, PageID.656)

Plaintiff's 7/20/15 Citizen Complaint is at the center of this litigation. The City repeatedly deviated from official policy in handling this complaint. Each of these deviations could potentially serve as an "adverse act" which inherently relates to the protected activity (filing of the 7/20/15 Citizen Complaint). The City attempts to mitigate this liability by advising the Court that Plaintiff plead something completely different about when and how the Citizen's Complaint was circulated (See ¶4, PageID.657). Although circulating the complaint before completing a full investigation would have also been improper, the adjusted scenario is substantially more favorable for the City than what Plaintiff actually alleged. The complaint clearly states that <u>Chief Gale circulated the complaint **immediately** after receiving it</u>—and **before** he had investigated anything or communicated with Plaintiff at all (¶¶54, 55, 57, at PageID.14).

The City's claims that Attorney McLean was successful in obtaining a PPO against Plaintiff are even more concerning. If that were the case, and that Norton Shores Police Department simply entered a valid Stalking/PPO into the LEIN database, that would make a tremendous difference. However, the City does not have any evidence to support this claim (if they did, it would have been made known by now). More importantly, this is a blatant mischaracterization of <u>what Plaintiff has alleged</u>.

4

Plaintiff claims that AFTER Attorney McLean failed to obtain a PPO from the state court (twice), the City proceeded to enter a Stalking/PPO against Plaintiff *without a valid court order*. Once again, the City is launching a collateral attack on Plaintiff's factual allegations which most easily establish liability against the City for First Amendment violations.  Here also, this Court did not have any difficulty in understanding exactly what Plaintiff had alleged.  See 8/8/18 Opinion at PageID.324:

> Although Melissa Meyers acknowledged that the PPO expired many months prior, she demanded that Rudd stipulate to an order authorizing NSPD to enter a nonexpiring PPO against Rudd into the LEIN database, which Rudd refused to do. Subsequently, Meyers had McLean file a motion with Judge Pittman stating that a clerical error had occurred (apparently in discharging the PPO) and requesting Judge Pittman to correct it. McLean subsequently filed another motion requesting Judge Pittman to authorize a stalking PPO against Rudd on the LEIN system, which included excerpts of Rudd's complaint to Chief Gale. (Id. at PageID.17.) <u>Shortly thereafter, the NSPD entered a stalking/PPO notation against Rudd on the LEIN system</u>, **without a valid court order**. …Rudd notified the NSPD that no court order had entered, but the NSPD failed to correct the problem

(*Id.* ECF No. 50, emphasis added). Accordingly, the City's omission and representations are inexcusable—especially since they pertain to central issues in the dispute.

Similarly, this Court's 8/8/18 Opinion also succinctly identified a substantial number of factual allegations which can support a plausible inference of causation between the actions against Plaintiff on 11/9/15 and Plaintiff's complaint to Chief Gale on 7/20/15.  These include:

> On November 9, 2015, immediately prior to the criminal contempt hearing, Rudd met with McLean and Defendant Joel Baar, managing Partner of the Bolhouse firm, to discuss a "global resolution on all issues in the case." During the meeting, Baar and McLean repeatedly told Rudd that he could avoid incarceration by discontinuing conduct that was "concerning" to Melissa and Mark Meyers, such as complaining to Chief Gale. Baar and McLean also advised Rudd that Chief Gale, Lieutenant McIntire, Defendant Doug Hughes (the City's attorney), and Mark Meyers were outside in the hall prepared to testify that Rudd "had been engaging in very concerning behavior."

(See Opinion, at PageID.324). Plaintiff's complaint also incorporates a verbatim recitation of the City's 11/5/15 "Cease and Desist" letter which was sent to Plaintiff in perfect synchronization with the contempt filings.

