# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  October 06, 2020

Mr. Philip Lee Ellison
P.O. Box 107
Hemlock, MI 48626

Mr. Andrew Jurgensen
Office of the Attorney General
of Michigan
P.O. Box 30217
Lansing, MI 48909

Ms. Mary Massaron
Plunkett Cooney
38505 Woodward Avenue
Suite 100
Bloomfield Hills, MI 48304

Ms. Michelle M. McLean
Bolhouse, Baar & Hofstee
3996 Chicago Drive, S.W.
Grandville, MI 49418

Ms. Melissa Meyers
85 Campau Avenue, N.W.
Suite R305
Grand Rapids, MI 49503

Mr. Daniel William Rudd
201 S. Lake Avenue
Spring Lake, MI 49456

Re:  Case No. 19-1226, *Daniel Rudd v. City of Norton Shores, et al*
Originating Case No. : 1:18-cv-00124

Dear Counsel and Mr. Rudd,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Thomas Dorwin

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0322p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

DANIEL WILLIAM RUDD,

*Plaintiff-Appellant*,

*v.*

CITY OF NORTON SHORES, MICHIGAN, et al.,

*Defendants-Appellees*.

No. 19-1226

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cv-00124—Gordon J. Quist, District Judge.

Decided and Filed:  October 6, 2020

Before: SUHRHEINRICH, DONALD, and MURPHY, Circuit Judges.

─────────────────

#### COUNSEL

**ON BRIEF:**  Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for
Appellant.   Mary Massaron, PLUNKETT COONEY, P.C., Bloomfield Hills, Michigan, for
Appellees City of Norton Shores, Gary Nelund, Daniel Shaw, Matthew Rhyndress, Michael
Wassilewski, Mark Meyers, Douglas Mark Hughes, William Hughes PLLC, and Jon Gale.
Andrew J. Jurgensen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing,
Michigan, for Appellee Chris McIntire.  Melissa Meyers, Grand Rapids, Michigan, in pro per.
Michelle M. McLean, BOLHOUSE, HOFSTEE & MCLEAN PC, Grandville, Michigan, for
Appellees Joel Baar, Bolhouse, Baar & Hofstee PC, and in pro per.  Daniel William Rudd,
Spring Lake, Michigan, pro se.

─────────────────

#### OPINION

─────────────────

MURPHY, Circuit Judge.  This case illustrates well the standard of review that applies at
a lawsuit's pleading stage.  The City of Norton Shores, a town of around 24,000, sits on the

shores of Lake Michigan.  Daniel Rudd has lived in or near the city for most of his life.  During a child-custody dispute, Rudd alleges that his ex-wife abducted their sons with assistance from her attorney.  Rudd called the police but alleges that they refused to help him find his sons because his ex-wife's attorney is married to the city manager.  Rudd later filed an official complaint with the police department criticizing the city manager and officers involved in this incident.  This complaint allegedly ignited a conspiracy to retaliate against him because of his criticisms—one that included an effort to get him jailed for his speech.  The evidence may confirm the allegations in his pro se complaint.  Or it may resoundingly disprove them.  But because we must accept his allegations as true, we partially reverse the dismissal of Rudd's First Amendment claim.  Rudd effectively alleges that the defendants sought to punish him for a modern-day "seditious libel."

I

A

Rudd makes four key factual allegations.  We reiterate at the outset that Rudd's allegations are just that: allegations.  We must accept them as true at this pleading stage.

1. *The Abduction*.  In July 2013, Rudd was in the midst of a contentious child-custody dispute with his ex-wife.  Compl., R.1, PageID#5.  Rudd and his ex-wife's own family grew concerned about the safety of his young sons.  *Id.*  At that time, the complaint asserts, his ex-wife was in a volatile relationship with her current husband, a man who was armed and had a history of domestic violence.  Compl., Ex. A, R.1-1, PageID#31.  Her husband had also recently threatened Rudd and his sons.  *Id.*  Around July 21, after "behaving erratically for several days," his ex-wife "absconded with the children" and hid "them away from [Rudd] and all of her immediate family members" in violation of Michigan law.  Compl., R.1, PageID#5–6.  During this abduction, Rudd alleges, his ex-wife began to send him "extortionate" text messages.  *Id.*, PageID#6.  He concluded that Melissa Meyers, her attorney, was helping with the texts because his ex-wife was demanding "specific legal concessions" in the custody dispute before she would return their sons.  *Id.*

Throughout this abduction, Rudd called the Norton Shores Police Department several times.  He explained his concerns about his sons' welfare because of his ex-wife's volatile family

situation and requested police assistance in finding them.  *Id.*, PageID#5–6.  At some point, Rudd also began telling the police that Ms. Meyers was assisting his ex-wife in hiding his sons and asked them to speak to her.  Compl., Ex. A, R.1-1, PageID#32.  He noted that his ex-wife had previously taken their sons to the Meyers home and that they might currently be there.  *Id.*

The complaint asserts that Chief of Police Daniel Shaw and Sergeant Matthew Rhyndress had a relationship with Ms. Meyers because she was married to City Manager Mark Meyers and was also Rhyndress's attorney.  Compl., R.1, PageID#3, 6.  Mark Meyers allegedly conspired with Shaw and Rhyndress to ensure that Rudd received no help finding his sons.  *Id.*, PageID#7; Compl., Ex. A, R.1-1, PageID#32–33.  Rhyndress later detained Rudd without cause and told him that the police "would not be investigating anything or providing any assistance."  Compl., R.1, PageID#7.  When Rudd asked why, Rhyndress allegedly threatened to arrest him for trespassing.  *Id.*  Rudd's complaint suggests that he was parked on the public street near the Meyers home during this encounter.  *Id.*, PageID#8; Compl., Ex. A, R.1-1, PageID#32–33.

