UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL WILLIAM RUDD,

       Plaintiff,

v.                                                                    Case No. 1:18-cv-124

CITY OF NORTON SHORES, et al.,                   Hon. Hala Y. Jarbou

       Defendants.

_____/

## OPINION

Plaintiff Daniel William Rudd, a pro se litigant, brings this civil rights action against the City of Norton Shores and several individuals.  Before the Court is his motion to amend the complaint.  For the reasons herein, the Court will grant the motion in part.

## I. BACKGROUND

### A. Original Complaint

Rudd filed his original complaint in this action in February 2018, asserting claims under 42 U.S.C. § 1983 and state law.  Rudd alleged a conspiracy between various employees of the City of Norton Shores, as well as private individuals working with the City, to retaliate against him for complaining about actions taken by the police and his ex-wife's attorney, Melissa Meyers, during a contentious child custody dispute between Rudd and his ex-wife in 2013.  Ms. Meyers happened to be the wife of the City Manager, Mark Meyers, and was an attorney for Sergeant Matthew Rhyndress of the Norton Shores Police Department.

In July 2013, during the custody proceedings, Rudd's ex-wife allegedly absconded with Rudd's children and kept them in hiding.  Rudd asked for help from the City police department. However, Mark Meyers allegedly conspired with Rhyndress and the Chief of Police, Daniel Shaw,

to ensure that Rudd would not receive help from the police.  When Rudd was parked on a public street, Rhyndress allegedly detained Rudd without cause and told him that the police would not assist him with finding his children.

With the help of allegedly falsified reports from Sergeant Rhyndress and Norton Shores Police Officer Michael Wassilewsky, Ms. Meyers obtained a personal protection order (PPO) against Rudd.  The judge apparently shortened the length of the order and it ended in 2014.  Rudd later prevailed in the child custody dispute, obtaining sole custody of his sons.

Rudd filed a citizen complaint with the Norton Shores Police Department in June 2015, after the City hired a new police chief.  The complaint asserted that the police had refused to assist him because of accusations he had made against Ms. Meyers.  It also asserted that former Police Chief Shaw improperly disclosed Rudd's information to the LEIN database.  According to Rudd, the new police chief, Jon Gale, never internally investigated this complaint.  Instead, he conducted a sham investigation with the help of a trusted colleague, Michigan State Police Lieutenant Chris McIntire.

Rudd allegedly experienced retaliation as a result of his citizen complaint.  In late July 2015, Ms. Meyers told Rudd's attorney that Rudd had violated the expired PPO by coaching his sons' soccer team at a tournament, an event at which Meyers was also present, and remaining present rather than leaving after being told about Meyers' presence.  She allegedly threatened to take further action at future soccer games.  Rudd complained about Ms. Meyers's statements to Police Chief Gale, but Gale simply forwarded Rudd's complaints to Ms. Meyers.

Ms. Meyers then coordinated with her law firm colleague, Michelle McLean, to try to update the PPO.  McLean filed a motion with the state court asserting that a clerical error had discharged the PPO from the LEIN database.  McLean asked the court to reenter the PPO in the

LEIN database.  After Rudd's counsel responded with a sanctions motion, McLean submitted a second motion to reenter the PPO in the LEIN database, relying in part on Rudd's citizen complaint to the police department as grounds for the PPO request.

In August 2015, Rudd requested records related to his citizen complaint from the Norton Shores Police Department under Michigan's Freedom of Information Act.  Days later, the police department entered the PPO into the LEIN database without a court order.  Rudd learned of this entry the following month.

In October 2015, Rudd sought a declaration in the PPO case that the LEIN entry was invalid.  McLean responded with a motion to hold Rudd in criminal contempt for violating the PPO.  Rudd's citizen complaint was a basis for McLean's motion.  The court overseeing the PPO scheduled a hearing for November 9, 2015.

Before the hearing, several individuals allegedly tried to intimidate Rudd into dropping his complaints against the City.  On November 5, 2015, the city's attorney, Douglas Hughes, sent Rudd a cease-and-desist letter, accusing Rudd of making defamatory and disparaging remarks about Mr. Meyers, informing Rudd that Hughes would take legal action to protect Meyers, and telling Rudd to be "mindful" of his statements.  The letter apparently contended that the City's mayor, Gary Nelund, had asked Hughes to "monitor" Rudd's conduct as it relates to Mr. Meyers. (*See* Compl., ECF No. 1, PageID.20.)

