

STATE OF MICHIGAN
IN THE 14TH CIRCUIT COURT FOR THE COUNTY OF MUSKEGON

MELISSA L. MEYERS,
    Petitioner,

-vs-

HON. GREGORY C. PITTMAN
FILE NO: 13-257503-PH

DANIEL WILLIAM RUDD,
    Respondent.

---

Michelle M. McLean (P71393)
Bolhouse, Baar & Hofstee, PC
Attorneys for Petitioner
3996 Chicago Drive SW
Grandville, MI 49418
(616) 531-7711

Daniel William Rudd
In Pro Per
Respondent
201 S Lake Ave.
Spring Lake, MI 49456
(231-557-2532

## 10/20/2015 RESPONDENT'S MOTION FOR JUDGEMENT DECLARING THE EXPIRATION OF PETITIONER'S 2013 PERSONAL PROTECTION ORDER

1) Along with his supporting Brief, Respondent (Daniel Rudd) now states and affirms the following in his motion for declaratory relief:

**Summary Statement**

2) Petitioner (Melissa Meyers) has recently claimed that this Court intended to extend her PPO beyond the original term. This is a misrepresentation of this Court's rulings. However, even if Petitioner's PPO remained active, this would not warrant Petitioner's actions as they are described in the Petitioner's recent court documents.

3) Petitioner is misusing legal process to needlessly interfere and disrupt Respondent's legitimate and necessary parenting activities.

pg 1 of 14

## Background Facts: Ruling on Motion To Terminate PPO

4) Petitioner was granted an ex parte Personal Protection Order (PPO) on July 23, 2013 by Judge Marietti.

5) During a hearing on Respondent's Motion To Terminate PPO (November 26, 2013) this Court made the necessary determinations regarding the two legal questions which were properly before the Court.

> "The petitioner bears the burden of <u>establishing reasonable cause for issuance</u> of a PPO . . . and of establishing <u>a justification for the continuance</u> of a PPO at a hearing on the respondent's motion to terminate the PPO[.]"
> *Hayford*, 279 Mich App at 326 (emphasis added).

6) Respondent notes that when a "continuance" is granted as described above, this means that the PPO will remain in effect *until it expires*. An "extension" may be granted by the Court pursuant to MCR 3.707. But in the present case, no extension was ever requested.

## Determination 1: Was there a reasonable cause to issue the ex parte PPO?

7) This Court determined that the ex parte allegations provided a sufficient basis, and then specifically affirmed the prior decision to set the term of the PPO at approximately six months.

> THE COURT: This order was signed by Judge Marietti in my absence, and he being an incredibly wise and reasoned jurist, signed the order based on what was alleged. I also note that he made the term of the order end as of February 1st, 2014, and again, I think being very wise and very reasoned in his approach to this thing. See **Exhibit C** attached hereto.

## Determination 2: Was there justification for the PPO to continue?

8) This Court indicated that the PPO would only continue as a prophylactic measure while an agreement was reached regarding a professional referral in the related custody proceedings.

> THE COURT: "So my intention is to resolve this in these hearings coming up, which means this PPO is going to end when we get to that point. All right? Clear? Come ready to resolve this. Okay?
>
> ...But as far as this order, I think you both got a little of what you needed here. **It's continuing, but it's not going to continue as long as it was proscribed to continue.**"
>
> See **Exhibit C.** (page 94, lines 4-14) emphasis added.

9) This Court reiterated its intent to end the PPO prior to the expiration date several times over and specifically declared a point in time when this would occur.

10) This Court addressed Petitioner directly to confirm her understanding that the PPO would be terminated early, after an upcoming custody hearing which was scheduled within the following two weeks. Petitioner indicated that she did understand the Court's intent. See **Exhibit C.** (page 93, lines 2-16)

11) Having already placed determinations on the record to justify the early termination of Petitioner's PPO, this Court directed Petitioner to draft an order with language to effectuate the early termination; *without having to conduct an additional hearing.*

> THE COURT: Well, let me give you a little guidance. The order should indicate that the protection order will remain in effect until further order of the Court. Okay? **That gives me the discretion and authority to end it earlier**, based on the agreements and the resolutions that we reach here in the custody, parenting time stuff."
>
> See **Exhibit C** (pg. 94 lines 19-25) emphasis added.

