UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL WILLIAM RUDD,

    Plaintiff,

v.

CITY OF NORTON SHORES, et al.,

    Defendants.

_____/

Case No. 1:18-cv-124

Hon. Hala Y. Jarbou

## **OPINION**

Plaintiff Daniel William Rudd brings this civil rights action against multiple officials employed by the City of Norton Shores and/or the Norton Shores Police Department. Lieutenant Chris McIntire is one of those officials. Before the Court is Defendant McIntire's motion to dismiss one of the claims against him for failure to state a claim (ECF No. 205). The Court will grant the motion.

### I. BACKGROUND

**A. Allegations by Rudd**

Rudd's complaint alleges a conspiracy by Defendants to retaliate against him for filing a citizen's complaint criticizing city officials and members of the Norton Shores Police Department. *See Rudd v. City of Norton Shores*, 977 F.3d 503, 507-11 (6th Cir. 2020) (describing the allegations).

To summarize, when Rudd was involved in a contentious custody dispute with his ex-wife in 2013, she allegedly absconded with their children. The Norton Shores Police Department allegedly refused to help him with the matter because the Chief of Police and a police officer (Sergeant Matthew Rhyndress) knew the attorney who represented Rudd's ex-wife. That attorney (Melissa Meyers) was married to the City Manager and was also a personal attorney for Rhyndress.

In fact, Rhyndress himself briefly detained Rudd without cause and told him that the police would not provide him any assistance with recovering his children.

Rudd eventually secured the return of his children and obtained full custody over them in August 2014. Before that happened, however, Meyers allegedly obtained a personal protection order (PPO) against Rudd in July 2013 based on false information, with the assistance of the Police Chief, who improperly disclosed Rudd's Law Enforcement Information Network (LEIN) information to Meyers so that she could portray Rudd as a dangerous person in the custody proceedings.

After the City hired a new chief of police, Rudd filed a citizen's complaint alleging improper conduct by the police department for, among other things, refusing to assist him and for disclosing his LEIN information. Rudd filed this complaint in July 2015. After receiving it, but before conducting any investigation, the new Police Chief (Jon Gale) allegedly shared the complaint with Meyers, with Meyers's husband (City Manager Mark Meyers), and with the former Police Chief, despite a policy that such complaints should remain confidential.

Chief Gale then met with Rudd and allegedly promised that he would investigate the LEIN violation with the assistance of the Michigan State Police, but instead Gale "arranged for a trusted colleague ([Defendant] McIntire) to contact Plaintiff and go through the motions of 'investigating' the complaint without any documentation or scrutiny." (Am. Compl. ¶ 56, ECF No. 194.)

Gale also allegedly conspired with Melissa Meyers to contrive a violation of the PPO, which had expired months earlier. After Meyers saw Rudd at a soccer tournament where he was coaching his children's team, she claimed that he had violated the PPO and she threatened to put his children "through the trauma of a police interaction[.]" (*Id.* ¶ 62.) To remedy the fact that the PPO had expired, she demanded that Rudd stipulate to an indefinite PPO. As grounds for this

2

demand, she referred to Rudd's citizen complaint, in which she claimed that he had made "false, defamatory comments," in order to "get [her] husband, the former police chief and [the] North Shores Police Department into some sort of trouble." (*Id.* ¶ 66.)

Meyers then went to the court to restore the PPO with the assistance of her law firm colleague, Michelle McLean. In early August 2015, McLean told the court that a "clerical error" had discharged the PPO from the LEIN database and she asked the Court to reenter it. (*Id.* ¶ 71.) About a week later, McLean filed a different motion asking the Court for permission to authorize the police department to restore the PPO to the LEIN database.

In late August, Rudd submitted a FOIA request to the police department regarding his citizen's complaint. A few days later, the department entered the PPO into the LEIN database without court permission. McLean then withdrew her requests to reinstate the PPO.

After Rudd sought a declaration from the court that the LEIN entry was invalid, McLean responded with a motion to hold Rudd in criminal contempt for violating the PPO. Rudd's citizen complaint was a "central theme" of the contempt motion. (*Id.* ¶ 85.)

Meanwhile, the City's attorney, Douglas Hughes, sent Rudd a threatening letter stating that the Mayor had asked Hughes to "monitor" Rudd. (*Id.* ¶ 88.) Hughes accused Rudd of making "defamatory and disparaging remarks" about Mark Meyers. (*Id.*) Hughes told Rudd to "be mindful" of statements he made to others about Mr. Meyers. (*Id.*) After Rudd responded that he had never had contact with Mr. Meyers, Hughes wrote to Rudd in an email, "Good. Stay away from the Meyer's and we will get along just fine." (*Id.* ¶ 91.) Hughes then sent a copy of this email to Chief Gale.

