UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL WILLIAM RUDD,

    Plaintiff,

v.

CITY OF NORTON SHORES, et al.,

    Defendants.
_____/

Case No. 1:18-cv-124

Hon. Hala Y. Jarbou

## OPINION

Plaintiff Daniel William Rudd brings this civil rights action against multiple individuals, including officials employed by the City of Norton Shores or the Michigan State Police. Lieutenant Chris McIntire is one of those officials. Before the Court is Defendant McIntire's motion for summary judgment (ECF No. 258). The Court will grant the motion.

### VI. BACKGROUND

#### A. Allegations by Rudd

Rudd's complaint alleges a conspiracy by Defendants to retaliate against him for criticizing City officials and seeking information from the City through the FOIA process. *See Rudd v. City of Norton Shores*, 977 F.3d 503, 507-11 (6th Cir. 2020) (describing the allegations).

To summarize, when Rudd was involved in a contentious custody dispute with his ex-wife in 2013, she allegedly absconded with their children. He requested help from the Norton Shores Police Department but it allegedly refused to help him with the matter because the Chief of Police at the time, Daniel Shaw, and a police officer, Sergeant Matthew Rhyndress, knew the attorney who represented Rudd's ex-wife. That attorney, Melissa Meyers, was married to the City Manager and was also a personal attorney for Rhyndress. In fact, Rhyndress himself allegedly briefly

detained Rudd without cause and told him that the police would not provide him any assistance with recovering his children.

Rudd eventually secured the return of his children and obtained full custody over them in August 2014. Before that happened, however, Meyers allegedly obtained a personal protection order (PPO) against Rudd in July 2013 based on false information, with the assistance of the Police Chief, who allegedly improperly disclosed Rudd's Law Enforcement Information Network (LEIN) information to Meyers so that she could portray Rudd as a dangerous person in the custody proceedings.

After the City hired a new chief of police, Rudd filed a citizen's complaint in July 2015 alleging improper conduct by the police department for, among other things, refusing to assist him and for disclosing his LEIN information. After receiving a copy of this complaint, but before conducting any investigation, the new Police Chief, Jon Gale, allegedly shared the complaint with Meyers, with Meyers's husband (City Manager Mark Meyers), and with the former Police Chief, despite a policy that such complaints should remain confidential.

Chief Gale then met with Rudd and allegedly promised that he would investigate the LEIN violation with the assistance of the Michigan State Police, but instead Gale "arranged for a trusted colleague ([Defendant] McIntire) to contact Plaintiff and go through the motions of 'investigating' the complaint without any documentation or scrutiny." (Am. Compl. ¶ 56, ECF No. 194.)

Gale also allegedly conspired with Melissa Meyers to contrive a violation of the PPO, which had expired months earlier. After Melissa Meyers saw Rudd at a soccer tournament where he was coaching his son's team, she claimed that he had violated the PPO and she threatened to put his children "through the trauma of a police interaction[.]" (*Id.* ¶ 62.) To remedy the fact that the PPO had expired, she allegedly demanded that Rudd stipulate to an indefinite PPO. As grounds

for this demand, she referred to Rudd's citizen complaint, in which she claimed that he had made "false, defamatory comments" in order to "get [her] husband, the former police chief and [the] North Shores Police Department into some sort of trouble." (*Id.* ¶ 66.)

Melissa Meyers then went to the court to restore the PPO with the assistance of her law firm colleague, Michelle McLean. In early August 2015, McLean told the court that a "clerical error" had discharged the PPO from the LEIN and she asked the Court to reenter it. (*Id.* ¶ 71.) About a week later, McLean filed a different motion asking the Court for permission to authorize the police department to restore the PPO to the LEIN.

In late August, Rudd submitted a FOIA request to the police department regarding his citizen's complaint. A few days later, the department allegedly entered the PPO into the LEIN without court permission. McLean then withdrew her requests to reinstate the PPO.