5

| 11/5/15 Letter From the City | 11/4/15 Bolhouse Def. Contempt Filings |
|---|---|
| Dear Mr. Rudd, This office represents the City of Norton Shores. Their Mayor has asked us to monitor your conduct and behavior as it relates to the <u>employment of Mark Meyers as the City Administrator</u> for the City of Norton Shores. | Respondents **interference with Petitioner's husband's employment** and defamatory, disparaging and slanderous comments about Petitioner and her husband, **City Manager, Mark Meyers** to the Police Chief on July 23, 2015 **is a violation of Petitioner's PPO.** |
| We have information that leads us to believe that you have made serious **defamatory and disparaging remarks about Mr. Meyers as well as other members of the Norton Shores Police Department.** | On 7/20/15 Respondent begin anew his pattern of harassment of Petitioner and her family by filing a frivolous complaint with the Norton Shores Police Chief <u>alleging criminal, unethical and civil violations</u> perpetrated by the Norton Shores City Manager and Petitioner's husband, <u>Mark Meyers, Police Chief, Dan Shaw, Sargent Matt Rhyndress, and Officer Wasilewski.</u> |
| Also be mindful that the statements you make to others about Mr. Meyers. | …Respondent remains undeterred by these two respected [agency] findings and **continues his investigative harassment** still to date |
| Please treat this letter as notice to you that <u>we will take whatever action is legally necessary</u> to protect the professional and privacy rights of Mr. Meyers. | <u>Respondents pattern of continued unconsented contacts and harassment must be stopped.</u> It is clear from Respondents actions that Respondent will only respond to this Courts contempt powers. |
| You are to cease and desist from any further contact or conversation with him. | Respondent must further be enjoined from writing, communicating slanderous, defamatory, libelous, disparaging comments and statements about Petitioner and any member of her family to other individuals |

In describing the 11/8/15 meeting and contempt hearing, the City asserts (emphasis added):

> In spite of the fact that this entire litigation arises from a state court child custody dispute, plaintiff completely disregards that as the basis for his interactions with Attorneys Meyers, McLain and Baar. Instead, plaintiff attributes "a single plan" to these attorneys and the Norton Shores defendants to retaliate against him for exercising his First Amendment rights. **The hubris this exhibits is stunning**.

(City's Brief at PageID.440). It is an absolute mystery how the 11/9/15 demands to "stop going to the City" and the subsequent contempt hearing, relates to child custody proceedings in any way. It is equally difficult to imagine why the City's highest paid executives would need to spend the morning at the county courthouse on a child custody matter? Why would the City attorney's billings include attendance at this hearing, review of the contempt filings and correspondence with Plaintiff during the preceding week? Why were Dough Hughes, Jon Gale and Mark Meyers discussing this matter over the weekend just before the hearing? (see PageID.20-21.) Most of all, <u>why should any of this be funded by the taxpayers of Norton Shores?</u>

Here again, Mr. Callahan asserts counter-facts instead of addressing the sufficiency of the facts which Plaintiff has actually alleged. In addition to regurgitating this tired "just a child custody dispute" story, Mr. Callahan inserts an unsupportable and irrelevant ad hominem attack: "**The hubris this exhibits is stunning**."

Presumably, this Court did not find Plaintiff's inference of retaliatory intent to be outlandish. The Court referenced these allegations and allowed the First Amendment Claims to go forward. By suggesting that Plaintiff has exhibited a stunning level of hubris in drawing this inference, this conclusory criticism also shows disrespect for this Court's determinations. By failing "treat with courtesy and respect all persons involved in the legal process" (MRPC 6.5), Mr. Callahan has inadvertently engaged in discourteous conduct toward the tribunal as well. See MRPC 3.5(d).[1]

Here, Mr. Callahan's actual task was to offer a plausible explanation for the City's 11/5/15 Cease and Desist letter and publicly funded participation in the contempt proceedings (particularly the 11/9/15 hearing). Mr. Callahan's subjective and disparaging personal beliefs about Mr. Rudd are a poor substitute for offering the relevant arguments on challenge to facial sufficiency.