The abduction continued "until a different police agency intervened."  Compl., R.1, PageID#7.  That agency "facilitated the safe return of [Rudd's] children."  *Id.*  After the abduction, the court overseeing the custody dispute restricted the parenting time for Rudd's ex-wife.  *Id.*

2. *Personal Protection Order.*  Over the next five months, Rudd alleges, Ms. Meyers "overwhelmed" his custody case with a "barrage of false allegations" that he had been "stalking and harassing her."  *Id.*  The complaint claims that several Norton Shores officials helped Meyers obtain an ex parte personal protection order as "leverage" in the custody case.  *Id.*  Police Chief Shaw allegedly authorized officers to illegally disclose Rudd's information on the Law Enforcement Information Network ("LEIN") to Mr. Meyers in order to help Ms. Meyers falsely portray Rudd as dangerous.  *Id.*, PageID#8–9.  The complaint adds that Sergeant Rhyndress and Officer Michael Wassilewski falsified reports by omitting mention of the risks that Rudd's sons faced and concealing Ms. Meyers's role.  *Id.*, PageID#8.  Based on the allegedly false and ex parte information, a six-month personal protection order was issued against Rudd.  *Id.*, PageID#9.

Rudd moved to terminate this order, and the court set the motion for a hearing in November 2013.  *Id.*  Before the hearing, Ms. Meyers filed a motion in the child-custody case asking the state court to order an evaluation by a neutral evaluator.  *Id.*  The court addressed both motions together.  *Id.*  It allegedly decided that the protection order should terminate early but remain in place "for a few weeks" while the parties litigated Ms. Meyers's custody-evaluation motion.  *Id.*  The court later ordered that evaluation to occur.  *Id.*, PageID#10.

Over the next two months, Ms. Meyers moved to find Rudd in criminal contempt for allegedly violating the protection order and requested sanctions on the ground that he filed his motion to terminate that order simply to harass her.  *Id.*  The court denied these motions because Rudd had received "some relief" when the court "shorten[ed] the term of the [order's] existence."  *Id.*  Rudd's complaint alleges that the protection order terminated in early 2014.  *Id.*, PageID#15.

Rudd later prevailed in the custody case.  After a six-month inquiry, the evaluator found that Rudd "possess[ed] deep love and care for his children" and that the evidence supported his concerns about his sons' safety.  *Id.*, PageID#11.  Discussing the situation between Rudd's ex-wife and her husband, the evaluator noted: "Although no severe or lethal violence has occurred in this case, the risk factors were present."  *Id.*  At some point, Michelle McLean—a partner at Melissa Meyers's law firm, Bolhouse, Baar & Hofstee, P.C. (the "Bolhouse Firm")—began representing Rudd's ex-wife.  *Id.*, PageID#4, 12.  Neither McLean nor Rudd's ex-wife challenged these findings.  *Id.*, PageID#11–12.  Rudd's ex-wife allegedly agreed with the concerns, acknowledging that her husband's "temper gets out of control sometimes" when he is drinking.  *Id.*, PageID#11.  In August 2014, Rudd received sole custody of his sons.  *Id.*, PageID#12.

3. *Rudd's Citizen Complaint*.  In 2015, Norton Shores hired a new chief of police, Jon Gale.  *Id.*  Rudd thought that Gale might "objectively" address his concerns with the way that the police had handled his sons' abduction.  *Id.*  On July 20, 2015, he filed an official complaint with the Norton Shores Police Department.  *Id.*  He noted that he had never before had negative encounters with the police or received a warning of criminal activity.  Compl., Ex. A, R.1-1, PageID#31.  He then explained how he had requested help with the abduction due to the

domestic-violence risks.  *Id.*  Yet Rudd suggested that the police refused to help him in retaliation for his accusations against Ms. Meyers.  *Id.*, PageID#32.  This complaint also asserted that the former chief had disclosed his information on the LEIN database to help Ms. Meyers's litigation.  *Id.*, PageID#33.  Rudd requested an inquiry.  Compl., R.1, PageID#13.  Police Chief Gale later told Rudd that he would investigate any internal policy violations and have an officer from the Michigan State Police investigate the LEIN allegation.  *Id.*, PageID#13–14.

Instead, Rudd alleges, Gale immediately gave his complaint to Mark and Melissa Meyers and former Police Chief Shaw—a violation of a confidentiality rule designed to prevent the chilling of citizen complaints.  *Id.*, PageID#14.  Rudd asserts that Gale never internally investigated the complaint.  *Id.*  And, according to Rudd, Gale set up a sham outside investigation, asking Michigan State Police Lieutenant Chris McIntire, a trusted colleague, to "go through the motions of 'investigating' the complaint without any documentation or scrutiny."  *Id.*

4.  *Alleged Retaliation*.  Rudd claims that his citizen complaint triggered retaliatory actions.  Ms. Meyers began to threaten Rudd using the allegedly expired protection order.  *Id.*, PageID#14–15.  In late July 2015, Rudd was coaching his sons' soccer team at a crowded tournament.  *Id.*  Ms. Meyers was at this tournament, but Rudd claims he never saw her.  *Id.*, PageID#15.  Eight days after Rudd filed his citizen complaint, Meyers sent Rudd's counsel an email asserting that Rudd violated the expired protection order because he continued to coach his sons' team (rather than leave) after being told of her presence.  *Id.*  She also expressed a willingness to "create a similar situation" at future soccer games, which might put Rudd's sons "through the trauma of police interaction" with him.  *Id.*  Although Meyers had been told by Police Chief Gale that the protection order had been removed from the LEIN database, she demanded that Rudd stipulate to an indefinite order.  *Id.*, PageID#15–16.  She also appears to have tied her demands to Rudd's citizen complaint.  *Id.*, PageID#16.  After stating that Rudd had "recently brought up issues from the past," she asserted that Rudd "ha[d] made false, defamatory comments again about [her] and [her] husband in a clear attempt to get [her] husband, the former police chief and North Shores Police Department into some sort of trouble."  *Id.*