On the morning of the hearing, McLean and the managing partner of her law firm, Joel Baar, allegedly threatened Rudd with jail time and suggested that Rudd could avoid jail if he agreed not to engage in certain conduct, alluding to Rudd's citizen complaint.  McLean allegedly offered to drop her contempt motion if Rudd withdrew his citizen complaint.

Rudd refused McLean's offer.  The judge allegedly found that the contempt motion was meritless and ordered that the PPO be removed from the LEIN database.

In his original complaint, Rudd sued the City of Norton Shores and several officials: City Manager Mark Meyers, Mayor Gary Nelund, Police Chief Daniel Shaw and his successor, Jon Gale, Sergeant Matthew Rhyndress, Officer Michael Wassilewski, and City Attorney Douglas Hughes and his law firm.  Rudd also sued Michigan State Police Lieutenant Chris McIntire as well as the following private actors:  Melissa Meyers, Michelle McLean, Joel Baar, and their law firm, Bolhouse, Baar & Hofstee, P.C.

Among other things, Rudd claimed that Defendants had conspired to retaliate against him for criticizing Mr. and Ms. Meyers and the Norton Shores police, in violation of Rudd's First Amendment rights.  Rudd brought claims for abuse of process, denial of access to the courts, malicious prosecution, and retaliation under 42 U.S.C. § 1983, as well as claims for abuse of process, malicious prosecution, and infliction of emotional distress under state law.  (*See* Compl., ECF No. 1.)

### B. Procedural History

Defendant McIntire moved for dismissal of the claims against him for failure to state a claim and immunity.  The Court granted this motion, holding the following:  abuse of process does not state a claim under § 1983; Rudd did not allege critical elements of a claim for denial of access to the courts or for malicious prosecution; and Rudd did not sufficiently allege retaliation or conspiracy to retaliate by McIntire.  (*See* 8/8/2018 Op., ECF No. 50.)  In addition, Rudd's state-law claims for malicious prosecution and intentional infliction of emotional distress were deficient and barred by Michigan's governmental immunity statute.

The remaining Defendants moved for judgment on the pleadings regarding the federal conspiracy and retaliation claims against them, which were the only remaining viable federal

4

claims in light of the Court's previous opinion.  The Court granted this motion.  The Court declined to exercise supplemental jurisdiction over Rudd's state-law claims against these other defendants. The Court entered its judgment on January 8, 2019, and denied a motion to alter or amend judgment on February 5, 2019.

Rudd appealed this Court's judgment.  On October 6, 2020, the Court of Appeals for the Sixth Circuit entered an opinion partially reversing this Court's decision.  *See Rudd v. City of Norton Shores*, 977 F.3d 503 (6th Cir. 2020).  Specifically, the Court of Appeals found that, for all the individual Defendants other than Defendant Nelund, Rudd had alleged sufficient facts to state a claim that they had conspired to retaliate against him for engaging in conduct protected by the First Amendment.  *Id.* at 519-20.  The Court of Appeals affirmed the dismissal of the state-law claims against Defendant McIntire.  *Id.* at 520.  However, that court reversed the dismissal of the state-law claims against the other defendants because the Court's dismissal was premised on declining to exercise supplemental jurisdiction where no federal claims remained in the action.  *Id.* And finally, the Court of Appeals expressly left "to the district's court's sound discretion whether Rudd should be given leave to amend his complaint[.]"  *Id.*

In March 2021, Rudd filed his motion to amend the complaint.  He proposes to add new allegations concerning the events in 2013 to support an amended retaliation claim (Count 1), a new claim for violation of due process (Count 2), expanded claims for malicious prosecution under § 1983 and state law (Counts 3 and 4, respectively), an amended claim for abuse of process under state law (Count 5), and a more specific claim for intentional infliction of emotional distress (Count 6).  He also attempts to correct defects in his allegations against Mayor Nelund.  Defendants oppose the motion.

## II. STANDARDS

When a plaintiff requests leave to amend their complaint, the Court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a).  "Denial may be appropriate, however, where there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'"  *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  An amendment would be futile if it would not survive a motion to dismiss.  *Write Start Early Christian Ed. Ctr., LLC v. Nat'l Fire & Marine Ins.*, 836 F. App'x 362, 364 (6th Cir. 2020).