## Custody Agreements and Resolutions Reached

12) On December 10, 2013 a hearing was held in the related custody proceedings and the *Rudd v Averill* parties were referred to Randy Flood of the Fountain Hill Center.

13) The record in the custody proceedings clearly indicates that this referral was exactly the type of "resolution" which this Court was referring to during the November 26, 2013 hearing, when this Court discussed its intention to "resolve these child parenting issues" during 1 or 2 brief hearings.   See **Exhibit C** (page 93, line 8)

## January 23, 2014 Hearing on Petitioner's Motion for Attorney Fees

14) After the Court granted Attorney Meyer's motion to refer the related custody issues to Randy Flood at the Fountain Hill Center, Attorney Meyers (Petitioner) sued Respondent for legal fees and costs regarding her PPO litigation.

15) Petitioner claimed that Respondent's motion to terminate was frivolous and intended only to harass Petitioner.   This Court disagreed.

16) On January 23, 2014, this Court heard arguments, denied Petitioner's motion for costs and placed the supporting factual findings and legal conclusions on the record.

> THE COURT: Well, I think by virtue of the decision that this Court reached, and whether you agree or not, that's certainly your prerogative, but by virtue of simply the idea that the <u>term of the order was modified</u> indicates that there was some arguable merit.
> **That I made a decision based upon that merit to shorten the term of the PPO's existence…** Mr. Rudd did receive some relief as he was seeking here. **There was a modification.**
>                                              See **Exhibit D** (page 12) emphasis added.

17) Immediately thereafter, this Court specifically advised Petitioner that no challenges had been raised to this finding in Respondent's favor,

> "Of course you have the right to disagree that I was correct in finding that merit, but I have not heard that argument."    See **Exhibit D** (page 12)

18) Clearly, this would have been the time for Attorney Meyers to articulate this interpretation of the December 17, 2013 Order, thereby proving that Petitioner had received a favorable ruling and not Respondent.

### Expiration of Petitioner's 2013 PPO

19) Due to financial constraints, Respondent did not motion the Court for an order terminating the PPO prior to the February 1, 2014 expiration date (which was only weeks away). However, no extension had been requested, no extension had been granted and no amended order had disturbed the terms of the original order (including the expiration date).

20) Therefore, Petitioner's Ex Parte PPO expired upon its own terms on February 1, 2014. On that same authority, the entry in the LEIN database was modified to show that the PPO was no longer active.

### Petitioner's Present Allegations of Willful Unconsented Contact

21) Respondent has, for his own reasons, diligently attempted to avoid any contact or proximity to Petitioner and intends to do this into the foreseeable future.

22) However, Petitioner has not demonstrated a similar motivation and has not made good faith efforts to prevent contact from occurring.

23) When Petitioner alone has had knowledge of potential scheduling conflicts, Petitioner has chosen to withhold this information instead of communicating appropriately with Respondent's attorney and working out a solution in advance.

24) The July 25, 2015 "incident" described by Petitioner's filings serves as a good example. However, it should be noted that **there was no contact or proximity**. Respondent never even saw Petitioner (or any member of her family) and therefore draws primarily from the accounts in Petitioner's pleadings and affidavits.

25) Because of her personal and professional relationships to the Rudd children's mother, Petitioner was aware that the Rudd children have played soccer for the West Michigan Storm for years.

26) But when Petitioner recently transferred her own children into that same soccer club, she did not make any effort to notify Respondent's attorney, or to discuss any potential scheduling conflicts in advance.

27) Petitioner indicates that she brought her children to the West Michigan Storm Sand Soccer Tournament at Pere Marquette Beach on July 25, 2015.

28) More than an hour after her own children had finished their games, Petitioner attended the Rudd children's game with her client, Andrea Averill.

29) Petitioner's children were not scheduled to play again for more than an hour and there were a number of open fields available nearby, but Petitioner chose to remain on the sidelines of the Rudd children's game for her own reasons.

30) Petitioner indicates that she became upset when she saw that Respondent was coaching the Rudd children's soccer team.

31) Respondent was busy preparing his team and was at least 75 feet away (on opposite side of the field) in an area reserved for the coach and the players. Respondent had absolutely no knowledge of Petitioner's presence.

32) However, Petitioner still felt that Respondent's mere presence at his children's game was a deliberate act of unconsented contact and/or harassment directed at her.

33) Petitioner indicated to her client (Andrea Averill) that she intended to call the police and report that Respondent had "violated" her 2013 PPO.