Just prior to the contempt hearing, Rudd met with McLean and another lawyer (Joel Baar) to resolve the contempt matter. They asked him to stop engaging in "conduct" that was

3

"concerning" to Mark and Melissa Meyers, ostensibly referring to Rudd's citizen's complaint. (*Id.* ¶ 94.) Rudd told them that his complaint had nothing to do with the PPO. However, McLean and Baar disagreed and indicated that Gale, McIntire, Hughes, and Mr. Meyers were "outside in the hall" and were "prepared to testify that Plaintiff had been engaging in very concerning behavior." (*Id.* ¶ 97.) McLean and Baar allegedly tried to intimidate Rudd into dropping his complaints against the City. (*Id.* ¶ 100.) Rudd refused to do so.

Hughes, Gale, McIntire, and Mr. Meyers all appeared at the contempt hearing. Their presence allegedly sent a "strong message" to Plaintiff, confirming their desire to intimidate and silence him. (*Id.* ¶ 101.) The judge overseeing the contempt proceedings "immediately" found that the contempt allegations were meritless but forced the parties to "mediate" their dispute. (*Id.* ¶ 102.) Later, the judge dismissed the proceedings with prejudice. The judge also granted Plaintiff's request to remove the PPO from the LEIN database.

**B. Rudd's Claims against McIntire**

Rudd asserts two claims against McIntire in his amended complaint: Count 1 of the amended complaint asserts that McIntire and others conspired to violate Rudd's First Amendment rights by retaliating against him for his complaints about Mark and Melissa Meyers and the Norton Shores Police Department. Count 3 asserts that McIntire subjected Rudd to intentional infliction of emotional distress ("IIED").

**C. Procedural History**

In August 2018, this Court granted McIntire's motion to dismiss the claims against him in the original complaint, which included a conspiracy-to-retaliate claim but did not include an IIED claim against McIntire. (*See* 8/8/2018 Op., ECF No. 50.) The Court later held that Rudd failed to state a federal claim against any of the other defendants, so it declined to exercise supplemental jurisdiction over Rudd's remaining state-law claims. (*See* 1/8/2019 Op., ECF No. 94.)

Rudd appealed this Court's decisions. The Court of Appeals affirmed the dismissal of the state-law claims against McIntire but overturned the dismissal of the conspiracy-to-retaliate claim. After that decision, Rudd amended his complaint to add the IIED claim against McIntire. McIntire now asks the Court to dismiss the IIED claim.

## II. DISMISSAL STANDARD

A claim may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint under Rule 12(b)(6) must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they

are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### III. ANALYSIS

Rudd's claims against McIntire rest on (1) McIntire's appearance at the contempt hearing and apparent willingness to testify in support of "false allegations" by Ms. Meyers; and (2) McIntire's participation in a "sham" investigation into Rudd's complaints. Specifically, Rudd alleges the following:

> 56) [Chief Gale] arranged for trusted colleague (F/Lt. **Chris McIntire**) to contact Plaintiff and go through the motions of "investigating" the complaint without any documentation or scrutiny.
>
> . . .
>
> 97) Attorneys Mclean and Baar . . . advised [Plaintiff] that Police Chief Jon Gale, First Lieutenant **Chris McIntire** (Michigan State Police), Attorney Doug Hughes and city manager Mark Meyers were outside in the hall and prepared to testify that Plaintiff had been engaging in very concerning behavior. These attorneys knew that their false allegations could damage Plaintiff's credibility before Judge Pittman, who also presided over Plaintiff's custody case.
>
> . . .
>
> 101) Attorney Doug Hughes, Chief Gale, city Manager Mark Meyers, and F/Lt. **Chris McIntire** all appeared at the hearing. Their presence alone sent a strong message to Plaintiff, confirming their unified commitment to damage, intimidate, and silence Plaintiff . . . .
>
> . . .
>
> 125) Chief Gale, Doug Hughes, F/Lt. **McIntire** and Mark Meyers were all present to offer their support and lend credibility to Melissa Meyers' false claims at the November 9, 2015 contempt hearing. Their presence also sent a strong message to Plaintiff regarding the City's support for the contempt proceedings.
>
> . . .
>
> 127) Chief Gale discussed the situation with Mayor Nelund before and after meeting with Plaintiff. Chief Gale had another meeting with Mayor Nelund after Chief Gale recruited F/Lt. **McIntire** to go through the motions of

> conducting an investigation. Mayor Nelund participated in numerous discussions and decisions about how Plaintiff's Citizen Complaint should be handled.