After Rudd sought a declaration from the court that the LEIN entry was invalid, McLean responded with a motion to hold Rudd in criminal contempt for violating the PPO. Rudd's citizen complaint was a "central theme" of the contempt motion. (*Id.* ¶ 85.)

Meanwhile, the City's attorney, Douglas Hughes, sent Rudd a letter stating that the Mayor had asked Hughes to "monitor" Rudd. (*Id.* ¶ 88.) Hughes accused Rudd of making "defamatory and disparaging remarks" about Mark Meyers. (*Id.*) Hughes told Rudd to "be mindful" of statements he made to others about Mr. Meyers. (*Id.*) After Rudd responded that he had never had contact with Mr. Meyers, Hughes wrote to Rudd in an email, "Good. Stay away from the Meyer[s] and we will get along just fine." (*Id.* ¶ 91.) Hughes then sent a copy of this email to Chief Gale.

Just prior to the contempt hearing, Rudd met with McLean and another lawyer (Joel Baar) to resolve the contempt matter. They asked him to stop engaging in "conduct" that was

"concerning" to Mark and Melissa Meyers, ostensibly referring to Rudd's citizen's complaint. (*Id.* ¶ 94.) Rudd told them that his complaint had nothing to do with the PPO. However, McLean and Baar disagreed and indicated that Gale, McIntire, Hughes, and Mr. Meyers were "outside in the hall" and were "prepared to testify that Plaintiff had been engaging in very concerning behavior." (*Id.* ¶ 97.) McLean and Baar allegedly tried to intimidate Rudd into dropping his complaints against the City. (*Id.* ¶ 100.) Rudd refused to do so.

Hughes, Gale, McIntire, and Mr. Meyers all appeared at the contempt hearing. Their presence allegedly sent a "strong message" to Rudd, confirming their desire to intimidate and silence him. (*Id.* ¶ 101.) The judge overseeing the contempt proceedings "immediately" found that the contempt allegations were meritless but forced the parties to "mediate" their dispute. (*Id.* ¶ 102.) Later, the judge dismissed the proceedings with prejudice. The judge also granted Rudd's request to remove the PPO from the LEIN.

### B. Procedural History

This Court initially dismissed the federal claims against Defendants for failure to state a claim and declined to exercise supplemental jurisdiction over the state law claims. (*See* 8/8/2018 Op. & Order, ECF Nos. 50, 51; 1/08/2019 Op. & Order, ECF Nos. 94, 95.) Rudd appealed that decision. The Court of Appeals overturned this Court's decisions in part, concluding that Rudd stated a retaliation conspiracy claim against all Defendants other than Mayor Nelund. *See Rudd*, 977 F.3d at 520.

Rudd subsequently asked for leave to file an amended complaint, restating his claim against Nelund. The Court permitted this amendment, in part, but among other things, the Court noted that any claims based on events occurring in 2013 were barred by the applicable statutes of limitations. (*See* 4/22/2021 Op. 9-10, ECF No. 189.)

### C. Rudd's Claim against McIntire

The only claim remaining against McIntire in Rudd's amended complaint is in Count 1, which asserts that McIntire and others violated Rudd's First Amendment rights, or conspired to do so, by retaliating against him for his complaints about Mark and Melissa Meyers and the Norton Shores Police Department.

### VII. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

### VIII. ANALYSIS

According to his complaint, Rudd's claims against McIntire rest on the following: (1) McIntire's appearance at the contempt hearing and apparent willingness to testify in support of "false allegations" by Ms. Meyers; and (2) McIntire's participation in a "sham" investigation into Rudd's complaints.

The Court of Appeals held that similar allegations in Rudd's original complaint sufficed to state a retaliation conspiracy claim against McIntire. It did not examine whether there was sufficient evidence to proceed to trial on that claim.

McIntire recognizes that he might be liable for personally retaliating against Rudd or for being part of a conspiracy to retaliate against Rudd. He contends, however, that the evidence does not suffice to create a question of fact under either theory.