**II.   Mr. Callahan had a heightened duty of candor, in these circumstances.**

As a sworn officer of the Court, Mr. Callahan's first obligation is to safeguard the fairness and integrity of the legal proceedings. See Michigan Rules of Professional Conduct 3.3(a), indicating that "A lawyer shall not knowingly":

> (1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
>
> (2) fail to disclose to a tribunal controlling legal authority in the jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or
>
> (3) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal

---

[1] MRPC 3.5(d) A lawyer shall not engage in undignified or discourteous conduct toward the tribunal. (Comment: The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from undignified or discourteous conduct is a corollary of the advocate's right to speak on behalf of litigants.)

*Id.* Further, because our courts <u>do</u> tend to rely upon the representations of court of officers—especially in the arduous process of *filtering* pro se complaints, an Attorney should exercise a *heightened degree of* care in making representations to the court regarding the claims of a non-lawyer opponent.  This is especially true when those claims have already been vetted and deemed non-frivolous. Portions of the opinion in *Peer v. Lewis* have been cited in over one hundred subsequent opinions, including the following passage:

> [A]ttorneys are the filter upon which courts rely to maintain the integrity of, and trust in, our judicial process.  *On the rare occasion when attorneys undermine that integrity and trust, there must be consequences*.

*In Re Engle Cases*, 283 F. Supp. 3d 1174 (M.D. Fla. 2017) (emphasis added).  Mr. Callahan also has failed to meet the required standard.  Rule 11(b) imposes a "continuing duty of candor," and a litigant may be sanctioned "for continuing to insist upon a position that is no longer tenable." *Ridder v. City of Springfield*, 109 F.3d 288, 293, 298 (6th Cir.1997), cert. denied, 522 U.S. 1046, 118 S.Ct. 687, 139 L.Ed.2d 634 (1998).

In keeping with the *safe harbor* provisions of Rule 11, the City was afforded just such an opportunity. Plaintiff served a copy of the Motion for Rule 11 Sanctions motion to Mr. Callahan on 9/21/18 (Proof of Service, ECF No. 65).  The City's subsequent failure to take any corrective measure precludes the possibility that these misrepresentations were the product of mistake or accident.  Two weeks <u>after</u> being notified of these substantial errors, the City moved for entry of a protective order "staying discovery until this Court has ruled on the pending motions to dismiss." (10/4/18, ECF No. 66.)  In requesting this relief, the City insists that:

> The motion which the Norton Shores Defendants filed was ***solely on the pleadings***. Discovery is not necessary for Plaintiff to respond to the motion to dismiss. <u>The pending motion to dismiss may resolve the case in total</u>, eliminating the need for discovery.

However, Apart from the distortions of Plaintiff's factual allegations, and a number of ventures well outside of the pleadings, the City's arguments are largely duplicative of the those already considered by this Court based on the previous submissions.

8

| F/Lt. McIntire's 4/13/18 Motion to Dismiss under Rule 12(b)(6) | The City's 9/11/18 Rule 12(c) Motion For Judgment On the Pleadings |
|---|---|
| At most Plaintiff's counts assert a vague conspiracy to violate Plaintiff's civil rights by all Defendants. All the Defendants are left to guess, or try to discover from Plaintiff's intermingled general allegations, what each of them allegedly did wrong. Such assertions are legally insufficient to state a § 1983 claim. (PageId.197) | Simply put, while the plaintiff's Complaint is littered with a plethora of speculation, innuendo and subjective musings, nowhere is there a single factual allegation showing the defendants agreed to "a single plan" to retaliate against plaintiff or that the defendants "shared the same general conspiratorial objective." (PageID.440) |
| Plaintiff generally alleges that all Defendants violated Plaintiff's rights over several years during various encounters with members of the Norton Shores Police Department and city officials regarding the Plaintiff's protracted contested child custody dispute with his ex-wife. (PageID.193) | [P]laintiff offers nothing more than conclusions and opinions to claim there was a meeting of the minds among the alleged conspirators. All plaintiff has alleged is that a contentious custody dispute existed in which both parties went to the local law enforcement agency with complaints of criminal conduct. (PageID.441) |