Rudd complained about this email to Police Chief Gale, but Gale simply passed his new message back to Ms. Meyers. *Id.* Meyers then coordinated with Michelle McLean, her colleague at the Bolhouse Firm, to get the protection order updated. *Id.* In early August, McLean filed a motion asserting that a "clerical error" had discharged the order from the LEIN database and asking the court to reenter it. *Id.*, PageID#17. Believing that the protection order had expired, Rudd's counsel responded with a sanctions motion. *Id.* McLean and Meyers then filed a second motion to authorize the police department to put the protection order in the LEIN database, relying on Rudd's citizen complaint to the police as the grounds for this request. *Id.*

On August 25, Rudd requested all records relating to his citizen complaint from the Norton Shores Police Department under Michigan's Freedom of Information Act. *Id.*, PageID#18. Days later, the department allegedly retaliated by entering the protection order into the LEIN database without a court order. *Id.* The complaint says that McLean knew of this decision. *Id.* She asked Rudd's counsel to cancel the upcoming motions hearing on the ground that Meyers was dropping her request for a protection order, omitting that the police had already entered it into the LEIN database. *Id.* In mid-September, Rudd asserts, he learned of this invalid entry in a letter from the Michigan State Police. *Id.* He immediately told the Norton Shores Police Department that it had been entered in error, but the department ignored his concern. *Id.*, PageID#18–19.

On October 20, Rudd filed a motion in the protection-order case seeking a declaration that the entry was invalid. *Id.*, PageID#19. McLean responded with a motion seeking to hold Rudd in criminal contempt for violating the order, requesting that he be sentenced to 30 days in jail and forced to pay $5,000 in costs. *Id.* Rudd's citizen complaint was "a central theme" of this contempt motion. *Id.* The court scheduled a hearing on these motions for November 9. *Id.*, PageID#21.

Before this hearing, Rudd claims, individuals tried to intimidate him into dropping his complaints about the city. On November 5, Douglas Hughes, the city attorney, sent him a cease-and-desist letter. *Id.*, PageID#20. The letter noted that the mayor had asked him to monitor Rudd's "conduct and behavior as it relates to the employment of Mark Meyers[.]" *Id.* The letter asserted that Rudd had "made serious defamatory and disparaging remarks about Mr. Meyers"

and that Hughes would "take whatever action is legally necessary to protect the professional and privacy rights of Mr. Meyers." *Id.*   It directed Rudd to be "mindful" of his statements.   *Id.* When Rudd responded that he had never contacted Mr. Meyers and that he found Hughes's letter intimidating, Hughes responded: "Good.   Stay away from the Meyer's [sic] and we will get along just fine."   *Id.*

On the morning of the hearing, McLean and Joel Baar, a managing partner of the Bolhouse Firm, also allegedly threatened Rudd with jail time.  *Id.*, PageID#21.   The complaint says that they told Rudd that he could avoid jail if he would agree not to engage in "conduct" "concerning" to Mark and Melissa Meyers, such as Rudd's citizen complaint and records requests.  *Id.*   They added that the hearing "could turn into an arraignment" and that Police Chief Gale, Lieutenant McIntire, City Attorney Hughes, and Mr. Meyers were all prepared to testify that Rudd had engaged in "very concerning behavior."   *Id.*, PageID#21–22.   They sought to get him to drop his complaint against the city in exchange for Ms. Meyers dropping her contempt motion.  *Id.*, PageID#22.

Rudd refused.  *Id.*   The court allegedly found Ms. Meyers's contempt motion meritless but sent the parties to mediation.  *Id.*, PageID#22–23.   This saga ended when the judge dismissed the motion with prejudice and ordered the police to remove the protection order from the LEIN database.  *Id.*, PageID#23.

B

In February 2018, Rudd brought this pro se suit against everyone involved.   He sued the City of Norton Shores and several officials: City Manager Mark Meyers, Mayor Gary Nelund, Police Chief Daniel Shaw and his successor, Jon Gale, Sergeant Matthew Rhyndress, Officer Michael Wassilewski, and City Attorney Douglas Hughes and his firm.   He also sued Michigan State Police Lieutenant Chris McIntire.   And he sued several private actors: Melissa Meyers, Michelle McLean, Joel Baar, and the Bolhouse Firm.   Among his federal claims under 42 U.S.C. § 1983, Rudd alleged that these parties violated the First Amendment by conspiring to retaliate against him for his speech critical of Mr. and Ms. Meyers and the Norton Shores police.   He also asserted state tort claims.

Lieutenant McIntire filed a motion to dismiss. The district court granted it. The court held that Rudd's allegations were too conclusory as to McIntire to state a conspiracy claim. It added that a substantive First Amendment claim would fail against McIntire because McIntire had not taken a sufficiently serious "adverse action" against Rudd in response to any protected speech. The court dismissed Rudd's other federal claims against all defendants and his state claims against McIntire.

The other defendants later filed their own motions to dismiss or for judgment on the pleadings. The court dismissed Rudd's First Amendment claim against these defendants and declined to exercise supplemental jurisdiction over his state claims. The court noted that § 1983 requires state action and that Rudd's complaint nowhere alleged that the private defendants acted on the state's behalf. Turning to the public defendants, the court held again that Rudd had failed to allege that they took a sufficiently serious "adverse action" against him for his protected speech.