## III. ANALYSIS

### A. Amendments that state a claim against Gary Nelund.

Rudd's proposed amended complaint attempts to correct the defect in his allegations against Mayor Nelund.  The Court of Appeals summarized that defect as follows:

> . . . Rudd's complaint does not adequately allege that Mayor Nelund shared in any objective to retaliate against Rudd for his speech. The complaint barely mentions the mayor at all.  It alleges that he "collaborat[ed]" with others and failed to take "remedial action."  *Id.*, PageID#3, 14.  And City Attorney Hughes's letter to Rudd suggested that he was writing at the mayor's request.  *Id.*, PageID#20.  Rudd's conclusory allegations against the mayor fall short because they do not identify any specific actions that he took.  *Cf. Moldowan v. City of Warren*, 578 F.3d 351, 395 (6th Cir. 2009).

*Rudd*, 977 F.3d at 519.

Rudd's proposed amended complaint now alleges that Nelund "authorized" Hughes, the City's attorney, to send the letter to Rudd threatening to take legal action, ostensibly in response to Rudd's statements about Mr. Meyers in Rudd's citizen complaint.  (*See* Proposed Am. Compl. ¶ 125, ECF No. 157-1.)  This act of authorization identifies the overt act taken by Nelund in support

of a conspiracy to retaliate against Rudd.  With this additional allegation, the proposed amended complaint arguably states a claim against Nelund.[1]

Defendants do not contend otherwise; instead, they raise a different objection.  They contend that the doctrines of res judicata (claim preclusion) and the law of the case preclude Rudd from attempting to add Nelund back to the action.  Defendants note that this Court granted Nelund's request for judgment on the pleadings, a decision that operates as a final decision on the merits.  In addition, Rudd asked the Court of Appeals for permission to amend his complaint, but the Court of Appeals did not grant that request.  Thus, Defendants ask the Court to hold Rudd to the outcome of those decisions.

Under federal law,

> [a] claim is barred by the res judicata [or claim preclusive] effect of prior litigation if all of the following elements are present:  (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.

*Trs. of Operating Eng'rs Local 234 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 380 (6th Cir. 2019) (quoting *Browning v. Levy*, 283 F.3d 761, 771 (6th Cir. 2002) (quotation marks omitted)).

The problem with Defendants' reliance on res judicata is that the Court of Appeals reversed this Court's judgment, at least in part.  Consequently, there is no final judgment on the merits in this matter to which res judicata would apply.  Indeed, as the standard recited in *Browning* indicates, res judicata typically applies to judgments in *prior* actions, not rulings in the same case. *See Currier v. Virginia*, 138 S. Ct. 2144, 2154 (2018) (noting that "[i]ssue preclusion addresses

---

[1] Nelund has not had an opportunity to respond.  The Court's decision does not preclude him from making his own arguments in support of dismissal of this claim.

the effect in a current case of a prior adjudication in *another case*.  So it doesn't often have much to say about the preclusive effects of rulings 'within the framework of a continuing action'") (quoting 18A C. Wright & A. Miller, *Federal Practice and Procedure* § 4434 (2d ed. 2002)).

Defendants also rely on the law of the case doctrine, contending that the Court must apply the "letter and spirit" of the Court of Appeals' decision not to grant Plaintiff leave to amend the complaint.  Under that doctrine,

> "findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation.  The doctrine also bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not." *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002) (citation omitted).  "This doctrine exists for good reason—it discourages 'perpetual litigation' and promotes finality in proceedings by requiring that parties seek review of a claim in the first appeal." *Burley v. Gagacki*, 834 F.3d 606, 619 (6th Cir. 2016) (quoting *United States v. McKinley*, 227 F.3d 716, 719 (6th Cir. 2000)).

*In re B&P Baird Holdings, Inc.*, 759 F. App'x 468, 477 (6th Cir. 2019).

The law of the case doctrine does not prevent the Court from granting leave to amend because Rudd sought to amend his complaint when appealing his case and the Court of Appeals never determined that he could not do so.  To the contrary, the Court of Appeals expressly stated that this Court had discretion to permit such an amendment.  Thus, Defendants' objections to proposed amendments that would add Nelund back to the case are meritless.

In addition, the Court finds that amendments pertaining to Nelund are not improper.  There is no evidence of undue delay, bad faith, or improper purpose by Rudd.  Accordingly, the Court will allow those amendments.