34) But Petitioner's client (the Rudd children's mother) did not want the Rudd children's father to be arrested *while he was coaching the Rudd children's team*.

35) As an alternative to police action, Mrs. Averill agreed to send Respondent a text message which stated only: "Just so you know, Melissa and her family are here. You may want to keep your distance." See **Exhibit E**

36) This message, received just minutes before the start of the game, was the only indication that Respondent ever received suggesting the possibility of Attorney Meyers being present.

37) With no way of knowing why Attorney Meyers would be present and no way of knowing WHERE on this crowded beach Attorney Meyers could be, Respondent determined that the best way to avoid any possible contact would be to remain where he was (in the area reserved for coaches and players) until the game was over.

38) Once Respondent completed his coaching duties, he was careful to stay in open areas and left the beach as quickly as it was possible to do so without risking a situation that would be harmful or humiliating for his children.

39) Attorney Meyers does not offer any explanation for why she did not simply walk a short distance down the beach to the next open field and wait until the time when her own children were scheduled to play. This would have allowed all the children present to enjoy their soccer games in peace.

40) Petitioner claims to have suffered significant distress, but her filings also indicate that Petitioner chose to remain there on the sidelines for the entirety of the Rudd children's game.

41) Attorney Meyers has repeatedly and dramatically declared that she does not want her children to be anywhere near Respondent. So it is difficult to understand why Respondent insisted that her children also remain on the sidelines to watch the Rudd children play their entire game.

42) Even if Petitioner believed that her 2013 PPO was still active, the situation which she describes <u>would not constitute a violation of that order</u>, would not justify police involvement, and would not require the humiliation of the Rudd children by disrupting (possibly ending) their soccer game.

**Petitioner's Attempts To Secure A "Stipulated" Extension Of Her 2013 PPO**

43) On or about this same time, Petitioner was advised that her 2013 PPO had expired from the LEIN database about 18 months ago.

44) Petitioner, who is no stranger to PPO proceedings, could have easily petitioned the Court for a PPO. It is not a burdensome process.

45) But instead Petitioner attempted to coerce an agreement through a lengthy e-mail to Respondent's attorney. See Petitioner's 08/12/2015 Exhibit 8.

46) This e-mail was <u>not</u> an attempt to collaboratively identify any potential scheduling conflicts and coordinate a <u>reasonable</u> solution for the benefit of the children.

47) Instead, Petitioner threatened police involvement and demanded that Respondent's participation in his children's events must be severely limited or non-existent whenever there is "even a remote possibility" that Petitioner *might* be present on a nearby field.

> "Mr. Rudd [must] make himself as inconspicuous as possible such that he is not within my eyesight at any games or tournaments… AND leave immediately after the game ends, or simply not attend the same during Mrs. Averill's parenting time."

48) Petitioner also requires that Respondent arrange for "someone else" to bring his children to their practices AND also waive his right to due process by subjecting himself to the stress and stigma of a non-expiring "stalking" PPO.

49) Petitioner concludes this e-mail by reiterating her thinly veiled threat of adverse action from the Norton Shores Police Department.

> "…and I certainly do not want my family subjected to police involvement, however, if we do not figure out some sort of solution immediately, I am afraid that is exactly what will occur."

50) Petitioner has clearly demonstrated, and continues to demonstrate that she is not interested in any reasonable "solution" that would simply allow the parties to maintain an acceptable distance without disturbing the children's activities.

### Petitioner's Actions Contradict Her Claims of Distress

51) Respondent's has consistently demonstrated that he truly does not want contact with Petitioner. <u>Respondent has not ever approached Petitioner.</u> Respondent has not ever interfered with Petitioner's parenting activities.

52) It is Petitioner who has inexplicably maintained her involvement in *Rudd v Averill* long after new counsel was hired with a clear acknowledgement that Attorney Meyers was too emotionally involved in the case.

53) It is Petitioner who has garnered numerous admonishments from this Court during the numerous occasions when she has prematurely summoned Respondent into her presence at the courthouse.

54) It was Petitioner who recently transferred her own children into the same soccer club that Respondent's children have played in for years and chose to withhold this information from anyone who might warn Respondent.

55) It was Petitioner who felt compelled to watch <u>Respondent's children</u> play their entire game when her children were not playing.