(Am. Compl. (emphasis added).)

The Court of Appeals held that similar allegations in Rudd's original complaint sufficed to state a retaliation conspiracy claim against McIntire. It did not examine whether those allegations state an IIED claim.

"To establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: '(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress.'" *Hayley v. Allstate Ins. Co.*, 686 N.W.2d 273, 276 (Mich. Ct. App. 2004) (quoting *Graham v. Ford*, 604 N.W.2d 713, 716 (Mich. Ct. App. 1999)).

McIntire argues that his alleged conduct does not qualify as extreme and outrageous. To satisfy that element of an IIED claim, "[t]he conduct complained of must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Id.* (quoting *Graham*, 686 N.W.2d at 716). "[I]t is initially for the court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery." *Doe v. Mills*, 536 N.W.2d 824, 834 (Mich. Ct. App. 1995). But "where reasonable individuals may differ," then the matter is for the jury to decide. *Hayley*, 686 N.W.2d at 277.

The Court agrees with Defendant. Appearing at a contempt hearing to testify and conducting a "sham" investigation are not so "outrageous" in character and so "extreme" that they qualify as being atrocious and beyond all possible bounds of decency. Rudd does not allege that McIntire gave false testimony, which would put McIntire's conduct closer to the outrageous end

of the spectrum. And Rudd does not identify any cases in which similar conduct satisfied the outrageous and extreme standard.

The cases cited by Rudd are distinguishable. In *Margita v. Diamond Mortgage Corp.*, 406 N.W.2d 268 (Mich. Ct. App. 1987), the defendant's agents threatened the plaintiffs with foreclosure and "repeatedly harassed plaintiffs [over a two-year period] through abusive phone calls or letters assessing late charges," despite the fact that no debt was due. *Id.* at 272. In *Ledsinger v. Burmeister*, 318 N.W.2d 558 (Mich. Ct. App. 1982), the defendant hurled racial epithets at the plaintiff while telling the plaintiff to leave his store, causing humiliation, embarrassment, and physical distress. *Id.* at 560. In *Rosenberg v. Rosenberg Brothers Special Account*, 351 N.W. 2d 563 (Mich. Ct. App. 1984), the plaintiff alleged "more than 26 instances where [the plaintiff's brother-in-law] . . . exerted his position over the recently widowed [plaintiff] to browbeat her into submission" and force her to sell her interests in property. *Id.* at 568. The level of harassing and abusive behavior in those cases is simply not present here.

It is not enough that McIntire allegedly acted as part of a conspiracy to retaliate against Rudd. As the Michigan Supreme Court has explained,

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. . . . Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908-09 (Mich. 1985) (quoting Restatement (Second) of Torts § 46, cmt. d.). This is not such a case in which an average person would exclaim "Outrageous!" In other words, McIntire's alleged conduct, even when viewed in the larger context of an alleged conspiracy to retaliate, could not reasonably be regarded as so extreme or outrageous as to permit recovery for IIED.

8

Rudd critiques McIntire for relying on a subpoena which purportedly indicates that McIntire did not appear at the contempt hearing voluntarily. Rudd contends that the subpoena is extrinsic evidence that the Court cannot consider at the dismissal stage. McIntire responds that the Court can consider the subpoena because it is a public record. However, the Court need not rely on the subpoena to find that Rudd fails to state an IIED claim. With or without the subpoena, the allegations do not suffice.

Rudd also responds by making assertions that are not contained in the complaint. Rudd contends that "McIntire either destroyed or prevented the preservation of any records or documentation," ostensibly referring to records or documentation showing that police improperly disclosed Rudd's information in the LEIN database. (Pl.'s Resp., ECF No. 231, PageID.2499.) However, McIntire's motion challenges the sufficiency of Rudd's complaint. Just as McIntire generally cannot rely on evidence outside the pleadings, Rudd cannot rely on belated assertions that he did not include in his complaint.

In addition, Rudd argues that the subpoena does not undermine his retaliation claim. That may be so, but it is irrelevant. McIntire has not asked the Court to dismiss the retaliation claim against him.

Finally, McIntire argues that, even if Rudd states a claim, he is immune from relief under state law. But because Rudd fails to state an IIED claim, the Court need not consider McIntire's alternative argument for dismissal.

9

## V. CONCLUSION

In summary, the amended complaint fails to state a claim against McIntire for intentional infliction of emotional distress. Accordingly, the Court will grant McIntire's motion.

An order will enter consistent with this Opinion.


Dated: October 8, 2021                               /s/ Hala Y. Jarbou
                                                     HALA Y. JARBOU
                                                     UNITED STATES DISTRICT JUDGE