**A. Retaliation**

To prove a retaliation claim based on the exercise of his First Amendment rights,

> Rudd must show that his conduct fell within the "freedom of speech" or the right "to petition," and he must show that the defendants "abridg[ed]" these rights by taking adverse actions against him because of his protected activities. In other words, Rudd must show that: (1) he engaged in protected conduct; (2) the defendants took an adverse action against him; and (3) a causal connection exists between the two.

*Rudd*, 977 F.3d at 513 (quoting *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019)).

The Court of Appeals suggested that Rudd's request for police assistance in 2013, his citizen complaint in July 2015, and his request for information in August 2015 are all instances of protected conduct. *See id.* at 514. However, McIntire argues that Rudd cannot show either an adverse action taken by McIntire or a causal connection between McIntire's actions and Rudd's protected conduct.

An adverse action is "'one that is *capable* of deterring a person of ordinary firmness from exercising the constitutional right in question.'" *Id.* at 514 (quoting *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010)) (quotation marks omitted). This standard is "calibrated . . . to the plaintiff"; "the average prisoner may 'have to endure more than' the average public employee, who may 'have to endure more than the average citizen.'" *Id.* (quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010)). In other words, the "standard is reduced" in this case because Rudd is an average citizen. *Id.*

The causal connection between the protected conduct and the adverse action must be such that McIntire's "retaliatory animus '[was] a but-for cause' of the actions, meaning that [he] would

6

not have taken them but for the fact that Rudd engaged in protected conduct." *Id.* at 515 (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)) (quotation marks omitted). "There is some uncertainty [in the case law] over whether a plaintiff must prove this but-for test or whether the plaintiff need only show that the protected conduct was a motivating factor for the action (which switches the burden to the defendant to prove the absence of but-for causation)." *Id.*

### 1. McIntire's Adverse Actions

At his deposition, Rudd identified the following actions, or inactions, taken by McIntire that he believes constitute adverse actions: (1) "making false representations as to the investigation that he would be conducting, and the steps that he would take to conduct that investigation," including "promising that he would connect with LEIN Field Services"; (2) not creating a report or "destroying documentation by deleting e-mails, deleting his report, if he started a report, or deleting any kind of logs which would document what he was doing"; (3) appearing at the contempt hearing and sitting with Chief Gale and Mark Meyers, so that "his presence there sent a strong message"; and (4) "never making any effort to make things right or to speak truthfully, or even to reach out . . . and say" that Rudd had a right to make complaints to the police. (Rudd Dep. 222-25, ECF No. 258-5.)

### (a) False representations about the investigation

Rudd and McIntire apparently had a telephone conversation on July 30, 2015. McIntire has provided a transcript of that call. During the call, Rudd expressed his concern that his LEIN information might have been improperly disclosed to Mark Meyers. (7/30/2015 Phone Tr., ECF No. 258-3, PageID.2740.) McIntire told Rudd that his "plan right now" was to "do a couple of different things." (*Id.*) One was to contact "LEIN Field Services." (*Id.*) Another was to ask Officer Mike Wasilewski whether he disclosed Rudd's information to anyone. (*Id.*, PageID.2740-2741.)

7

At his deposition, McIntire testified that he investigated the LEIN issue by contacting Mark Meyers and asking him if he received any LEIN information from the Norton Shores Police Department. (McIntire Dep. 51, ECF No. 258-2.) Meyers told him that he had not received any such information. (*Id.*) McIntire consulted with Muskegon County prosecutor Matt Roberts about this investigation, and Roberts agreed that McIntire did not need to proceed any further. (*Id.* at 51-52.) McIntire did not contact LEIN Field Services; he testified that he decided not to do so after contacting Mark Meyers. (*Id.* at 65.) He also testified he was not required to contact LEIN Field Services, and that "standard protocol" was for *him* to decide how to conduct his investigation. (*Id.* at 52-53.)