The Rule 12(b)(6) challenge filed by the Attorney General's office, was raised early in the litigation (4/13/18) and was drafted without the benefit of this Court's 8/8/18 Opinion (ECF No. 50). Because the City filed their Rule 12(c) challenge much later—*and <u>after</u> this Court's thorough analysis on the sufficiency of the pleadings*—the City's motion to dismiss should be held to a higher standard. Further, this Court succinctly identified the pertinent, non-conclusory factual allegations upon which plausible inferences may be drawn (8/8/18 Opinion at PageId.321-324). While purporting to challenge facial sufficiency, the City's brief does not engage in any real analysis of the most important factual allegations identified in this Court's Opinion.

When you strip away the mischaracterizations of Plaintiff's pleadings, the City's recent brief largely argues from silence and offers no substantial insight as to what this Court missed in deciding to allow Plaintiff's First Amendment claims to proceed against the City, the Bolhouse Defendants, and Ms. Meyers. The City could have withdrawn and amended their filings after reviewing the defects which had been specifically identified. Instead, the City doubled down by relying on the same claims as the basis for other relief. In this case, the *other relief* also suggests an ulterior purpose for the City's motion for judgement on the pleadings.

### III. The City has substantial motivation to delay disclosure of documents requested on 9/17/18.

After nearly a year of fighting disclosure in state court FOIA litigation, the City finally disclosed some of the public records which demonstrate a culture of indifference toward constitutional violations by the NSPD.[2] Additionally, a substantial number of court records had already been produced during the course of the state Stalking/PPO litigation in the state courts.

Based on this documentary evidence, some of Plaintiff's First Amendment claims against the City are nearly ripe for partial summary judgment under Rule 56. If Plaintiff prevails on establishing any one of his First Amendment claim in this manner, he will immediately be able to retain the services of an experienced civil rights attorney. The public records requested by Plaintiff on 9/17/18 are likely to provide the missing pieces.[3] Conversely, if the City can successfully delay access to critical department records (delays which can be extended through other tactics as well), the City is well situated to prevail in this lawsuit by simply outlasting Plaintiff's ability to maintain it. However, the Defendants knew that Plaintiff would be allowed to make discovery requests once the parties had "conferred as required by Rule 26(f)."

### IV. Obstructionist Conduct & Abusive Litigation Tactics:

Plaintiff attempted to begin the process of discussing a discovery plan (including limited preliminary discovery and phased discovery) on 7/6/18. The Defendants unanimously asserted that they would not entertain such discussions until a Rule 16 conference had been scheduled. This 8/20/18 Order accomplished this and directed the parties to confer as required by Rule 26(f). See ECF No. 52. Plaintiff immediately contacted opposing counsel to inquire about times for a joint meeting, but his efforts were met with various forms of resistance. It was in this context that Attorney Callahan interposed baseless, irrelevant, and derogatory statements about Plaintiff

---

[2] Plaintiff, sought records 1/27/17, filed a FOIA Complaint 8/29/17, after failing to obtain an emergency stay of the 5/3/18 disclosure order, the City filed emergency appeals in the Michigan COA and the Supreme Court (all denied). Even then contempt proceedings were required to obtain un-redacted versions of City records (resolved on 6/28/18). See Exhibit 1-5.

[3] Most of these records sought by Plaintiff would typically be: (a) available to any citizen through the FOIA; (b) already located and preserved in a litigation file.

(described in ¶¶11-13 of Plaintiff's sanctions motion, PageID.662). The e-mail alleges that Plaintiff has somehow severely mistreated Attorney Lisa Hall, during the course of the state court FOIA litigation. (Ex.A, PageID.671). Mr. Callahan conveys that having reviewed this litigation, he was "rather appalled" by Plaintiff's treatment of Ms. Hall—to the degree that Plaintiff would not be welcome in any Plunkett Cooney building. Plaintiff contends that these allegations were absolutely (and verifiably) false. Further there was absolutely no legitimate purpose for raising injecting these claims into the already tenuous scheduling of a joint meeting (Ex.A, PageID.671).