II

Rudd appeals the dismissal of his First Amendment claim. We begin with the ground rules. Start with procedure. We review de novo a decision granting a motion to dismiss or for judgment on the pleadings. *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 479 (6th Cir. 2020); *Doe v. Baum*, 903 F.3d 575, 580 (6th Cir. 2018). To survive these motions, Rudd's complaint must provide "a short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering whether Rudd's complaint does so, we accept as true its factual allegations and draw all reasonable inferences in his favor, but we disregard any legal conclusions. *Doe*, 903 F.3d at 580–81. The factual allegations will suffice if they "'plausibly suggest[]' that he can meet the elements of his claim," *id.* at 580 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), and allow us "to draw the reasonable inference" that the defendants would be liable if Rudd could prove his alleged facts, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Turn to substance. Section 1983 makes "liable" "[e]very person" who "under color of" state law "subjects, or causes to be subjected," another person "to the deprivation of any rights,

privileges, or immunities secured by the Constitution[.]"  42 U.S.C. § 1983.  This text requires plaintiffs to allege two things.  They must allege that they suffered a "deprivation" of a constitutional right.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970).  And they must allege that the defendant acted "under color of" state law when inflicting this injury.  *See Harcz v. Boucher*, 763 F. App'x 536, 540 (6th Cir. 2019).  Because Rudd has sued many defendants, he also must meet a third § 1983 requirement: He cannot generically hold one defendant liable for another's actions.  Rather, he must allege that each defendant, through that defendant's own actions, "subject[ed]" him (or "cause[d]" him to be subjected) to the constitutional deprivation.  *See Jane Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020).

How does Rudd hope to prove these § 1983 requirements?  The first one (proving the deprivation of a constitutional right) is the straightforward part of his appeal.  He asserts that the defendants violated the First Amendment by retaliating against him for his speech and petitioning.  This type of claim is well established.  "'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citation omitted).

The second and third requirements (proving that each defendant acted under color of state law and independently violated Rudd's rights) are more complicated.  Rudd faces an obvious obstacle to proving that the *private* defendants acted "under color of" state law because that requirement typically excludes private parties from the statute's reach.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).  Rudd attempts to avoid this obstacle by alleging that the public and private defendants conspired to retaliate against him for his speech.  The Supreme Court has held that private parties who conspire with public actors to violate constitutional rights "act[] 'under color' of law for purposes of" § 1983.  *Adickes*, 398 U.S. at 152; *Dennis v. Sparks*, 449 U.S. 24, 28 (1980).  We have thus noted that "claims of conspiracies between private and state actors, if adequately alleged, generally suffice to establish state action on the part of the private actors for the purpose of deciding a motion to dismiss."  *Revis v. Meldrum*, 489 F.3d 273, 292 (6th Cir. 2007).  (The Fourteenth Amendment also requires state action, but as a constitutional matter rather than a statutory one.  Yet the Constitution follows a state-action test

analogous to § 1983's statutory test.  *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982).)

Rudd likewise relies on his conspiracy claim to avoid § 1983's rule against holding one defendant vicariously liable for another's actions.  *See Jane Doe*, 954 F.3d at 934.  The Supreme Court has read § 1983's language against the backdrop of common-law tort principles.  *See Nieves*, 139 S. Ct. at 1726.  The common law has long allowed a conspirator to be found liable for a tort committed by a coconspirator in furtherance of the conspiracy.  *See Beck v. Prupis*, 529 U.S. 494, 502–03 (2000); Restatement (First) of Torts § 876 (1939).  Courts have thus applied this conspiracy rule in the § 1983 context.  *See Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012); *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980).  If Rudd has plausibly alleged a conspiracy against a defendant, the conspiracy allegation offers "the conceptual spring" for holding that defendant liable for the actions of another defendant.  *Farrar v. Cain*, 756 F.2d 1148, 1151 (5th Cir. 1985) (citation omitted).

These ground rules show that this case boils down to two questions:  Do Rudd's allegations plausibly plead a deprivation of his rights under the First Amendment?  If so, do Rudd's conspiracy allegations plead enough facts against each defendant to connect that defendant to this constitutional deprivation?  We will address these questions in turn.

A

The First Amendment prohibits state actors from "abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I.  To state a First Amendment claim, Rudd must show that his conduct fell within the "freedom of speech" or the right "to petition," and he must show that the defendants "abridg[ed]" these rights by taking adverse actions against him because of his protected activities.  In other words, Rudd must show that: (1) he engaged in protected conduct; (2) the defendants took an adverse action against him; and (3) a causal connection exists between the two.  *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019).  Rudd's complaint plausibly alleges all three elements.

1. *Protected Conduct*.  Rudd's allegations implicate both the freedom to petition and the freedom of speech.  The Supreme "Court has recognized the 'right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights.'"  *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018) (citation omitted).  Like many others, this right has roots in the English Bill of Rights of 1689.  *McDonald v. Smith*, 472 U.S. 479, 482 (1985).  Under the English version, "all commitments and prosecutions for such petitioning [were] illegal." 2 William Blackstone, *Commentaries on the Laws of England* *139.  So the Supreme Court has held that the right allows an ordinary citizen to "convey[] the special concerns of [the petition's] author to the government," and to "request[] action by the government to address those concerns," generally without fear of criminal or civil repercussions.  *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388–89 (2011); *see BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524– 25 (2002).