### B. Amendments barred by the statutes of limitations.

Defendants note that many of the new allegations in the proposed amended complaint relate to events that occurred in 2013.  For instance, paragraph 116 of the proposed complaint alleges conduct in 2013 as part of a conspiracy to retaliate against Rudd.  Similarly, subparagraphs (c)(i)

and (c)(ii) of paragraph 132 allege retaliatory conduct occurring in 2013.  Paragraphs 134 to 136,

139 to 141, and 150 allege conduct in 2013 by the judge in Rudd's PPO proceedings, in support

of the new claim for denial of due process.  Paragraph 156 alleges a conspiracy to prosecute the

PPO against Rudd in 2013, in support of a modified version of Rudd's malicious prosecution

claim.  Counts 3, 4, 5, and 6 of the proposed amended complaint are likewise based, at least in

part, on events from 2013.

The federal claims based solely on incidents in 2013 are barred by the applicable statute of

limitations.  State statutes of limitations and tolling principles apply to determine the timeliness of

claims asserted under 42 U.S.C. § 1983.  *Wilson v. Garcia*, 471 U.S. 261, 268-69 (1985).  Civil

rights suits filed in Michigan under § 1983 are the equivalent of personal injury actions; thus, the

applicable statute of limitations is three years.  *See Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 867

n.8 (6th Cir. 2020).  Accrual of the claim for relief, however, is a question of federal law.  *Collyer*

*v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).  The statute of limitations begins to run when the

aggrieved party knows or has reason to know of the injury that is the basis of his action.  *Id.*

In addition, Rudd's proposed state-law claims, to the extent they are based on events from

2013, are barred by the statutes of limitations.  Rudd's claim for malicious prosecution under state

law (Count 4) is subject to the two-year limitations period in Mich. Comp. Laws § 600.5805(5)

(2013).  Rudd's claims of abuse of process (Count 5) and infliction of emotional distress (Count 6)

are subject to the three-year limitations period in Mich. Comp. Laws § 600.5805(10) (2013) for

personal injury actions.  *See Lechner v. Peppler*, No. 337872, 2018 WL 2121483, at *3 (Mich. Ct.

App. May 8, 2018).  In Michigan, these claims accrue "at the time the wrong . . . was done

regardless of the time when damage results."  Mich. Comp. Laws § 600.5827.

Rudd's claims regarding events in 2013 accrued in 2013.  He had reason to know of the harms done to him when those harms occurred.  Also, he had an actionable claim.  Accordingly, any claims concerning the events in 2013 would have accrued no later than 2013 and the applicable limitations period would have expired by 2016, long before he filed his complaint in this action.

Note that the "continuing violation" theory would not save Rudd's claims.  Rudd apparently contends that the events in 2013 are not barred by the statute of limitations because they are part of the same conspiracy of retaliation against Rudd as the events in 2015.  "A continuing violation occurs over several incidents that are not themselves actionable; conversely, discrete events that are easily identifiable and separately actionable do not constitute a continuing violation." *Norman v. Granson*, No. 18-4232, 2020 WL 3240900, at *2 (6th Cir. Mar. 25, 2020). "The doctrine is 'rarely' applied in § 1983 cases." *Id.* (quoting *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003)).

Here, Rudd alleges discrete incidents of retaliation occurring in 2013 and 2015.  The incidents in 2013 were actionable after they occurred; thus, the statute of limitations for those events accrued in 2013 and expired in 2016.  Even if Defendants' actions in 2015 were motivated by the same general intent as those in 2013—i.e., to deter Rudd from exercising his First Amendment rights—a continuing violation cannot be shown "by proof that the alleged acts of [misconduct] occurring prior to the limitations period are sufficiently related to those occurring within the limitations period." *Sharpe*, 319 F.3d at 268; *see also Howell v. Cox*, 758 F. App'x 480, 485 (6th Cir. 2018) (rejecting contention that separate instances of retaliation by the same individual amounted to a continuing violation).

Rudd claims that Defendants waived a statute of limitations defense by seeking judgment on the pleadings.  He offers no authority for that assertion.  Moreover, the issue at present is

whether the Court should give Rudd the opportunity to amend his complaint.  Defendants could not have waived a defense to claims based on allegations that Rudd had not yet asserted.