56) It *is* Petitioner who has remained unwilling to proactively identify scheduling conflicts and prevent the possibility of future contact *even when specifically requested by Respondent's counsel.*

57) It is Petitioner who instead directs her energy toward disrupting Respondent's activities with his children and facilitating adverse police action against Respondent.

## Petitioner's Motions For An Amended PPO (Without A Hearing)

58) On July 30, 2015 Petitioner motioned this Court to enter a Nunc Pro Tunc order, without a hearing, so that the Norton Shores Police Department would be authorized to reactivate Petitioner's PPO in the LEIN database.

59) Petitioner's motion states that the actual intention and effect of the December 17, 2013 order was to extend her PPO more than three times the original term, only to expire upon Petitioner's withdrawl from related custody proceedings.

60) Petitioner sets aside the rulings of this Court as expressed consistently throughout the record, and seizes upon an isolated interpretation of a single phrase in the December 17, 2013 temporary order.

61) However, this interpretation would result in fatal jurisdictional and procedural defect (a fact which Petitioner has noted in her own pleadings).

62) Respondent argues that <u>this Court did not abandon the parties to speculate</u> as to the Court's intention regarding the phrase Petitioner now misconstrues. As noted above, this Court made its intent plainly clear. (bottom of page 3 #8)

63) Respondent's previous Attorney noted these defects in her August 5, 2015 "Response and Objection To Petitioner's Motion For Nunc Pro Tunc Order…"

64) Petitioner's August 12, 2015 Responsive Pleading did not cure these defects, but instead raised a large number of unsupported and irrelevant allegations against Respondent.

## Petitioner Seeks Relief In A More Favorable Venue

65) As of August 28, 2015, this Court had <u>not</u> granted Petitioner's requests for an order which would properly authorize an entry in the LEIN database. The matter was set to be resolved by this Court during a hearing on September 8, 2015.

66) With this knowledge, Attorney Melissa Meyers went directly to the Norton Shores Police Department (August 28, 2015) and presented her case to a non-lawyer employee who was subordinate to Melissa Meyer's husband.

67) Though Petitioner's recent pleadings before this Court clearly acknowledged that the December 17, 2013 written order <u>did not</u> authorize an entry in the LEIN database, Petitioner persuaded the Norton Shores Police Department of the exact opposite.

68) Petitioner instructed the Norton Shores Police Department to alter the LEIN database so that the PPO was active again, and the Norton Shores Police Department complied.

69) A few days later, Petitioner withdrew her motion to "bring PPO into compliance with MCR 3.706" and cancelled the September 8, 2015 hearing.

70) Generally, a Petitioner is eager to provide notice when a PPO has issued, in hopes of preventing unwanted contact. However, Petitioner did not notify Respondent's attorney that the 2013 PPO was once again active in the LEIN database, and did not indicate any reason for withdrawing her motion.

71) Respondent remained entirely unaware of these actions until he received an automated mailing from the Michigan State Police on September 10, 2015. The letter stated a "Stalking" PPO had been entered by the Norton Shores Police Department on August 28, 2015 "as ordered by the issuing court." See **Exhibit F.**

72) Petitioner's request for such an order was denied. The August 28, 2015 entry in the LEIN database was not properly authorized and should be removed.

### Basis for Respondent's Relief

73) Petitioner has not asserted any legal or factual basis to warrant the extreme injunctive relief which she has claimed for herself by circumventing this Court's rightful jurisdiction.

74) This Court clearly ruled that such relief was not warranted in this case.

75) While Respondent will continue to avoid any contact with or proximity to Petitioner, Respondent should not be subjected to the stress and stigma of a "non-expiring" PPO without any due process of law.

76) Respondent and his children should not be subjected to needless disruptions of their legitimate activities in public places whenever Petitioner chooses to appear and place herself in proximity to Respondent.

77) Petitioner's continuing threats of adverse police action and her deliberate efforts to effectuate the same (without good cause) have continued to create a substantial hardship for Respondent and for his children.

78) Petitioner's actions, as described in her own court documents demonstrate an alarming indifference toward the welfare of the Rudd children and a disregard for

the objectives of her client, Andrea Averill, in meeting the objectives that this Court has placed before her.