In a follow-up call with Rudd on August 26, 2015, McIntire explained that "there's nothing to lead me to believe anybody had released any LEIN information . . . outside of folks who are suppose[d] to have it[.]" (8/26/2015 Call Tr., ECF No. 258-4, PageID.2748.) He told Rudd that he did not check the LEIN database; instead, he spoke with Meyers, who told him that he did not receive any LEIN information. (*Id.*)

In short, Rudd wanted McIntire to look into the LEIN violation and he did so. Rudd does not point to any false representations in the phone call. McIntire did not promise that he would contact LEIN Field Services. Instead, he stated that was his "plan" at the time of their July phone call. According to his testimony, that plan changed after he contacted Mark Meyers. Moreover, even if he did make such a promise, a broken promise is not a misrepresentation of fact.

Furthermore, a jury could not reasonably conclude from the evidence that McIntire's investigation was an adverse action. Rudd contends that McIntire has offered no reasonable justification for his "bizarrely deficient investigation techniques" (Pl.'s Resp. Br. 26, ECF No. 285), but Rudd did not have a right to dictate how McIntire would conduct his investigation,

8

and there is no evidence that McIntire ignored Rudd's concerns. To the contrary, McIntire consulted with a prosecutor, and they agreed on the proper steps for an investigation. After taking those steps, McIntire determined that there was no evidence of a LEIN violation. He then told Rudd what he had found. None of those actions would deter a person of ordinary firmness from exercising their First Amendment rights.

### (b) Not creating a report or destroying documentation

McIntire testified that he did not write a report because Roberts instructed him that there was no need to do so. (McIntire Dep. 56.) The prosecutor was satisfied with the facts as McIntire had verbally presented them. (*Id.* at 56-57.) Based on those facts, the prosecutor told McIntire that there was no need to "move forward." (*Id.* at 57.) McIntire subsequently contacted Rudd and informed him of the results of his investigation.

Rudd presents no evidence to contradict McIntire's testimony. He also presents no evidence that McIntire destroyed any documents. More importantly, Rudd does not explain how not preparing a written report in these circumstances constitutes an adverse action, let alone one that was motivated by Rudd's protected conduct. Indeed, McIntire's call to Rudd is the equivalent of a report. It gave Rudd information about the steps taken in the investigation and the result. Rudd cannot establish that this form of report would deter a person of ordinary firmness from raising complaints about the police or petitioning them for assistance.[1]

---

[1] Rudd argues that McIntire's failure to prepare a report was "in brazen defiance of MSP orders," but this assertion is unsupported. (Pl.'s Resp. Br. 26.) Rudd cites Exhibits 38 and 39, but he did not file these exhibits until after McIntire filed his reply brief. (*See* Pl.'s Errata, ECF No. 292.) Moreover, Rudd does not explain how these exhibits support his assertion. He appears to be referring to deposition transcripts, but he does not cite the relevant portions of those transcripts. It is not the Court's job to mine these transcripts for evidence supporting his argument.

### (c) Appearing at the contempt hearing

Rudd claims that McIntire appeared at the contempt hearing for the purpose of intimidating Rudd, in retaliation for Rudd's citizen complaint. But McIntire provides evidence that he appeared in response to a subpoena issued by Michelle McLean. That subpoena, which is attached to McIntire's motion, states that McIntire was ordered to appear for a hearing at the probate court in Muskegon, Michigan, on November 9, 2015. (*See* Subpoena, ECF No. 258-6.) At his deposition, McIntire confirmed that he received this subpoena before the hearing.[2] (McIntire Dep. 85-86.) Consequently, McIntire did not appear at the hearing in order to retaliate against Rudd; he appeared because a court subpoena required him to do so. He did not have a choice. Thus, even if his appearance at the hearing was an adverse action, it was not retaliatory because it was not motivated by Rudd's protected conduct. He would have appeared at the hearing even without that protected conduct.