Here again, there are indications of the same ulterior purpose. Mr. Callahan sent these baseless accusations to all the attorneys, knowing that Plaintiff was already struggling to obtain cooperation in scheduling the joint meeting—a task which Plaintiff had been assigned by court order.[4] Additionally, the narrative of the accusation itself is strikingly familiar to the baseless allegations which Plaintiff has been forced to endure from the Bolhouse Defendants for many years.

At the heart of this lawsuit is the claim that the Defendants have repeatedly opposed Plaintiff's petitioning activity through a subversive campaign to vilify and/or criminalize Plaintiff's efforts to vindicate his rights through legitimate court process.[5] Instead of facing the merits of the dispute, collateral attacks have been waged on Plaintiff's ability to participate in the proceedings. The recent conduct by Attorney Callahan follows that same trajectory. Instead of addressing seeking judicial determinations on the merits, the Defendants are attempting to hinder and discourage Plaintiff's participation in the proceedings.

---

[4] "Plaintiff shall be responsible for scheduling the meeting, which may be conducted in person or by telephone (8/20/18 Order, ECF No. 52, PageID.338).

[5] In 2015, the Bolhouse Defendant's repeatedly characterized <u>all</u> of Plaintiff's petitioning activities as illegal, immoral and malicious. State court filings by the Bolhouse Defendants are replete with extremely denigrating expressions directed at Plaintiff's participation in the legal process. Even Plaintiff's efforts to have the unauthorized LEIN entry removed (October 2015) was characterized as a criminal act of harassment, a violation of the 2013 ex parte PPO, and an indication that Plaintiff was "delusional." These same Defendants continue to assert that Plaintiff's efforts to oppose the renewed claims of stalking (and LEIN entry) in the 2015 state court proceedings—AND the filing of this lawsuit all constitute acts of harassment (e.g. Def. Answer at PageID.134;  Def. Melissa Meyers Brief seeking dismissal at PageID.401.)

MRPC 6.5 requires attorneys to "treat with courtesy and respect all persons involved in the legal process." The comment section is also instructive:

> "A lawyer is an officer of the court who has sworn to uphold the federal and state constitutions, to proceed only by means that are truthful and honorable, and to avoid offensive personality. It follows that such a professional must treat clients and third persons with courtesy and respect. For many citizens, contact with a lawyer is the first or only contact with the legal system. Respect for law and for legal institutions is diminished whenever a lawyer neglects the obligation to treat persons properly. It is increased when the obligation is met."

While this conduct probably does not fall under the purview of Rule 11. This Court has inherent power to address bad faith litigation tactics—especially when those tactics interfere with court processes that serve "to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. at 2123 (1991). Sanctions imposed to safeguard the integrity and fairness of court procedures flow not from rule or statute, but from the "the control necessarily vested in courts to manage their own affairs." *Id.* This includes the ability to "fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44, 111 S.Ct. 2123. "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Id.* at 2134.

Plaintiff asks this Court to fashion appropriate sanctions which will prevent this type of misconduct from occurring in the future. This could include the appointment of a special master to oversee discovery disputes and the production of documents (with all expenses to be covered by Plunkett Cooney). Alternatively, a sanction of $6000.00 could be paid by Plunkett Cooney and deposited as a retainer for the services of an attorney to advise and assist Plaintiff until a firm has been retained to handle the duration of the litigation. toward the appointment of a court appointed prevent this type of misconduct from occurring in the future.

Respectfully Submitted on October 22, 2018:

    /s/  Daniel William Rudd
Daniel William Rudd, Plaintiff (Pro Se)
201 S Lake Ave. Spring Lake, MI 49456
daniel@stock20.com  (231) 557-2532