The freedom of speech likewise protects the right of an ordinary citizen to criticize public officials, again generally without fear of criminal or civil repercussions.  *See Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).  The great public outcry against the Sedition Act of 1789, which allowed the government to punish "malicious" writings designed to bring public officials into "disrepute," emphatically exemplifies this right.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 273–75 (1964); St. George Tucker, *View of the Constitution of the United States* 380 (1999).  While that Act "was never tested in [the Supreme] Court, the attack upon its validity has carried the day in the court of history."  *Sullivan*, 376 U.S. at 276.  Today, countless decisions make clear that "[c]riticism of government is at the very center of the constitutionally protected area of free discussion."  *Barrett v. Harrington*, 130 F.3d 246, 262 (6th Cir. 1997) (citation omitted).  And they make clear that this constitutional protection extends to criticisms of the police.  *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987).

On appeal, the defendants do not dispute that Rudd's complaint adequately alleges that he engaged in petitioning and speech activities that fall within these freedoms.  Most obviously, Rudd petitioned the Norton Shores Police Department when he filed a citizen complaint in July 2015 and requested public records about that complaint a month later.  Compl., R.1, PageID#12– 13, 18; *see DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288–89 (11th Cir. 2019);

No. 19-1226                    *Rudd v. City of Norton Shores, et al.*                    Page 12

*Gagliardi v. Village of Pawling*, 18 F.3d 188, 194–95 (2d Cir. 1994). His citizen complaint was also protected expression because he criticized public officials for the way in which they had handled his earlier requests for help in July 2013. *See Bloch*, 156 F.3d at 678. And even those earlier informal requests for police assistance in July 2013 qualify as protected petitioning of the government. Compl., R.1, PageID#5–7; *see Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010); *Meyer v. Bd. of Cnty. Comm'rs of Harper Cnty.*, 482 F.3d 1232, 1243 (10th Cir. 2007).

To be sure, the First Amendment does not protect a person who tells knowing or reckless lies or takes threatening actions. *See McDonald*, 472 U.S. at 483–85; *Barrett*, 130 F.3d at 263 n.28. And the defendants obviously believe that Rudd told falsehoods and engaged in harassment. But they rightly do not dispute that we must accept Rudd's contrary allegations as true at this pleading stage. As alleged, his conduct falls within core First Amendment freedoms.

2. *Adverse Action*. Rudd next must show that the defendants took a sufficiently serious "adverse action" against him. We have described an adverse action as "one that is '*capable* of deterring a person of ordinary firmness' from exercising the constitutional right in question." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (citation omitted). This test represents a compromise of competing concerns. On the one hand, it would "trivialize the First Amendment" if we allowed a citizen to sue over any governmental nuisance, no matter how inconsequential. *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999) (en banc) (citation omitted). On the other, nothing justifies "harassing people for exercising their constitutional rights," so the deterrent effect on speech "need not be great" to be actionable. *Id.* (citation omitted). The standard is reduced even more in this case because of the plaintiff before the court—an ordinary citizen. We have calibrated the person-of-ordinary-firmness test to the plaintiff, explaining that the average prisoner may "have to endure more than" the average public employee, who may "have to endure more than the average citizen." *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010).

A few examples show the kinds of actions we have found sufficiently "adverse" under the First Amendment. Cynthia Bloch could sue a sheriff for disclosing humiliating and confidential details of her rape in response to her criticism that the sheriff had not done enough

to find the culprit. *See Bloch*, 156 F.3d at 679–80. Tom and Melanie Briner could sue the police for failing to investigate a crime in response to their criticism over how the police had investigated an earlier crime. *See Briner v. City of Ontario*, 370 F. App'x 682, 700–01 (6th Cir. 2010). Sue Fritz could sue a township official for encouraging her employer not to renew her contract in response to her comments at public meetings. *See Fritz*, 592 F.3d at 725–26. David Holzemer could sue a police officer for delaying the renewal of a permit in response to his petitioning of a city councilman. *See Holzemer*, 621 F.3d at 525. Kathleen Benison could sue college officials for filing a suit against her in response to her husband's sponsoring a vote of no confidence against them. *See Benison v. Ross*, 765 F.3d 649, 660 (6th Cir. 2014). And Frank Barrett could sue a judge for falsely telling the media that he had been "stalking" her in response to his public criticisms. *See Barrett*, 130 F.3d at 262.

Measured against this caselaw, Rudd's complaint contains enough facts to allege that the defendants took "adverse" actions that could "chill" an ordinary person from speaking out. *See Thaddeus-X*, 175 F.3d at 397. If anything, he has alleged more serious actions. Most notably, Rudd asserts that the defendants conspired to hold him in criminal contempt for violating an expired protection order and to send him to jail for 30 days. Compl., R.1, PageID#19; *cf. Benison*, 765 F.3d at 660. Relatedly, Rudd alleges that the police wrongly breached their rules of confidentiality for citizen complaints and illegally put an expired protection order into the LEIN database. Compl., R.1, PageID#14, 18; *cf. Bloch*, 156 F.3d at 679–80. Switching back to 2013, Rudd alleges that the police detained him without probable cause and refused to investigate his sons' abduction because of his claims against Ms. Meyers. Compl., R.1, PageID#6–7; Compl., Ex. A, R.1-1, PageID#32–33; *cf. Briner*, 370 F. App'x at 700–01. And he alleges that Ms. Meyers, with the assistance of the police, obtained a protection order by falsely accusing him of stalking. Compl., R.1, PageID#7–9; *cf. Barrett*, 130 F.3d at 262.

3. *Causation*. Rudd lastly must show "a causal connection" between his protected conduct and the injurious actions that the defendants allegedly took. *Nieves*, 139 S. Ct. at 1722 (citation omitted). The defendants' retaliatory animus "must be a 'but-for' cause" of the actions, meaning that they would not have taken them but for the fact that Rudd engaged in protected conduct. *Id.* (citation omitted). There is some uncertainty in our cases over whether a plaintiff

must prove this but-for test or whether the plaintiff need only show that the protected conduct was a motivating factor for the action (which switches the burden to the defendant to prove the absence of but-for causation).  *See Spithaler v. Smith*, 803 F. App'x 826, 829–30 (6th Cir. 2020).