Rudd also relies on the Court of Appeals' decision but that reliance is misplaced.  Rudd contends that the Court of Appeals held that he had stated valid conspiracy and retaliation claims based on conduct occurring in 2013 and 2015.  That is true, but that holding does not necessarily mean that there are no other deficiencies with Rudd's claims.  The Court of Appeals was reviewing this Court's decision that he had failed to state a claim.  It was not reviewing other issues, such as the statute of limitations.  Thus, the Court of Appeals did not expressly or implicitly hold that Rudd's claims were timely.

Accordingly, the Court will not allow Rudd to amend the complaint to add facts and claims that are barred by the statute of limitations, specifically paragraphs 116, 132(c)(i), 132(c)(ii), 134-36, 139-41, 147, 150, and 156.

**C. Amendments that are conclusory.**

Defendants argue that paragraph 132 of the proposed amended complaint contains allegations about the City that are conclusory.  Part of that paragraph states:

> a) The City of Norton Shores has historically engaged in the practice of overlooking police misconduct and constitutional violations by certain officers. By failing to meaningfully investigate and punish constitutional violations, the City is liable for the subsequent injuries to Plaintiff under a ratification theory. *See Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247-48 (6th Cir. 1990).

> b) The City, via Chief Gale and Chief Shaw, also failed to supervise and train certain officers who had previously engaged in dishonest conduct or abuse of police powers. *See e.g. Wright v. City of Euclid*, 962 F.3d 852, 881 (6th Cir. 2020).

> . . .

(Proposed Am. Compl. ¶ 132.)  The Court agrees that these allegations are conclusory.  Plaintiff offers no facts to support his contention that the City has a historical practice of overlooking police

misconduct, or that it failed to train and supervise officers who had previously engaged in improper conduct.

Furthermore, as to Defendants Gale and Shaw, a failure to supervise or train is not sufficient by itself to give rise to individual liability under § 1983. *See Shehee v. Lutrell*, 199 F.3d 295, 300 (6th Cir. 1999) ("a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)).  Thus, subparagraphs (a) and (b) of paragraph 132 add nothing to the complaint that would survive a  motion to dismiss.

In subparagraph (c) of paragraph 132, Rudd claims that the "highest ranking municipal policymakers adopted the retaliatory course of action against Plaintiff," ostensibly for the purpose of holding the City liable for an act taken by a "municipal policymaker" under the reasoning in *Pembaur v. Cincinnati*, 475 U.S. 469 (1986).  (*See* Proposed Am. Compl. ¶ 132(c).)  Plaintiff references actions taken by Mayor Nelund, City Administrator Mark Meyers, and Police Chiefs Shaw and Gale.  Plaintiff then alleges the following:

> i) In 2013 Police Chief Shaw and City Administrator Mark Meyers urged Melissa Meyers to obtain a sham PPO and then participated heavily in the efforts to support that petition.

> ii) Chief Shaw directed Sgt. Rhyndress to threaten Plaintiff with an unlawful arrest in July of 2013 (¶27-29). Chief Shaw directed Officer Wassilewski to assist Mark Meyers in the sham PPO litigation by offering insight from privileged LEIN records. (¶36).

> iii) In 2015, Mayor Nelund acted as a final decisionmaker in commissioning the threat letter which Doug Hughes sent to Plaintiff.

> iv) Alternatively, if Mark Meyers was the final decisionmaker for legal services, he also ratified and agreed to the action. After Plaintiff indicated that the letter caused him to feel intimidated, Hughes sent Gale a celebratory message and indicated his intent to report the same to Mark Meyers (¶¶91-92).

12

(Proposed Am. Compl. ¶ 132(c) (footnote omitted).)

As discussed in the previous section, subsections (i) and (ii) concern actions taken in 2013 and would not survive a motion to dismiss because they are barred by the statute of limitations.

However, the Court will allow subsection (iii) of subparagraph (c) because it is plausible that the mayor of the City, presumably its highest-ranking official, has authority to establish municipal policy for the City.

In addition, the Court will allow subsection (iv) because it is as much an allegation concerning Meyers' personal liability as it is a possible theory of liability for the City.

Also, the Court will allow subparagraphs (d) through (f) of paragraph 132, which allege actions taken by Police Chief Gale.  Even assuming for purposes of this Opinion that Rudd has not plausibly alleged that Gale is a municipal policymaker for the City, these subparagraphs allege actions taken by Gale and are relevant for Defendant Gale's personal liability for retaliation against Defendant; that claim would survive dismissal.