79) Respondent, Daniel Rudd, seeks relief from these harms in the form a declaratory Judgment and has attached Proposed Findings of Fact and Conclusions of Law for this Court's consideration. See **Exhibit B.**

## RESPONDENT'S PRAYER FOR RELIEF

Respondent now respectfully petitions this Court for the following relief:

a. If it pleases the Court, enter the attached Order REMOVAL OF ENTRY FROM LEIN (SCAO Order MC 239), instructing the Norton Shores Police Department to remove the entry which they improperly entered on August 28, 2015. See **Exhibit A**

b. Conduct a hearing and issue a ruling pursuant to MCR 2.605 declaring the rights and relations of the parties as determined by this Court. Respondent respectfully submits proposed Findings Fact & Conclusions of Law for this Court's consideration. See **Exhibit B**

c. Alternatively, issue any other order, ruling, or determination whereby this controversy may be resolved.

d. Issue any other relief that this Court deems just.

Date: _____    Respectfully Submitted,

Daniel William Rudd
Respondent, In Pro Per

STATE OF MICHIGAN
IN THE 14TH CIRCUIT COURT FOR THE COUNTY OF MUSKEGON

MELISSA L. MEYERS,
    Petitioner,

                                                 HON. GREGORY C. PITTMAN
-vs-                                                FILE NO: 13-257503-PH

DANIEL WILLIAM RUDD,
    Respondent.

| | |
|---|---|
| Michelle M. McLean (P71393) | Daniel William Rudd |
| Bolhouse, Baar & Hofstee, PC | In Pro Per |
| Attorneys for Petitioner | Respondent |
| 3996 Chicago Drive SW | 201 S Lake Ave. |
| Grandville, MI 49418 | Spring Lake, MI 49456 |
| (616) 531-7711 | (231-557-2532) |

**BRIEF IN SUPPORT OF RESPONDENT'S
10/20/2015 MOTION FOR JUDGEMENT DECLARING
THE EXPIRATION OF PETITIONER'S 2013 PERSONAL PROTECTION ORDER**

Respondent filed his Motion for a Declaratory Judgment on 10/20/2015. Now in support of same, Respondent respectfully submits this supporting brief.

    **I.**    **Pertinent Legal Questions And Relevant Authorities**

    **a. Why Does Petitioner Believe A Nunc Pro Tunc Order Is Needed
For The Previous Order To Be "Compliant With MCR 3.706"?**

Both of Petitioner's recent pleadings (July 30, 2015 & August 12, 2015) indicate Petitioner's full awareness that the December 17, 2013 written order cannot extend, modify or amend the original PPO. As Petitioner stated, "information necessary pursuant to MCR 3.706 is absent." However, Petitioner's dilemma only arises at this later date because she has mischaracterized the nature and the scope of the December 17, 2013 Order and claim that it is a "continuance" of the PPO— well beyond the initial expiration date. As noted in Respondent's motion, Petitioner is really attempting to extort an "extension" without the required evidence to support same.

MCR 3.707 governs the modification, termination or extension of personal protection orders. In fact, MCR 3.707(B)(1) clearly outlines the deadlines and process for a request to extend the effectiveness of the order. If "the expiration date on a personal protection order is extended, **an amended order must be entered**." MCR 3.707(B)(2). The newly amended order must reflect the essential elements described in MCR 3.706 (such as an expiration date stated plainly on the face).

Petitioner takes great liberty when she suggests that the Court must bring an order "into compliance with MCR 3.706"; and that this should be taken care of without a hearing (Nunc Pro Tunc). Equally offensive is the characterization of Petitioner's relief as merely correcting a clerical error, or supplying an omission in the record.

b. **The Clearly Stated Requirements of MCR 3.707 Preserve Safety & The Public's Interest**

While "the procedural safeguards employed under the [PPO] statute are sufficient to meet [a] due process challenge." *Kampf*, 237 Mich App at 384, the statutes and court rules regarding PPO proceedings ensure clarity regarding nature of the PPO and the obligations of Law Enforcement. Confusion in this regard puts victims and police officers in danger, while also undermining the public confidence in public officials. Further, "When personal protection orders are allowed to be misused because of careless wording or otherwise, then the law is correspondingly undermined because it loses the respect of citizens that is important to the effective operation of our justice system." *People v. Freeman*, 240 Mich App 235, 612 NW2d 824 (2000).

The caption of the December 17, 2013 indicates the narrow focus of the hearing on November 26, 2013. Petitioner knows that extension of the PPO was not even contemplated at this hearing. To achieve her desired result, Petitioner must isolate a single phrase from the entirety of the record. Petitioner has essentially asked this Court to do the same while ignoring the procedural requirements.