Rudd implies that the subpoena was invalid because there is no date next to the signature of the attorney who requested it. (*See* Subpoena, PageID.3079.) However, Rudd does not explain how the lack of such a date rendered the subpoena invalid or unenforceable, let alone that McIntire would have known of this legal deficiency and could have voluntarily ignored the subpoena after receiving it. Indeed, Michigan Court Rule 2.506, which governs the form and issuance of witness subpoenas, does not require a date next to the attorney's signature.

Rudd also implies that the subpoena was never served on McIntire because no copy or proof of service was filed with the state court and because the Michigan State Police ("MSP") told

---

[2] Rudd contends that McIntire's deposition shows that he had "no first-hand knowledge of being served with (receiving or possessing) the subpoena prior to the November 9, 2015 contempt hearing." (Pl.'s Resp. Br., PageID.3655.) On the contrary, although McIntire testified that he did not recall where he was when he received the subpoena, who served it on him, or how long before the hearing he received it, he remembered possessing it; he testified that it "made [him] go to court." (McIntire Dep. 86.)

Rudd that they had no record of the subpoena when responding to his FOIA request. (*See* 3/1/2018 MSP Letter to Rudd, ECF No. 286-15.) However, Rudd provides no evidence to support his assertion that there was no copy of the subpoena or proof of its service on file with the state court. Nor does he explain how or why filing such a copy with the state court would have been necessary or expected. Michigan Court Rule 2.506 does not require the filing of such.

Moreover, the MSP's letter merely establishes that the department did not possess a copy of the subpoena, which makes sense if the subpoena was served on McIntire. That letter does not conflict with McIntire's testimony or with the subpoena itself.

In short, Rudd has not provided evidence to create an issue of fact about whether the subpoena existed or whether McIntire received it before the contempt hearing. Accordingly, there is no genuine dispute of fact about McIntire's reason for appearing at the contempt hearing. He appeared due to the subpoena, not because he was retaliating against Rudd.

Rudd argues that, even if the subpoena compelled McIntire to testify, there was no reason for him to "convey his solidarity by sitting next to the Norton Shores Defendants in a show of solidarity." (Pl.'s Resp. Br. 26.) However, Rudd's assertion that McIntire's choice of seating amounted to a "show of solidarity" is unsupported by any details. More importantly, that choice was not an adverse action.

Rudd also contends that "nothing prevented McIntire from bringing the entire scheme to a screeching halt by advising Judge Pittman that neither he, nor any of the law enforcement officers present[,] had any reason to believe that Rudd's Citizen Complaint was false, misleading, or brought in bad faith." (*Id.*) In fact, court procedure and decorum prevented McIntire from doing so. McIntire attended the hearing as a witness at McLean's request. Witnesses do not control court proceedings and cannot interrupt them to offer their unprompted opinions. As it turned out,

11

McIntire did not testify at the hearing at all (McIntire Aff., ECF No. 24-1, PageID.216), so there is no reason to think that he had an opportunity to communicate his views to the court. His failure to do so was not an adverse action.

### (d) Not making an effort to reach out

Rudd also contends that McIntire should have contacted Rudd to assure him that he had a right to file a complaint about the police. Rudd does not explain how McIntire's failure to do so is an adverse action. McIntire did not have an affirmative obligation to inform or reassure Rudd of his First Amendment rights, and a failure to do so would not deter a person of ordinary firmness from exercising those rights.

### (e) Other actions

Rudd's response brief raises other actions that he contends support his claim. For instance, he contends that, during his August 26, 2015, phone call with McIntire, McIntire "actively work[ed] to discourage Rudd from speaking to the prosecutor on his own or requesting to have an actual outside investigator review [his] complaint." (Pl.'s Resp. Br. 21.) The transcript of that call does not support Rudd's assertion.