Either way, Rudd's complaint plausibly alleges the causal connection.  To begin with, he asserts plenty of facts suggesting that the adverse actions in 2015 were motivated by his citizen complaint and public-records request.  Only eight days after Rudd filed this citizen complaint, Rudd's lawyer received an email from Melissa Meyers accusing Rudd of violating the expired protection order while coaching his sons' soccer team.  Compl., R.1, PageID#14–15.  That email criticized Rudd's complaint for bringing up "issues from the past" and making "false, defamatory comments" about her, her husband, and the police.  *Id.*, PageID#16.  Ms. Meyers's contempt motion and her motion to authorize the police department to put the protection order in the LEIN database likewise both purportedly based her "stalking" allegations on Rudd's citizen complaint (which criticized the public officials more than her).  *Id.*, PageID#17, 19.  And the city attorney sent Rudd a threatening letter due to his "defamatory and disparaging remarks" about Mark Meyers.  *Id.*, PageID#20.  Separately, Rudd has plausibly alleged that the earlier adverse actions in 2013 (e.g., the refusal to help him find his sons, the allegedly illegal detention, and the personal protection order) were all in response to his speech against Ms. Meyers.  *Id.*, PageID#6–9.

We end with one disclaimer.  The Supreme Court has held generally that a plaintiff can prove a causal connection between protected speech and an arrest or prosecution only if the plaintiff shows that a defendant lacked probable cause for that arrest or prosecution.  *Nieves*, 139 S. Ct. at 1727; *Hartman v. Moore*, 547 U.S. 250, 265–66 (2006).  We need not consider whether a probable-cause element extends to civil suits (or motions filed within them) because the defendants make no probable-cause argument on appeal.  *Cf. DeMartini*, 942 F.3d at 1289–91.

*  *  *

The defendants' responses do not convince us otherwise.  *First*, they assert that Rudd failed to plead an adequate "adverse action" because he challenges police *inaction*.  They argue that he complains only of the police department's failure to assist him in 2013 and its failure to

investigate his complaint in 2015.   These arguments are factually and legally mistaken. Factually, Rudd alleges more.  With respect to his July 2015 complaint, he asserts that the police responded not by doing "nothing" but by conspiring to have him held in criminal contempt for violating an expired protection order.  *See Benison*, 765 F.3d at 660.  With respect to his July 2013 request for help, he alleges that the defendants responded by detaining him and obtaining a protection order based on false stalking accusations.  *See Barrett*, 130 F.3d at 262.

Legally, it is true that the "right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999).   And individuals have no constitutional entitlement to police protection.  *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989).   Yet the "unconstitutional conditions" doctrine places limits on the government's ability to deny an otherwise discretionary benefit in retaliation for a person's protected speech.  *Holzemer*, 621 F.3d at 525.  Even if, for example, a person does not have a right to a permit, the government still may not deny that permit because of the person's public criticisms.  *See id.*  Likewise, police officers could not refuse to protect individuals from crime because the officers disliked their politics, even if the individuals had no right to protection as an initial matter.   We have thus held that plaintiffs stated a plausible claim by suggesting that the police "refused to investigate the theft of [their] GMC truck in retaliation for complaints regarding the [police's] alleged failure to properly investigate [an earlier] burglary[.]" *Briner*, 370 F. App'x at 700.

*Second*, the defendants turn to causation.  They suggest that their efforts to enforce the protection order could not be retaliatory because the order remained in effect through 2015.  At this stage, we must reject this argument's premise.  Rudd's complaint alleges that the order terminated in early 2014, and we must accept his allegation as true.  Compl., R.1, PageID#15. The defendants respond that we should take judicial notice of a December 2013 court order stating that the protection order "shall remain in full force and effect until further order of the Court."  Mot., Ex. 2, R.53-2, PageID#345; *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008).  But this court order does not show that the protection order continued through 2015.  It shows only that the protection order did not terminate in December 2013,

which comports with Rudd's allegations that it ended a few months later.   Other records corroborate Rudd's claim.   His complaint cites statements from the state judge suggesting that Rudd convinced the judge to "shorten the term" of his six-month protection order—a decision that would conflict with the notion that it extended for years.   Compl., R.1, PageID#10.   And another record lists the order's expiration date as February 1, 2014.   Mot., Ex. 3, R.53-3, PageID#347.   Regardless, even if the protection order had not expired, the complaint plausibly alleges that the defendants engaged in retaliatory actions because of his speech, not because of any violation of that protection order.   All told, this causation question requires "the resolution of facts more appropriately dealt with at the summary-judgment stage or at trial."   *Mills v. Barnard*, 869 F.3d 473, 487 (6th Cir. 2017).

*Third*, some individual defendants suggest that Rudd's allegations against them do not, by themselves, show that they independently violated the First Amendment.   The private defendants assert that the complaint fails to show that their actions were under color of state law. And Lieutenant McIntire of the Michigan State Police argues that the complaint alleges merely that he attended a contempt hearing and failed to investigate Rudd's complaint.   As noted, however, Rudd's conspiracy allegations can suffice at the pleading stage "to establish state action on the part of the private actors[.]"   *Revis*, 489 F.3d at 292.   And his conspiracy allegations can suffice to hold these defendants liable for their codefendants' actions.   *See Livers*, 700 F.3d at 360.   These defendant-specific arguments thus fall short so long as Rudd has plausibly alleged that the defendants joined a conspiracy—the issue to which we now turn.