As indicated above, subsections (a) and (b) of paragraph 132 will not be allowed because they are conclusory.

### D. Count 2

The Court agrees with Defendants that Count 2 of Rudd's proposed amended complaint would not survive a motion to dismiss.  In that count, Rudd contends that attorney Hughes and Judge Pittman conspired to deprive Rudd of his parental rights in the child custody proceedings and his liberty interests in the PPO proceedings, in violation of Rudd's right to control the care of his children and his right to due process.  Pittman presided over the child custody proceedings and the PPO proceedings.  He is not named as a defendant, however, so the pertinent question is whether Rudd's allegations suffice to state an additional claim against Defendant Hughes based on Hughes' alleged involvement in those court proceedings.

13

Rudd contends that Hughes "had a longstanding personal and professional relationship" with Judge Pittman because Pittman worked for Hughes' law firm before becoming a judge. (Proposed Am. Compl. ¶ 134.)  Also, Hughes was allegedly  "working closely with Judge Pittman on several sensitive issues" around the time of the events alleged.  (*Id.* ¶ 135.)  Rudd alleges that Hughes "directed" Pittman to "single out" Rudd for "differential treatment" in the PPO and child custody proceedings.  (*Id.* ¶ 136.)  Rudd then alleges several actions and statements by Pittman during those proceedings that purport to show such differential treatment.  Rudd further alleges that after he filed his citizen complaint in 2015, Hughes "directed" Pittman to "subject Plaintiff to adverse treatment in family court proceedings" in order to "create[] financial hardship and ensure that Plaintiff could not afford representation in any court proceeding."  (*Id.* ¶ 137.)  And Rudd contends that Hughes obtained Pittman's "back-channel agreement" to allow the City to "proceed with an unauthorized LEIN entry" and to allow the "contempt proceedings" against Rudd to proceed.  (*Id.* ¶¶ 139-40.)

Rudd's allegations concerning directions by Hughes or an agreement between Hughes and Pittman to treat Rudd differently in his court proceedings are conclusory and speculative.  *See Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one).  Rudd offers no support for his belief that there was a hidden agreement between Hughes and Pittman to violate Rudd's constitutional rights or to injure him in any other way.  The existence of a prior professional or personal relationship between them does not provide the necessary support to state a plausible conspiracy claim, nor does Rudd's contention that Pittman treated him unfairly in the court proceedings.  Such treatment, if it occurred, does not plausibly suggest that Hughes influenced Pittman's conduct.

14

In addition, to the extent Rudd's injuries derive from decisions made by Judge Pittman, this Court is not the proper venue for seeking relief from those injuries.  This Court does not act as a court of appeal for decisions made by a state court.  "The *Rooker-Feldman* doctrine embodies the notion that appellate review of state-court decisions and the validity of state judicial proceedings is limited to the Supreme Court under 28 U.S.C. § 1257, and thus that federal district courts lack jurisdiction to review such matters."  *In re Cook*, 551 F.3d 542, 548 (6th Cir. 2009).  Where the "source of injury" for the plaintiff's claim is the state court judgment, then this Court lacks jurisdiction to review the claim.  *Id.*  Accordingly, for all the foregoing reasons, Count 2 of the proposed amended complaint fails to state a claim.  The Court will not allow that amendment.

### E. Count 3

Count 3 of the proposed amended complaint apparently amends Rudd's claim for malicious prosecution under § 1983.  It asserts a claim for "malicious prosecution," in violation of the Fourth Amendment, and "unreasonable prosecutorial seizure,"[2] in violation of the Fourteenth Amendment.  (Proposed Am. Compl. 36.)  In support of this claim, Rudd contends that Mark and Melissa Meyers, Shaw, Rhyndress, and Wassilewski participated in a 2013 decision to prosecute a "sham PPO" for which there was no basis.  (Proposed Am. Compl. ¶ 156.)  For reasons discussed above, Rudd's claim for conduct occurring in 2013 is barred by the three-year statute of limitations.

Rudd also contends that in 2015, after the PPO expired, Mark and Melissa Meyers, Hughes, Nelund, McIntire, McLean, and Baar "perpetrated a scheme" to subject Rudd to "additional liberty deprivations and travel restrictions[.]"  (*Id.* ¶ 157.)  Here, Rudd refers to the police department's

---

[2] Unreasonable prosecutorial seizure is simply another name for malicious prosecution under § 1983.  *See King*, 852 F.3d at 580.

entry of the expired PPO into the LEIN database in 2015, and McLean's subsequent motion for criminal contempt sanctions against Rudd for allegedly violating that PPO.