### c. The oral record reflects this Court's intent with clarity and consistency.

When confronted with this Court's clear statements on the record of these proceedings, Petitioner claims that these declarations are "irrelevant" and "out of context." Petitioner repeatedly asserts that the Court speaks only through written orders while Respondent argues that these clear and consistent statements <u>ARE the context</u>.

> The determinative factor in interpreting a judgment is the intention of the court, as gathered, not from an isolated part thereof but from all parts of the judgment itself. When construing written judgments, courts consider the circumstances present at the time of entry and do not consider the meaning of particular provisions of the judgment in isolation but in the context of the whole judgment. ... . [46 Am Jur 2d, Judgments, § 74.]

### d. An oral ruling <u>can</u> sometimes have the same weight and effect as a written order.

> ...it is a settled maxim that courts generally speak through their judgments and decrees, and not their oral statements or written opinions. *Tiedman v. Tiedman*, 400 Mich. 571, 576, 255 N.W.2d 632 (1977). However, there are circumstances in which "[a]n oral ruling has the same force and effect as a written order," as when, for example, an oral ruling clearly communicates the finality of the court's pronouncement.*McClure v. H.K. Porter Co.*, 174 Mich.App. 499, 503, 436 N.W.2d 677 (1988). See also*People v. Kennebrew*, 220 Mich.App. 601, 607, 560 N.W.2d 354 (1996). When assessing whether an oral ruling has equal effect to that of a written order, we consider whether the oral ruling contains indicia of formality and finality comparable to that of a written order. See*People v. Vincent*, 455 Mich. 110, 125, 565 N.W.2d 629 (1997) *ARBOR FARMS v. GeoStar Corp.*, 853 N.W.2d 430 (Mich. Ct. App. 2014)

### e. The Court may find that the January 23, 2014 oral ruling meets this standard.

> THE COURT: Well, I think by virtue of the decision that this Court reached, and whether you agree or not, that's certainly your prerogative, but by virtue of simply the idea that the term of the order was modified indicates that there was some arguable merit.
> That I made a decision based upon that merit to shorten the term of the PPO's existence in a sense--we're being very particular and very specific--Mr. Rudd did receive some relief as he was seeking here. There was a modification.

See Exhibit C.   *Meyers v Rudd - January 23, 2014 Hearing on Costs*

### f. A Supreme Court Ruling Which (possibly) Contemplates Some Comparable Legal Questions.

**NOTE:** Respondent is clearly out of his depth on the complexities of this ruling from the Supreme Court, but respectfully submits these excerpts <u>only if the Court is inclined to review them.</u>

> This case concerns the interpretation of 28 U. S. C. § 1450,[1] which provides in pertinent part: "Whenever any action is removed from a State court to a district court of the United States . . . [a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court." ...The court rejected petitioners' contention that the life of the order was indefinitely prolonged by § 1450 "until dissolved or modified by the district court," holding that the purpose of that statute "is to prevent a break in the force of an injunction or a restraining order that could otherwise occur when jurisdiction is being shifted," 472 F. 2d, at 767, not to "create a special breed of temporary restraining orders that survive beyond the life span imposed by the state law from which they spring and beyond the life that the district court could have granted them had the orders initiated from the federal court." Id., at 766. *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 94 S. Ct. 1113, 39 L. Ed. 2d 426 (1974).
>
> But while Congress clearly intended to preserve the effectiveness of state court orders after removal, there is no basis for believing that § 1450 was designed to give injunctions or other orders greater effect after removal to federal court than they would have had if the case had remained in state court. After removal, the federal court "takes the case up where the State court left it off." Duncan v. Gegan, 101 U. S. 810, 812 (1880). The "full force and effect" provided state court orders after removal of the case to federal court was not intended to be more than the force and effect the orders would have had in state court. *Id.* at 436

## II. <u>Conclusion:</u>

This Court should grant declaratory relief so that the written orders of the Court align with the consistent rulings and determinations that this Court has placed on the record. Petitioner incorrectly suggests that the December 17, 2013 order must be brought "into compliance with MCR 3.706"; and falsely states that this Court intended to triple the term of her PPO.

Respondent instead presumes that "the Court knows the law." The December 17, 2013 order was not defective. When construed in harmony and consistency with the record as a whole; there is no conflict with statute or court rule.

Date: 10/20/2015    Respectfully Submitted, _____
Daniel William Rudd, Respondent, In Pro Per