After Rudd complained to McIntire that the Norton Shores police did not help him when he told the police his children were at risk of physical abuse or domestic violence, McIntire told Rudd, "I am going to contact, I've been working with prosecutor Mark Roberts on this. I'm going to give him a call and just tell him what you told me. . . . I'm going to ask the prosecutor's office assessment[.]" (8/26/2015 Call Tr., PageID.2763.) Nothing in that statement, or anywhere else in the call transcript, suggests that McIntire discouraged Rudd from speaking to the prosecutor or requesting some form of independent review.

In summary, Rudd has failed to provide evidence to create a genuine dispute of fact about whether McIntire personally retaliated against him.

**B. Conspiracy to Retaliate**

Even if McIntire himself did not retaliate against Rudd, McIntire might be liable if he conspired with others to do so. "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Id*. at 944. Instead, the plaintiff must show that: (1) "a single plan" existed; (2) "the alleged coconspirator shared in the general conspiratorial objective" to deprive the plaintiff of a constitutional right (or a federal statutory right); and (3) "an overt act was committed in furtherance of the conspiracy that caused injury" to the plaintiff. *Id*. McIntire argues that Rudd has failed to provide evidence of his involvement in an agreement or plan to retaliate against Rudd or of an overt act in furtherance of that agreement.

Rudd responds that Michelle McLean and others wanted Rudd to believe that "forthcoming testimony" from McIntire at the contempt hearing on November 9, 2015, "would persuade Judge Pittman that Rudd had engaged in very concerning behaviors[.]" (Pl.'s Resp. Br. 33.) To that end, McLean purportedly "needed to make sure that McIntire would actually be standing in the hallway outside Judge Pittman's courtroom." (*Id.*) Also, "McLean needed to be sure that McIntire would not do or say anything that would undermine the joint narrative which had been carefully crafted (i.e. Rudd's Citizen Complaint amounts to 'indirect unconsented contact' directed toward Melissa Meyers)." (*Id.*) In support of these assertions, Rudd points to a supposed record[3] of a phone call between Mark Meyers and McIntire on November 4, 2015. (*See* Rudd Decl., ECF No. 286-14,

---

[3] The record is an image of a chart pasted into an affidavit. The chart shows dates, times, phone numbers, places, and names. The chart apparently represents calls made by or to McIntire on those dates.

13

PageID.3772.) Rudd believes that McIntire and Mark Meyers had no reason to talk during this particular timeframe, so a jury could infer that McIntire provided Mark Meyers an assurance of cooperation during the call and that the call was McIntire's "real" reason for appearing at the hearing. (Pl.'s Resp. Br. 34.)

Rudd's inferences about the content of the call between Meyers and McIntire are wholly speculative. They are not reasonable; thus, the call does not provide evidence of an agreement to retaliate against Rudd. Indeed, it is difficult to fathom why Meyers would have such a call with McIntire when *McLean* was the one who supposedly wanted McIntire's presence to send a message to Rudd. For her part, McLean testified that she never spoke to McIntire, at or before the contempt hearing. (McLean Dep. 125-26, ECF No. 289-1.) She called him as a witness only because he was aware of the contents of Rudd's citizen's complaint and the allegations they contained about Melissa Meyers. (*Id.* at 110-11, 117.)

In any case, the subpoena establishes that McIntire appeared at the hearing as the result of a subpoena. As discussed, McIntire could not simply ignore the subpoena and choose not to appear. Thus, his appearance at the hearing could not have been an overt act in furtherance of the conspiracy. No other evidence plausibly suggests that McIntire participated in a conspiracy to retaliate against Rudd. Accordingly, the Court will grant McIntire's motion.

14

## IV. CONCLUSION

In summary, Rudd has failed to provide sufficient evidence to establish a genuine issue of material fact regarding his retaliation claim against McIntire. Consequently, the Court will grant McIntire's motion for summary judgment.

An order will enter consistent with this Opinion.

Dated:  March 16, 2022                         /s/ Hala Y. Jarbou
                                                                             HALA Y. JARBOU
                                                                             UNITED STATES DISTRICT JUDGE