B

Having plausibly alleged a First Amendment claim, we next ask whether Rudd sufficiently connected each defendant to this claim through his conspiracy allegations.   Our circuit uses a "simple" conspiracy test.   *Novak*, 932 F.3d at 436.   A plaintiff must prove that "a single plan" existed, that each "alleged coconspirator shared in the general conspiratorial objective," and that "an overt act was committed in furtherance of the conspiracy[.]"   *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).   An "express agreement" need not exist, and "[e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved."   *Id.*

A complaint must identify the alleged conspiracy with more than "vague and conclusory allegations[.]"  *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020) (quoting *Heyne v. Metro. Nashville Public Schs.*, 655 F.3d 556, 563 (6th Cir. 2011)).  At "this early stage of litigation," however, a plaintiff's specific allegations of a conspiracy will suffice as long as they are plausible.  *Novak*, 932 F.3d at 436.  That is so even if a defendant's briefing identifies a "more likely alternative explanation[]" for what occurred.  *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013).

1.  Under this framework, Rudd's allegations suffice to allege a conspiracy among most of the defendants.  As an initial matter, the complaint plausibly alleges the generalities of the alleged conspiracy.  It identifies a single specific "plan": The defendants sought to retaliate against Rudd for his speech—namely, his recurring complaints about Ms. Meyers and the Norton Shores officials for their alleged conduct during his ex-wife's abduction of his sons in 2013.  *See Marvaso*, 971 F.3d at 606.  The complaint next identifies plenty of overt acts taken to further this conspiracy, including the adverse actions described above.  *See id.*  For the remaining element— that the defendants joined in the conspiracy's objectives—we must consider the complaint's allegations against each defendant individually.

*Melissa Meyers*.  Rudd's complaint asserts specific, nonconclusory allegations suggesting that Ms. Meyers shared the objective to retaliate against Rudd for his speech and to discourage him from speaking.  *See Novak*, 932 F.3d at 436.  Among them: In 2013, she allegedly sought the personal protection order based on false stalking allegations.  Compl., R.1, PageID#7.  In 2015, she invoked that expired order to threaten Rudd with criminal sanctions soon after he filed his citizen complaint criticizing her, her husband, and the Norton Shores police.  *Id.*, PageID#15.  Her email threatening these actions also impugned Rudd's citizen complaint, calling it "false" and "defamatory."  *Id.*, PageID#16.  Ms. Meyers later followed through with these threats by seeking to hold Rudd in criminal contempt allegedly based on his speech.  *Id.*, PageID#19.

*City Manager Mark Meyers*.  Rudd's complaint next plausibly alleges that City Manager Meyers shared the same objective.  After Rudd accused Ms. Meyers of helping his ex-wife with the abduction of Rudd's kids, Mr. Meyers allegedly coordinated with the police to ensure that Rudd received no aid finding his sons.  *Id.*, PageID#7; Compl., Ex. A, R.1-1, PageID#32–33.

The complaint adds that Mr. Meyers obtained confidential information about Rudd for Ms. Meyers to use in her request for a personal protection order. Compl., R.1, PageID#8–9. And it alleges that he was ready to testify about Rudd's "concerning behavior" at the contempt hearing in which Ms. Meyers sought to hold Rudd criminally liable for his citizen complaint. *Id.*, PageID#21–22.

*Chiefs of Police Daniel Shaw and Jon Gale*. Rudd's complaint also plausibly alleges facts suggesting that Chief of Police Shaw and his successor, Chief of Police Gale, shared in the same conspiratorial objective. The complaint alleges that Shaw illegally authorized a subordinate to provide Mark Meyers with confidential information from the police database about Rudd in retaliation for Rudd's accusations. *Id.*, PageID#8–9. And Police Chief Gale allegedly violated a longstanding policy by disclosing Rudd's citizen complaint to Mark and Melissa Meyers. *Id.*, PageID#14. Gale was also ready to testify in support of Ms. Meyers's contempt motion, which, again, was tied to Rudd's citizen complaint criticizing the police. *Id.*, PageID#21–22.

*City Attorney Douglas Hughes*. The complaint likewise asserts specific facts alleging that City Attorney Hughes shared the same objective. He sent Rudd a letter threatening legal action if Rudd did not stop criticizing Mark and Melissa Meyers and the Norton Shores police. *Id.*, PageID#20. The letter was based on Rudd's speech—asserting that Rudd had made "defamatory and disparaging remarks" and that Rudd should be "mindful" of the statements he makes to others about Mark Meyers. *Id.* This letter, too, plausibly suggests a coordinated effort to threaten Rudd because of his speech and to deter him from speaking.

*Officer Michael Wassilewski, Sergeant Matthew Rhyndress, and Lieutenant Chris McIntire*. The same goes for the three remaining law-enforcement officers. Officer Wassilewski and Sergeant Rhyndress both allegedly had a personal relationship with Ms. Meyers. *Id.*, PageID#3. Rudd asserts that they falsified reports to help Meyers obtain the personal protection order and to cover up the police conduct during the 2013 incident. *Id.*, PageID#8. Sergeant Rhyndress also allegedly detained Rudd without probable cause and threatened him with arrest in retaliation for his speech against Ms. Meyers. *Id.*, PageID#7. For his part, Lieutenant

McIntire attended the hearing for Ms. Meyers's contempt motion and was also allegedly willing to testify about Rudd's "concerning behavior." *Id.*, PageID#21–22.