Defendants contend that there is no claim for malicious prosecution outside the criminal setting.  In *King v. Harwood*, 852 F.3d 568 (6th Cir. 2017), the Court of Appeals described the elements for a malicious prosecution claim under § 1983 as follows:

> "(1) a *criminal* prosecution was initiated against the plaintiff, and the defendant made[,] influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the *criminal* prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the *criminal* proceeding was resolved in the plaintiff's favor."

*King*, 852 F.3d at 580 (quoting *Sanders v. Jones*, 845 F.3d 721, 728 (6th Cir. 2017) (emphasis added)).

Defendants argue that Rudd does not state a claim for malicious prosecution because a PPO is obtained through a civil proceeding, not a criminal proceeding.  Even if that is so, however, that argument does not squarely address Rudd's allegations about the prosecution of *criminal contempt* proceedings in 2015.  The civil/criminal distinction does not quite rule out the possibility that criminal contempt proceedings might be the basis for a malicious prosecution claim under § 1983.

Nevertheless, the Court finds that Rudd's allegations about the contempt proceedings do not state a malicious prosecution claim under § 1983 for a different reason:  he did not suffer a "deprivation of liberty, as understood under Fourth Amendment jurisprudence[.]"  *See King*, 845 F.3d at 580.  Rudd alleges no deprivation of liberty as a result of the contempt proceedings.  Indeed, he alleges that the court denied the contempt motion.

Rudd apparently alleges that the 2015 LEIN entry subjected him to "substantial travel and firearm restrictions" (Proposed Am. Compl. ¶ 159); however, that LEIN entry did not stem from the prosecution of the 2015 contempt proceedings or from any other prosecution within the

limitations period.  To the contrary, Rudd alleges that the police put the PPO into the LEIN database without court approval.  Moreover, unidentified travel and firearm restrictions are not deprivations of liberty as understood by the Fourth Amendment.[3]  Thus, Count 3 would not survive a motion to dismiss.

### F. Count 4

Count 4 amends Rudd's claim for malicious prosecution under state law, relying on the same facts alleged in Count 3.  As discussed above, a claim for malicious prosecution under state law is subject to a two-year statute of limitations.  Rudd alleges no relevant facts regarding the prosecution and termination of an action against him within two years prior to the filing of his original complaint.  Accordingly, this claim is time-barred and the Court will not allow it as part of the amended complaint.

### G. Counts 5 and 6

Count 5 amends Rudd's claim of abuse of process under state law.  Count 6 amends Rudd's claim for intentional infliction of emotional distress.  Defendants have not offered a reason to disallow these amendments, apart from the statute of limitations.  That reason does not suffice because these claims appear to be based in part on events occurring in 2015.  Accordingly, the Court will allow the amended claims.

### IV. CONCLUSION

In summary, the Court will not allow the following amendments to the complaint because they state or support claims that would not survive a motion to dismiss:  paragraphs 116, 132(a),

---

[3] A case cited by Rudd, *McDonough v. Smith*, 139 S. Ct. 2149 (2019), does not apply.  In *McDonough*, the plaintiff claimed that officers had fabricated evidence to pursue criminal charges against him. *Id.* at 2155.  The Court assumed, without deciding, that the plaintiff had a right under the Due Process Clause not to be deprived of liberty as a result of evidence fabricated by a government officer. *Id.*  Although the Court agreed that travel restrictions placed on the plaintiff would constitute a deprivation of liberty for purposes of due process, it did not consider whether such restrictions would constitute a deprivation of liberty (i.e., an arrest or detention) under Fourth Amendment jurisprudence.

132(b), 132(c)(i), 132(c)(ii), 134-36, 139-41, 147, 150, and 156 of the proposed amended complaint.  For the same reason, the Court will not allow Counts 2, 3, and 4 of the proposed amended complaint.

The Court will order Rudd to submit a version of his proposed amended complaint with the foregoing paragraphs and counts removed.  That version will serve as the amended complaint.

An order will enter in accordance with this Opinion.


Dated:   April 22, 2021                            /s/ Hala Y. Jarbou
                                                   HALA Y. JARBOU
                                                   UNITED STATES DISTRICT JUDGE