*Michelle McLean & Joel Baar.* Rudd's complaint lastly pleads specific allegations tying Michelle McLean and Joel Baar of the Bolhouse Firm to the conspiratorial objective—to retaliate against Rudd for his speech critical of Mr. and Ms. Meyers and the Norton Shores police. At a meeting immediately before the criminal-contempt hearing, the complaint alleges, McLean and Baar threatened Rudd that he could go to jail because of his "concerning conduct": his citizen complaint and public-records requests. *Id.*, PageID#21. And the complaint alleges that they attempted to "coerce" him "into dropping any complaint[] against the city of Norton Shores" by using Ms. Meyers's unrelated criminal-contempt motion as leverage. *Id.*, PageID#22.

*Mayor Gary Nelund.* All of that said, Rudd's complaint does not adequately allege that Mayor Nelund shared in any objective to retaliate against Rudd for his speech. The complaint barely mentions the mayor at all. It alleges that he "collaborat[ed]" with others and failed to take "remedial action." *Id.*, PageID#3, 14. And City Attorney Hughes's letter to Rudd suggested that he was writing at the mayor's request. *Id.*, PageID#20. Rudd's conclusory allegations against the mayor fall short because they do not identify any specific actions that he took. *Cf. Moldowan v. City of Warren*, 578 F.3d 351, 395 (6th Cir. 2009).

2. The defendants' rejoinders do not change things. They argue that Rudd alleges only "parallel conduct" among the defendants, conduct that is more likely explained by unchoreographed independent actions than an agreement. *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 567). Not so. *Twombly* is instructive on this point. There, the plaintiffs claimed that several companies conspired to violate the Sherman Act. But their complaint's specific allegations asserted only "identical, *independent* action"—that is, "parallel conduct"— among the defendants. *Twombly*, 550 U.S. at 549–52 (emphasis added). Rudd's complaint, by contrast, alleges plenty of collaboration. To list a few examples, Chief of Police Gale allegedly shared Rudd's citizen complaint with Mark and Melissa Meyers—in violation of the department's confidentiality policy. Compl., R.1, PageID#14. And when Ms. Meyers sought to hold Rudd in criminal contempt allegedly for his citizen complaint, many public officials showed

up at the hearing to testify about Rudd's purported "concerning behavior." *Id.*, PageID#21–22. In short, the complaint does not assert that the defendants acted independently of one another; it alleges how they worked together. Specific allegations of coordinated action, rather than "parallel conduct," can suffice to state a conspiracy claim. *See Novak*, 932 F.3d at 436.

The defendants also argue that Rudd's complaint fails to include any allegation that they shared the same conspiratorial objective. Yet the complaint repeatedly refers to a conspiracy to retaliate against Rudd for his speech and to stop him from speaking. Regardless, a complaint's conspiracy claim does not turn on whether the plaintiff includes "a conclusory allegation of agreement[.]" *Twombly*, 550 U.S. at 557. It turns on whether the specific facts alleged raise a "suggestion" of such an agreement. *Id.* Rudd's specific allegations satisfy this standard. *See Novak*, 932 F.3d at 436; *cf. Jacobs v. Alam*, 915 F.3d 1028, 1043 (6th Cir. 2019).

At bottom, the defendants dispute the truth of Rudd's allegations. They claim that Rudd's case "rests entirely on the gossamer thread of several alleged personal relationships," such as the "coincidental fact" that Melissa Meyers was married to the city manager. Norton Shores Br. 27–28. And they insist that this was just "a contentious custody dispute in which both sides went to local law enforcement agencies to complain about the conduct of those on the other side." *Id.* at 28. Maybe so. But the truth of Rudd's allegations is for down the road. Even if the evidence will later show that Rudd's version of events is "the least plausible of the bunch," we must accept that version at this pleading stage. *See Doe*, 903 F.3d at 587. And that version plausibly alleges a conspiracy to retaliate against him for his speech.

*   *   *

We conclude with some loose ends. None of the defendants have invoked a qualified-immunity defense on appeal, so we need not consider whether their alleged conduct violated a clearly established constitutional right at this stage. *See Brown v. Crowley*, 312 F.3d 782, 787–88 (6th Cir. 2002); *cf. Spithaler*, 803 F. App'x at 829. Likewise, the corporate defendants (the City of Norton Shores, the Bolhouse Firm, & City Attorney Hughes's law firm) have not asserted that Rudd failed to adequately plead the types of allegations necessary to make them liable under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (municipal

corporations); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (private entities). We thus need not consider that point either.  We lastly leave to the district court's sound discretion whether Rudd should be given leave to amend his complaint (potentially with the counsel that he retained for his reply brief in this court).

To sum up, we affirm the district court on all of Rudd's federal claims against Lieutenant McIntire except for his First Amendment retaliation claim, and we affirm the district court on Rudd's state claims against McIntire because Rudd did not raise sufficient arguments with respect to these claims on appeal.  We also affirm the district court's dismissal of Rudd's First Amendment retaliation claim against Mayor Nelund because Rudd did not allege enough facts against the mayor.  But we reverse the dismissal of Rudd's First Amendment retaliation claim against the remaining defendants.  And because the district court declined to exercise supplemental jurisdiction over Rudd's state claims against those defendants rather than dismiss them on the merits, we reverse the dismissal of those state claims, too.

Rudd has alleged facts that state a plausible claim for relief.  Stripped to their essence, his allegations assert that the defendants conspired to, among other things, send him to jail simply because they did not like the criticisms in his citizen complaint.  Such allegations, if proved true, state an actionable First Amendment claim.  We thus affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-1226

DANIEL WILLIAM RUDD,

    Plaintiff - Appellant,

      v.

CITY OF NORTON SHORES, MICHIGAN, et al.,

    Defendants - Appellees.

> **FILED**
> Oct 06, 2020
> DEBORAH S. HUNT, Clerk

Before:  SUHRHEINRICH, DONALD, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk