UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL WILLIAM RUDD,

      Plaintiff,

                                        Case No. 1:18-cv-124

v.

                                        Hon. Hala Y. Jarbou

CITY OF NORTON SHORES, et al.,

      Defendants.

_____/

## OPINION

Plaintiff Daniel William Rudd brings this civil rights action against city officials and private individuals. Before the Court is a motion for summary judgment by the City of Norton Shores and its employees, including: Mayor Gary Nelund; Police Chief Jon Gale; former Police Chief Daniel Shaw; City Manager Mark Meyers; Officers Matthew Rhyndress and Michael Wasilweski; City Attorney Douglas Hughes; and Hughes's law firm, William Hughes, PLLC (collectively, the "Norton Shores Defendants") (ECF No. 261). Also before the Court is a motion for summary judgment by Melissa Meyers, Michelle McLean, Joel Baar, and their law firm, Bolhouse, Hofstee & McLean P.C. (collectively, the "Bolhouse Defendants") (ECF No. 264). In addition, Rudd has filed a motion for partial summary judgment against the Bolhouse Defendants (ECF No. 266). For the reasons herein, the Court will grant Defendants' motions for summary judgment and deny Rudd's motion for partial summary judgment.

## I. BACKGROUND

### A. Allegations by Rudd

Rudd's complaint alleges a conspiracy by Defendants to retaliate against him for criticizing City officials and seeking information from the City through the FOIA process. *See Rudd v. City of Norton Shores*, 977 F.3d 503, 507-11 (6th Cir. 2020) (describing the allegations).

To summarize, when Rudd was involved in a contentious custody dispute with his ex-wife in 2013, she allegedly absconded with their children.  He requested help from the Norton Shores Police Department but it allegedly refused to help him with the matter because the Chief of Police at the time, Daniel Shaw, and a police officer, Sergeant Matthew Rhyndress, knew the attorney who represented Rudd's ex-wife.  That attorney, Melissa Meyers, was married to the City Manager and was also a personal attorney for Rhyndress.  In fact, Rhyndress himself allegedly briefly detained Rudd without cause and told him that the police would not provide him any assistance with recovering his children.

Rudd eventually secured the return of his children and obtained full custody over them in August 2014.  Before that happened, however, Meyers allegedly obtained a personal protection order (PPO) against Rudd in July 2013 based on false information, with the assistance of Police Chief Daniel Shaw, who allegedly improperly disclosed Rudd's Law Enforcement Information Network (LEIN) information to Meyers so that she could portray Rudd as a dangerous person in the custody proceedings.

After the City hired a new chief of police, Rudd filed a citizen complaint in July 2015 alleging improper conduct by the police department for, among other things, refusing to assist him and for disclosing his LEIN information.  After receiving a copy of this complaint, but before conducting any investigation, the new Police Chief, Jon Gale, allegedly shared the complaint with Meyers, with Meyers's husband (City Manager Mark Meyers), and with the former Police Chief, despite a policy that such complaints should remain confidential.

Chief Gale then met with Rudd and allegedly promised that he would investigate the LEIN violation with the assistance of the Michigan State Police, but instead Gale "arranged for a trusted

colleague (F/Lt. Chris McIntire) to contact [Rudd] and go through the motions of 'investigating' the complaint without any documentation or scrutiny."  (Am. Compl. ¶ 56, ECF No. 194.)

Gale also allegedly conspired with Melissa Meyers to contrive a violation of the PPO, which had expired months earlier.  After Melissa Meyers saw Rudd at a soccer tournament where he was coaching his son's team, she claimed that he had violated the PPO and she threatened to put his children "through the trauma of a police interaction[.]"  (*Id.* ¶ 62.)  To remedy the fact that the PPO had expired, she demanded that Rudd stipulate to an indefinite PPO.  As grounds for this demand, she referred to Rudd's citizen complaint, in which she claimed that he had made "false, defamatory comments" in order to "get [her] husband, the former police chief and [the] North Shores Police Department into some sort of trouble."  (*Id.* ¶ 66.)

Melissa Meyers then went to the court to restore the PPO with the assistance of her law firm colleague, Michelle McLean.  In early August 2015, McLean told the court that a "clerical error" had discharged the PPO from the LEIN and she asked the Court to reenter it.  (*Id.* ¶ 71.)  About a week later, McLean filed a different motion asking the Court for permission to authorize the police department to restore the PPO to the LEIN.

In late August, Rudd submitted a FOIA request to the police department regarding his citizen's complaint.  A few days later, the department allegedly entered the PPO into the LEIN without court permission.  McLean then withdrew her request to reinstate the PPO.

After Rudd sought a declaration from the court that the LEIN entry was invalid, McLean responded with a motion to hold Rudd in criminal contempt for violating the PPO.  Rudd's citizen complaint was a "central theme" of the contempt motion.  (*Id.* ¶ 85.)

Meanwhile, the City's attorney, Douglas Hughes, sent Rudd a letter stating that the Mayor had asked Hughes to "monitor" Rudd.  (*Id.* ¶ 88.)  Hughes accused Rudd of making "defamatory

and disparaging remarks" about Mark Meyers.  (*Id.*)  Hughes told Rudd to "be mindful" of statements he made to others about Mr. Meyers.  (*Id.*)  After Rudd responded that he had never had contact with Mr. Meyers, Hughes wrote to Rudd in an email, "Good.  Stay away from the Meyer[s] and we will get along just fine."  (*Id.* ¶ 91.)  Hughes then sent a copy of this email to Chief Gale.

Just prior to the contempt hearing, Rudd met with McLean and another lawyer (Joel Baar) to resolve the contempt matter.  They asked him to stop engaging in "conduct" that was "concerning" to Mark and Melissa Meyers, ostensibly referring to Rudd's citizen's complaint.  (*Id.* ¶ 94.)  Rudd told them that his complaint had nothing to do with the PPO.  However, McLean and Baar disagreed and indicated that Gale, McIntire, Hughes, and Mr. Meyers were "outside in the hall" and were "prepared to testify that [Rudd] had been engaging in very concerning behavior." (*Id.* ¶ 97.)  McLean and Baar allegedly tried to intimidate Rudd into dropping his complaints against the City.  (*Id.* ¶ 100.)  Rudd refused to do so.

Hughes, Gale, McIntire, and Mark Meyers all appeared at the contempt hearing.  Their presence allegedly sent a "strong message" to Rudd, confirming their desire to intimidate and silence him.  (*Id.* ¶ 101.)  The judge overseeing the contempt proceedings "immediately" found that the contempt allegations were meritless but forced the parties to "mediate" their dispute.  (*Id.* ¶ 102.)  Later, the judge dismissed the proceedings with prejudice.  The judge also granted Rudd's request to remove the PPO from the LEIN.

### B. Claims Asserted by Rudd

Count 1 of Rudd's amended complaint asserts that Defendants retaliated against him, or conspired to do so, in violation of his First Amendment rights.  Count 2 asserts a claim against Defendants Melissa Meyers, McLean, Baar, and their law firm for abuse of process.  Count 3

asserts a claim against Melissa Meyers, Gale, and McLean for intentional infliction of emotional distress.

### C. Summary of Evidence

The following is a summary of the evidence construed in the light most favorable to Rudd.

#### 1. Rudd seeks police assistance in a custody dispute.

Rudd was scheduled to pick up his children from his ex-wife, Andrea Averill, in Marne, Michigan, around noon on Friday, July 19, 2013, per the terms of a custody order.  (Rudd Dep. 31, ECF Nos. 262-1, 264-5.)  However, Averill texted him and told him that she would not be bringing the children because she was not confident that he would return them on Monday.  (*Id.* at 32.)  She told him she would let him see the children the following morning.  She indicated that her attorney, Melissa Meyers, had said she could keep the children for an extra day.  (*Id.* at 43.)

The next day, July 20, Rudd drove to the home of his ex-wife's friend, Amber Rupe, who lived in Norton Shores.  Rudd believed his ex-wife might be staying there with his children.  (*Id.* at 60.)  After Rudd arrived, he called 911.  Through that call, Rudd reached Officer Cudney of the Norton Shores Police Department.  Cudney drove to Rupe's house and determined that Rudd's children were not there.  Rupe said that Averill had stayed there the previous night, but Rupe claimed that Averill had left for an unknown location.  Cudney called Averill but he was unable to reach her.  Rudd told Cudney that Averill's actions were a criminal offense, hoping that Cudney would investigate further.  However, Cudney told Rudd that it was department policy not to investigate this sort of issue because the Muskegon County prosecutor would not charge Averill unless she took the children out of state.  (*Id.* at 65, 68.)

On Sunday, July 21, Rudd spoke with Averill over the phone.  She said she would let him see his children if he agreed to certain terms.  He called 911 again.  Officer Wasilewski of the Norton Shores Police Department called him back.  (*Id.* at 69.)  Rudd explained the circumstances.

By that point, Averill had texted Rudd to say that the kids were safe and that she was not planning on leaving the state. Rudd told Wasilewski that he thought Averill might be hiding with their children at the home of her attorney, Melissa Meyers. He wanted Wasilewski to look into it, but Wasilewski refused to do so without evidence that Averill was there. (*Id.* at 78.) According to Rudd, Wasilewski suggested that Rudd could drive by Meyers's house to see if Averill's vehicle was parked nearby. (*Id.* at 79-80.) Wasilewski promised to file a report that Averill failed to return the children for parenting time, but Wasilewski told Rudd that he should take up the matter with the court. (*Id.* at 80-81.)

Rudd decided to drive by Meyers's house. He did that several times, driving up and down her street. He then parked on the street across from her house. (*Id.* at 83.) He did not see Averill's vehicle, but he decided to wait and see if any children appeared. He stayed there for at least 20 minutes, trying to file a missing child report through a national hotline. (*Id.* at 84.)

Mark Meyers had seen Rudd driving up and down the street and then park near his house. (Mark Meyers Dep. 14, ECF No. 262-4.) Rudd appeared to be staring at Mark, so Mark became concerned. He called Police Chief Shaw. Shaw promised to have an officer respond. (Shaw Dep. 27, ECF No. 262-5.) That officer was Sergeant Rhyndress.

Wasilewski heard over the radio that Rhyndress was headed to Meyers's home, so he told Rhyndress about his contact with Rudd. (Rhyndress Dep. 12, ECF No. 262-6.) When Rhyndress arrived, he approached Rudd and asked him why he was there. (Rudd Dep. 85.) Rudd thought Wasilewski had sent Rhyndress, so Rudd asked Rhyndress if he had spoken to Wasilewski. According to Rudd, Rhyndress said, "[W]e're not going to investigate anything and we're not going to talk to Meyers and you need to leave right now." (*Id.*) Rhyndress spoke to Mark Meyers, who said that he did not want Rudd there. (Rhyndress Dep. 25.) Rhyndress gave Rudd a "trespass

6

warning" and threatened to arrest Rudd if he returned.  (Rudd Dep. 85.)   Later, Rhyndress spoke

to Melissa Meyers, who informed Rhyndress that Rudd's children were safe with their mother.

(Rhyndress Dep. 14.)

### 2. Melissa Meyers obtains a PPO against Rudd.

On July 22, 2013, Melissa Meyers obtained a PPO against Rudd in the Muskegon County

Circuit Court based, in part, on his actions near her home.  (*See* Pet. for PPO, ECF No. 212-2,

PageID.2273-2274.)   The PPO stated that it would remain in effect until February 1, 2014.

(7/22/2013 PPO, ECF No. 262-14, PageID.3258.)   A few months later, Rudd asked the court to

terminate the PPO.   Judge Pittman denied this request and ordered that the PPO "remain in full

force and effect until further order of the Court."   (12/17/2013 Order re PPO, ECF No. 262-15,

PageID.3260.)

### 3. Chief Shaw discusses a query of Rudd's LEIN information with Mark Meyers.

At some point, Mark Meyers heard that Rudd possessed a firearm, so he asked Chief Shaw

whether it was legal for a person to possess a firearm if they were the subject of a PPO.  (Mark

Meyers Dep. 44.)   Chief Shaw responded by email on October 3, 2013.   According to the email,

"Wasilewski queried Rudd's vehicle through LEIN, which automatically queries his record as

well." (10/3/2013 Shaw Email, ECF No. 262-7.)   However, Shaw was not able to see the results

of this query, so he was not able to determine whether Rudd had a "CPL," i.e., a concealed pistol

license.  (*Id.*)  Shaw indicated that Meyers could speak to Wasilewski about the issue, but Meyers

never did so.  (*See* Mark Meyers Dep. 45; Wasilewski Dep. 39, ECF No. 262-8.)

### 4. Rudd submits a citizen complaint.

On July 20, 2015, about two years after the custody dispute with his ex-wife, Rudd emailed

a "citizen complaint" to the new police chief of Norton Shores, Jon Gale.   The complaint alleged

illegal conduct by Mark Meyers, Melissa Meyers, former Police Chief Shaw, and Officers Wasilewski and Rhyndress in 2013.  (*See* Citizen Compl., ECF No. 194-1.)  Rudd claimed that Officers Wasilewski and Rhyndress improperly ignored his requests for help in July 2013 and then retaliated against him at the request of City Manager Mark Meyers by ordering him to leave a public street and threatening to arrest him.  (*Id.*, PageID.1757.)  Rudd also claimed that, at the direction of Shaw and Meyers, the Norton Shores Police Department improperly withheld documents from Rudd in response to a FOIA request.  In addition, Mark Meyers purportedly asked the police department to disclose information about Rudd from the LEIN in order to assist Meyers's wife, Melissa Meyers, in civil proceedings against Rudd.  According to Rudd, Chief Shaw approved this request.  (*Id.*, PageID.1758.)

### 5. Chief Gale responds to Rudd's complaint.

The day after receiving this complaint, Gale contacted Rudd to set up a meeting with him. (Gale-Rudd Emails, ECF No. 262-9, PageID.3216.)  Gale also sent a copy of the complaint to Mark Meyers because Gale wanted background information about the incidents alleged.  (Gale Dep. 40-42, ECF No. 262-11.)  Gale spoke to Mark Meyers and then reviewed police reports involving Rudd and Meyers.  Gale also spoke to Shaw.  (*Id.* at 42.)

Rudd and Gale met with one another on July 23, 2015.  After this meeting, Rudd understood that Gale intended to refer the matter to the Michigan State Police for an investigation. (Rudd Dep. 182.)  Because Norton Shores employees were the subject of the complaint, Gale thought that it would be a conflict of interest for Norton Shores to handle the investigation.  (Gale Dep. 38.)  Also, the complaint contained a "criminal element" appropriate for state police investigation.  (*Id.* at 38, 136.)  Gale believed that, as a result of his conversation with Rudd, Rudd had withdrawn his complaint from the Norton Shores Police Department.  (Gale Dep. 81, 136.) Emails from Rudd to Gale appear to confirm this understanding.  (*See* 7/27/2015 Rudd Email to

Gale, ECF No. 262-10, PageID.3218 ("I agree that investigating these allegations . . . would constitute a conflict of interest . . . .  If you are not planning to refer this matter to the State Police, then I intend to do so myself. . . .  If you are able to assist in turning this over to the State Police, . . . please let me know."); 7/28/2015 Rudd Email to Gale, ECF No. 262-10, PageID.3219 ("I understand that you are leaving this in the hands of the State Police now.").)  Gale contacted Officer Chris McIntire of the Michigan State Police to perform the investigation.  Gale then informed Rudd that McIntire would be Rudd's "Michigan State Police contact" should he wish to pursue a complaint against Norton Shores employees.  (Rudd Dep. 200.)

### 6. Melissa Meyers sees Rudd at their children's soccer events.

Rudd's and Melissa Meyers's children played for the same soccer club, so Rudd and Meyers attended the same soccer events, including a soccer tournament held on July 25, 2015. (Melissa Meyers Aff. ¶ 43, ECF No. 264-4.)  At the tournament, Melissa Meyers saw Rudd's ex-wife, Averill, who informed her that Rudd was also present.  (*Id.*)  Rudd was coaching his son's game.  Meyers asked Averill to send Rudd a text informing him of Meyers's presence.  Averill did so but Rudd did not leave as Meyers hoped he would.  (*See* Averill Text, ECF No. 267-5, PageID.3513; Rudd Dep. 359.)  According to Meyers, Rudd stayed even after his son's game finished.  He also appeared at another soccer game the following day, and at a soccer clinic on July 27 and 28, when Meyers was present.  (Melissa Meyers Aff. ¶¶ 43, 45-46.)  After seeing Rudd at these events, Meyers became concerned for her safety.  (*Id.*)

### 7. Melissa Meyers obtains a copy of Rudd's citizen complaint.

On July 29, 2015, Melissa Meyers filed a FOIA request with the City of Norton Shores seeking all communications to or from Rudd since July 2013.  (*See* Meyers Email, ECF No. 262-13, PageID.3256.)  Among other things, the City provided Meyers with a copy of Rudd's citizen complaint.  She believed that the complaint contained falsehoods about her and her husband.  She

also thought it was evidence that Rudd "would never stop his attempts to harm [her] personally and professionally if [she] did not seek enforcement of the PPO," so she retained the assistance of attorneys at her firm, Michelle McLean and Joel Baar.  (Melissa Meyers Aff. ¶ 56.)

### 8. Officer McIntire investigates Rudd's allegation regarding the disclosure of his LEIN information.

Rudd and McIntire spoke over the telephone on July 30, 2015.  During that call, Rudd expressed his concern that the police department had improperly disclosed his LEIN information to Mark Meyers.  (7/30/2015 Call Tr., ECF No. 258-3, PageID.2740.)

McIntire investigated the LEIN issue by contacting Mark Meyers and asking him if he received any LEIN information from the Norton Shores Police Department.  (McIntire Dep. 51, ECF No. 258-2.)  Meyers told him that he had not received any such information.  (*Id.*)

In a follow-up call with Rudd on August 26, 2015, McIntire explained to Rudd that "there's nothing to lead me to believe anybody had released any LEIN information . . . outside of folks who are suppose[d] to have it[.]"  (8/26/2015 Call Tr., ECF No. 258-4, PageID.2748.)  He told Rudd that he spoke with Mark Meyers, who told him that Meyers did not receive any LEIN information. (*Id.*)

### 9. Melissa Meyers asks the court to modify the PPO so that it can be entered into the LEIN.

At some point, Melissa Meyers discovered that the PPO was no longer in the LEIN.  On July 31, 2015, McLean filed a motion in the PPO case, asking the Muskegon County Circuit Court to bring its December 17, 2013 order into compliance for placement into the LEIN.  (*See* Mot. for Nunc Pro Tunc Order, ECF No. 212-6.)

Rudd objected to this motion.  He argued that the PPO had expired, relying on comments made by the judge at the PPO hearings, and he asked the court to enter judgment in his favor. (ECF Nos. 212-7, 212-9.)

In response, McLean accused Rudd of engaging in a "willful course and pattern of conduct directed toward and involving [Melissa Meyers] and her family that . . . constitutes harassment[.]" (Pet'r's Response to Obj., ECF No. 212-8, PageID.2288.)  To support this assertion, McLean quoted statements made by Rudd in his citizen complaint regarding Mark and Melissa Meyers, Chief Shaw, Sergeant Rhyndress, and Officer Wasilewski.  (*See id.*, PageID.2288-2290.)  McLean also contended that Rudd made disparaging statements about Mark and Melissa Meyers when meeting with Chief Gale in July.  And McLean accused Rudd of appearing at soccer events occurring on July 25-27 despite knowing that Melissa Meyers would be present.  (*Id.*, PageID.2291.)

### 10. Melissa Meyers has the Norton Shores Police Department reinstate the PPO into the LEIN.

On August 28, 2015, while her motion for a nunc pro tunc order was still pending, Melissa Meyers went to the Norton Shores Police Department to have the PPO reentered into the LEIN. The LEIN operator, Debra Strandberg, reviewed the court's December 17, 2013 order, conferred with court staff, and updated the LEIN accordingly.  (*See* Field Contact, ECF No. 262-17, PageID.3267-3268; Strandberg Aff. ¶ 8, ECF No. 262-18.)  Chief Gale was not involved in that process.  (Gale Dep. 81, 85, 118, 120; *see* Strandberg Aff. ¶ 10 ("I was never directed to make any unauthorized entries, modifications, or removals from LEIN by any of my superiors or by any third party.").)  A few days later, Meyers withdrew her motion for a nunc pro tunc order to modify the PPO.

### 11. Melissa Meyers asks for contempt sanctions for Rudd's alleged violations of the PPO.

On November 3, 2015, Melissa Meyers filed a motion asking the Muskegon County Circuit Court to hold Rudd in contempt for allegedly violating the PPO.  As evidence of such violations, she relied on Rudd's statements in his citizen's complaint, allegedly disparaging comments about

Mark and Melissa Meyers that Rudd made to Chief Gale, and Rudd's appearances at the soccer events.  (*See* Am. Mot. to Show Cause, ECF No. 212-12, PageID.2339-2341.)  The court scheduled a hearing in the case for November 9, 2015.  McLean issued subpoenas to several individuals to appear at the hearing, including Officer McIntire and Chief Gale.  (*See* Gale Subpoena, ECF No. 212-15; McIntire Subpoena, ECF No. 212-16.)

### 12. Norton Shores sends a cease-and-desist letter to Rudd

On November 5, 2015, Norton Shores City Attorney Doug Hughes sent a letter to Rudd communicating the following:

> This office represents the City of Norton Shores.  Their Mayor has asked us to monitor your conduct and behavior as it relates to the employment of Mark Meyers as the City Administrator for the City of Norton Shores.
>
> We have information to believe that you have made serious defamatory and disparaging remarks about Mr. Meyers, as well as other members of the Norton Shores Police Department.  Please treat this letter as notice to you that we will take whatever action is legally necessary to protect the professional and privacy rights of Mr. Meyers.
>
> You are to cease and desist from any further contact or conversation with him.  Also be mindful that [sic] the statements you make to others about Mr. Meyers.  If you have had [sic] hired legal counsel, please make a copy of this letter and give it to that individual and instruct him to contact me.

(11/5/2015 Letter, ECF No. 262-19.)

Rudd responded to Hughes by email, stating that he had "never had any kind of contact or conversation with Mark Meyers."  (11/6/2015-11/7/2015 Emails, ECF No. 262-20, PageID.3278.) Hughes forwarded Rudd's email to Chief Gale, stating:

> Check this out.  I will share w mark tomorrow.  I told Daniel, good, stay away from the Meyer[s] and he and [sic] will get along just fine.

(*Id.*)

### 13. McLean and her law firm partner, Joel Baar, meet with Rudd before the contempt hearing.

On the morning of the contempt hearing, McLean and Baar met with Rudd to attempt to resolve the matter.  According to a transcript of that meeting, McLean wanted to know what Rudd was "trying to accomplish" by "going to the City of Norton Shores over and over again demanding all these investigations[.]"  (11/9/2015 Meeting Tr., ECF No. 212-17, PageID.2362.)  Rudd insisted that those investigations were not relevant to the PPO.  Baar disagreed, telling Rudd, "I think it [is relevant] because it's being interpreted differently by the city quite differently than what you're interpreting it right now. . . .  That's why representatives from the city are going to be here today." (*Id.*)  McLean added, "[T]hose representatives are saying basically [the] PPO should stay in place that this guy's violated and you're not following the court order[.]"  (*Id.*)  She also represented that she intended to have "Gale testify that he did a thorough investigation and that [Rudd has] no valid complaints, but [he] continue[s] to pursue the complaints."  (*Id.*, PageID.2372.)

### 14. Judge Pittman adjourns the hearing on Meyers's motion for contempt sanctions.

At the motion hearing itself, Judge Pittman criticized McLean for raising "meritless" arguments about slander and defamation because "personal protection orders do not protect against slander or defamation."  (11/9/2015 Show Cause Hr'g Tr. 7-8, ECF No. 262-24.)  The judge also criticized McLean for attempting to convert a 15-minute hearing on Rudd's request for termination of the PPO into an evidentiary hearing on contempt sanctions.  (*Id.* at 9-10.)  To provide time for a longer hearing, the Court adjourned the matter and ordered the parties to participate in mediation. (*Id.* at 10.)  Mark Meyers attended this hearing.  And Hughes, who was often in the courthouse, stopped by the courtroom to see if Chief Gale needed any assistance.  (Hughes Dep. 28, ECF No. 262-23.)

13

### 15. Melissa and Mark Meyers meet with Gale and a Muskegon County Prosecutor

After the November 9 hearing, Melissa Meyers invited Gale to a meeting with Assistant Prosecuting Attorney Maat in order to determine whether Rudd had violated the PPO.  (Gale Dep. 107-08.)  Mark Meyers was also present at the meeting.  Ultimately, no charges were filed or pursued.  (*Id.* at 113-14.)

### 16. Judge Pittman dismisses the PPO and orders its removal from the LEIN

At a hearing on December 15, 2015, Rudd agreed not to have contact with Melissa Meyers, so Judge Pittman dismissed the PPO and later ordered its removal from the LEIN.  (Undated Muskegon Cir. Ct. Order, ECF No. 212-18, PageID.2373-2374; 2/4/2016 Order for Removal of Entry from LEIN, ECF No. 212-19.)

### D. Procedural History

Rudd filed this action in February 2018.

### 1. This Court dismisses all claims.

In August 2018 and January 2019, this Court dismissed the federal claims against Defendants for failure to state a claim and declined to exercise supplemental jurisdiction over the state-law claims.  (*See* 8/8/2018 Op. & Order, ECF Nos. 50, 51; 1/08/2019 Op. & Order, ECF Nos. 94, 95.)

### 2. The Court of Appeals reinstates the retaliation claims.

Rudd appealed the Court's decisions.  The Court of Appeals overturned those decisions in part, concluding that Rudd stated a retaliation conspiracy claim against all Defendants other than Mayor Nelund.  *See Rudd*, 977 F.3d at 520.

14

### 3. Rudd files an amended complaint.

Rudd subsequently asked for leave to file an amended complaint, restating his claim against Nelund.  This Court permitted that amendment, in part, but the Court noted that any claims based on events occurring in 2013 were barred by the applicable statutes of limitations.  (*See* 4/22/2021 Op. 9-10, ECF No. 189.)

### 4. The parties seek multiple extensions of the dispositive motion deadline.

The initial deadline for filing dispositive motions was September 22, 2021.  On September 2, upon the parties' stipulation, the Court extended that deadline to October 22 (ECF No. 247).  On October 22, the Court granted the parties' stipulation to extend the deadline to October 29 (ECF No. 253).  On October 25, the Court granted Rudd's request to extend the deadline to November 5 (ECF No. 256).  When doing so, the Court indicated that "[n]o further extensions shall be granted."  (*Id.*)

Rudd and Defendants filed their respective motions for summary judgment on November 5, 2021.  On November 24, the Court granted the parties' stipulation to extend the deadline for Rudd's response to Defendants' motions until December 27 (ECF No. 273).  At the time, the Court explained that it "will not entertain any further requests for extensions from any party."  (*Id.*, PageID.3570.)  *After the December 27 deadline passed*, Rudd filed a motion for reconsideration, asking for more time to file his response (ECF No. 282). The Court granted his request, giving him until January 7, 2022.  He filed his response on the deadline.

### 5. Rudd attempts to amend his response brief.

On January 26, 2022, five days after Defendants filed their reply briefs, and almost three weeks after Rudd filed his response brief, Rudd filed an "Errata" titled "Notice of Errors in Plaintiff's Consolidated Brief Opposing Summary Judgment," to which he attached almost 400 pages of exhibits.  (Errata, ECF No. 292.)  The "Errata" purports to add citations and exhibits that

15

were missing from Rudd's response brief.  Defendants responded to this document by asking the Court to strike it.  (Defs.' Mots. to Strike, ECF Nos. 293, 297.)  Rudd then filed a motion for leave to "correct" his summary judgment exhibits, which Defendants oppose.  (Pl.'s Mot. for Leave to Amend, ECF No. 298.)

## II. MOTION TO AMEND

Before considering the summary judgment motions, the Court will address Rudd's attempts to correct the omissions in his brief that responds to Defendants' motions for summary judgment. Rudd's "errata" and attempt to amend his response are, in effect, improper and untimely attempts at filing a supplemental response to Defendants' motions.

Rudd contends that the errors in his response brief were "unintentional" and that time constraints prevented him from filing a proper response brief (Errata, PageID.3973); however, the Court gave him several extensions of the deadline to accommodate his need for extra time.  In spite of those extensions, he submitted a brief that falls short of a finished product.  That brief contains blanks, incomplete sentences, and what appear to be notes that Rudd made to himself. Also, it is clear from the numbering of the exhibits attached to the response brief that Rudd did not include everything that he originally intended.  The numbering inexplicably skips over certain numbers.  In other words, Rudd did not commit an unintentional error.  Rather, it appears that he was well aware of the deficiencies in his brief and is now attempting to skirt the Court's deadlines by cleaning it up after seeing the other side's responses.

This is not the first time Rudd has employed this tactic.  In *Rudd v. Pittman*, No. 1:20-cv-27 (W.D. Mich.), he repeatedly sought extensions of time to file pleadings and briefing, and then he repeatedly missed deadlines that he requested.  (*See* 3/16/2021 Order, No. 1:20-cv-27, ECF No. 74, PageID.612.)  And as here, he filed a "draft" document that he attempted to fix by amending it after the deadline.  (*Id.*)

16

The Court will strike the Errata because Rudd provides no legal basis for such a request. Moreover, that document provides little help to the Court. Rudd apparently expects the Court to conduct a page-by-page edit of his response brief, filling in the missing information with the new information identified in a 21-page list of corrections. The Court is not obligated to correct Rudd's work for him. It was his obligation to provide the Court with a complete response within the time provided.

In addition, the Court will deny Rudd's request to "amend" his response brief with additional exhibits. The new exhibits are untimely. The Court has discretion to extend a deadline where the failure to meet it is the result of "excusable neglect." Fed. R. Civ. P. 6(b). The Court balances five factors when making this determination:

> (1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith.

*Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006).

Here, the last four factors weigh against Rudd. He offers no plausible explanation for providing additional exhibits several weeks after the extended response deadline passed. Even a cursory review of his filing would have revealed that they were missing, yet he did nothing about it until long after the fact. Furthermore, after reviewing the exhibits themselves, the Court does not believe that they would change the outcome in this case. Accordingly, the Court will strike the "Errata" and deny Rudd's motion for leave to amend his response brief.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## IV. RETALIATION

### A. General Standard

To prove a retaliation claim based on the exercise of his First Amendment rights,

> Rudd must show that his conduct fell within the "freedom of speech" or the right "to petition," and he must show that the defendants "abridg[ed]" these rights by taking adverse actions against him because of his protected activities.  In other words, Rudd must show that: (1) he engaged in protected conduct; (2) the defendants took an adverse action against him; and (3) a causal connection exists between the two.

*Rudd*, 977 F.3d at 513 (quoting *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019)).

The Court of Appeals suggested that Rudd's request for police assistance in 2013, his citizen complaint in July 2015, and his FOIA request in August 2015 are all instances of protected conduct.  *See id.* at 514.

An adverse action is "'one that is *capable* of deterring a person of ordinary firmness from exercising the constitutional right in question.'"  *Id.* at 514 (quoting *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (quotation marks omitted)).  This standard is "calibrated . . . to the plaintiff"; "the average prisoner may 'have to endure more than' the average public employee, who may 'have to endure more than the average citizen.'"  *Id.* (quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010)).  In other words, the "standard is reduced" in this case because Rudd is an average citizen.  *Id.*

The causal connection between the protected conduct and the adverse action must be such that a defendant's "retaliatory animus '[was] a but-for cause' of the actions, meaning that [the defendant] would not have taken them but for the fact that Rudd engaged in protected conduct." *Id.* at 515 (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quotation marks omitted)). "There is some uncertainty [in the case law] over whether a plaintiff must prove this but-for test or whether the plaintiff need only show that the protected conduct was a motivating factor for the action (which switches the burden to the defendant to prove the absence of but-for causation)." *Id.*

### B. Conspiracy to Retaliate

Even if a defendant did not personally retaliate against Rudd, a defendant might be liable for conspiring with others to do so. "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Id*. at 944. Rudd must show that: (1) "a single plan" existed; (2) "the alleged coconspirator shared in the general conspiratorial objective" to deprive Rudd of a constitutional right (or a federal statutory right); and (3) "an overt act was committed in furtherance of the conspiracy that caused injury" to Rudd. *Id.*

### V. QUALIFIED IMMUNITY

Defendants assert that they are entitled to qualified immunity for some of Rudd's claims. Qualified immunity shields public officials "'from undue interference with their duties and from potentially disabling threats of liability.'" *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). It "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,'

19

'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Rudd bears the burden of showing that Defendants are not entitled to qualified immunity. *See Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). To do so, Rudd must show "(1) that [Defendants] violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted). "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id.*

> To be clearly established,
>
> a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that every reasonable official would know.

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (citations and quotation marks omitted). It is not necessary for there to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590.

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct *in the particular circumstances before him*. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity. We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. A rule is too general if the unlawfulness of the officer's conduct

does not follow immediately from the conclusion that the rule was firmly established.

*Id.* (citations and quotation marks omitted; emphasis added).  "Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was [unlawful]."  *Guertin*, 912 F.3d at 932 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

## VI. NORTON SHORES DEFENDANTS

Defendants Shaw, Rhyndress, Wasilewski, Nelund, Gale, Mark Meyers, Hughes, William Hughes, PLLC, and the City of Norton Shores seek summary judgment for Rudd's claims against them.

### A. Shaw, Rhyndress & Wasilewski

Defendants argue that Rudd's claims against Shaw, Rhyndress, and Wasilewski are untimely.  State statutes of limitations and tolling principles apply to determine the timeliness of claims asserted under 42 U.S.C. § 1983.  *Wilson v. Garcia*, 471 U.S. 261, 268-69 (1985).  For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years.  *See* Mich. Comp. Laws § 600.5805(2); *Carroll v. Wilkerson*, 782 F.2d 44, 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999).  Accrual of the claim for relief, however, is a question of federal law.  *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984).  The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action.  *Collyer*, 98 F.3d at 220.

Likewise, Rudd's claims of abuse of process and infliction of emotional distress are subject to the three-year limitations period in Mich. Comp. Laws § 600.5805(10) (2013) for personal injury actions.  *See Lechner v. Peppler*, No. 337872, 2018 WL 2121483, at *3 (Mich. Ct. App.

21

May 8, 2018). In Michigan, these claims accrue "at the time the wrong . . . was done regardless of the time when damage results." Mich. Comp. Laws § 600.5827.

Rudd's allegations against Shaw, Rhyndress, and Wasilewski concern conduct that occurred in 2013. Rudd filed his complaint in 2018, more than three years after he had reason to know of the injury on which his retaliation claims are based. Rudd provides no argument in response to Defendants' statute-of-limitations defense. Accordingly, the Court will dismiss the claims against Shaw, Rhyndress, and Wasilewski because they are untimely.

### B. Mark Meyers

Rudd apparently contends that Mark Meyers took the following actions, either in retaliation against Rudd or as part of a conspiracy to retaliate against him: (1) Meyers directed Strandberg to enter the PPO into the LEIN; (2) Meyers directed Hughes to take action toward Rudd; (3) Meyers spoke to Officer McIntire during McIntire's investigation; (4) Meyers appeared at the contempt hearing; and (5) Meyers met with a prosecutor after the contempt hearing to discuss whether there had been a violation of the PPO. (*See* Pl.'s Resp. Br. 13, 25, 28, 32-33, ECF No. 285.)

### 1. Directing Strandberg to Enter the PPO into the LEIN

Rudd suggests that Mark Meyers directed Strandberg to enter the PPO into the LEIN. No evidence supports that assertion. Strandberg avers that she was responsible for entering PPOs into the LEIN "in accordance with guidelines and policies promulgated by the Michigan State Police and the Norton Shores Police Department." (Strandberg Aff. ¶¶ 4, 7.) There is no evidence that she required authorization from Meyers or that she received direction from him on the matter.

### 2. Directing Hughes to Respond to Rudd

According to Mark Meyers, he spoke to Gale and Mayor Nelund after receiving a copy of Rudd's citizen complaint, but he was not involved in any response to it. He told Nelund and Gale that he "would not be involved with Chief Gale in the complaint because that would be

inappropriate." (Mark Meyers Dep. 65.)  He told Nelund to "work directly with Chief Gale on it." (*Id.* at 66.)  In other words, Meyers "separated [him]self from any investigation into [the] complaint so it could be reviewed objectively by [the] police department." (*Id.* at 94.)  He did not ask Hughes to write the cease-and-desist letter.  (*Id.* at 143.)  Rudd offers no evidence to dispute Meyers's testimony.

Rudd contends that "legal billings prepared by Doug Hughes chart the actions taken by Doug Hughes at the request of Mark Meyers" and that "[r]ecords show substantial discussions . . . with Mark Meyers while the cease and desist letter was prepared." (Pl.'s Resp. Br. 32.)  However, Rudd's response brief cites no evidence to support these assertions.  *Cf.* Fed. R. Civ. P. 56(c)(1)(A) (requiring a party asserting a fact to "[cite] to particular parts of materials in the record").

It is possible that Rudd is referring to an exhibit he filed that appears to contain a record of work performed by attorneys.  That exhibit contains the following entry:

> 11/06/2015 DMH   Conference with Administrator.  Draft letter to ██████.  Review and respond to e-mail from Administrator.  Email to ██████.  Begin review of motion and order to show cause.  E-mail to associate and note to paralegal.  Review and respond to e-mails from clients.

(ECF No. 286-18, PageID.3803.)  It is not clear what this entry represents, let alone that it has anything to do with the letter to Rudd.  Indeed, Hughes's letter to Rudd is dated November 5, 2015, but the entry above is dated November 6, 2015.  It makes no sense that Hughes would draft the letter on November 6 but give it a date of November 5.  In short, any assertion that this entry demonstrates involvement by Meyers in the letter from Hughes to Rudd is wholly speculative.  It is not sufficient to create a genuine factual dispute.

### 3. Speaking to Officer McIntire

When investigating Rudd's claim that someone had improperly disclosed Rudd's LEIN information to Mark Meyers, Officer McIntire contacted Meyers in July or August 2015 to find

out whether Meyers had received any of Rudd's LEIN information.  Meyers said that he had not, and no evidence indicates otherwise.  Rudd does not explain how that communication is evidence of an adverse action by Meyers or of an overt action in support of a conspiracy to retaliate against Rudd.

It is possible that Rudd is referring to a supposed record of a phone call between Mark Meyers and McIntire on November 4, 2015.  (*See* Rudd Decl., ECF No. 286-14, PageID.3772.) [1] There is no evidence of the contents of this call, however.  Nor is there any evidence from which a jury could infer that the call involved a conspiracy to retaliate against Rudd.  Accordingly, the communications between McIntire and Meyers do not support a retaliation claim against Mark Meyers.

### 4. Attending the Contempt Hearing

Mark Meyers was also present at the contempt hearing in November 2015 concerning the PPO obtained by his wife.  Rudd does not explain how Meyers's presence at a hearing involving his wife amounts to an adverse action or an overt action in furtherance of a conspiracy to retaliate against Rudd.  As Defendants note, there is no evidence that Mark Meyers was involved in the contempt proceedings other than as a potential witness.  He was not a party to the PPO case and there is no evidence that he asked his wife or anyone else to reinstate the PPO into the LEIN or to pursue contempt sanctions against Rudd.

---

[1] The record is an image of a chart pasted into Rudd's affidavit.  The chart shows dates, times, phone numbers, places, and names.  The chart apparently represents calls made by or to McIntire on those dates.  Rudd provides no support for his contention that this image demonstrates the existence of a call between McIntire and Meyers.

### 5. Meeting with a Prosecutor

Rudd mentions in passing that Mark and Melissa Meyers met with a prosecutor to determine whether Rudd had violated the PPO. Nothing resulted from that meeting, however. Thus, it does not support a retaliation claim.

### 6. Other Actions

Rudd's complaint also alleges that Mark Meyers destroyed or falsified official records and "obstructed [Rudd's] efforts to obtain a proper name-clearing hearing[.]" (Am. Compl. ¶¶ 116-17.) These allegations are unsupported.

In summary, Rudd's evidence does not suffice to demonstrate a retaliation claim against Mark Meyers.

## C. Chief Gale

Rudd's retaliation claim against Gale is apparently based on the following actions: (1) disclosing Rudd's citizen complaint to Mark Meyers and former police chief Shaw; (2) directing Strandberg to enter the PPO into the LEIN; (3) appearing at the contempt hearing; (4) attending the meeting with Mark and Melissa Meyers and a prosecutor; (5) telling McIntire that "Rudd tended to FOIA everything"; and (6) arranging a "sham" investigation by McIntire. (Pl.'s Resp. Br. 5, 11, 13, 25, 35.)

### 1. Disclosing Rudd's Citizen Complaint

Rudd apparently argues that Gale retaliated against him by disclosing his citizen complaint to Meyers and Shaw, though Rudd does not explain why this would be an adverse action. Rudd contends that Gale violated city policy, but the policy states the following:

> 1. Upon receipt of the complaint, the investigator will contact the employee as soon as possible (unless contact would jeopardize a criminal investigation) and notify them of the complaint.

> 2. The employee under investigation will be notified of the investigation and
> provided with a copy of the original complaint. . . .

(Norton Shores Police Dept. Standard Operating P., ECF No. 286-3, PageID.3692.)   In other words, the policy expressly contemplates that city employees identified in the complaint will receive a copy of it.  Meyers and Shaw were both identified in Rudd's complaint.

Rudd notes that Gale submitted an affidavit in another case stating the following:

> d. Based on my experience as a law enforcement officer and as a Chief of Police,
> public disclosure of the name of the person making a complaint against police
> officers would have a chilling effect on the willingness of other citizens to make
> a complaint.
>
> e.  Even if the name of the individual making the complaint were not disclosed, a
> disclosure of the nature of the events complained of would have the same chilling
> effect, as the identity of those involved can often be ascertained by a description
> of the event itself.

(Gale Aff., ECF No. 194-2, PageID.1761.)  In that affidavit, Gale was explaining why he denied Rudd's FOIA request for "a copy of any/all complaints submitted against the Norton Shores Police Department's policies or employees from January 1, 2014 until the present." (*Id.*)  That situation is different.  Rudd was not involved in other complaints filed against the police department.  As Gale observed, disclosing such complaints to any member of the public who asked for them would potentially have a "chilling effect" on citizens who wished to make complaints.  In contrast, the Norton Shores Police Department did not disclose Rudd's complaint to the public.  Instead, it disclosed the complaint to those who were named in it.  That disclosure is consistent with the policy identified above.  Indeed, if the department is to investigate a complaint, it is reasonable to expect that those who are the subject of the complaint will learn of its contents.[2]  Thus, Gale's disclosures were not an adverse action.

---

[2] The same logic applies to the extent Rudd contends Gale was responsible for disclosing the complaint to Melissa Meyers in response to her FOIA request. Although she was not an employee, she was named in the complaint.

### 2. Directing Strandberg to enter the PPO into the LEIN

No evidence supports Rudd's contention that Gale was involved in entering the PPO into the LEIN or in directing someone else to do so.

### 3. Attending the contempt hearing

Gale was present at the contempt hearing because McLean issued him a subpoena requiring his attendance. (*See* Gale Dep. 107.) In other words, he had no choice but to appear at the hearing. No evidence indicates that he appeared because of Rudd's protected conduct, or as part of a conspiracy to retaliate against Rudd.

### 4. Attending the meeting with the prosecutor

Gale attended a meeting with Mark and Melissa Meyers and the county prosecutor, but nothing resulted from that meeting. Indeed, there is no evidence that Rudd was even aware of it. Thus, it could not have deterred a person of ordinary firmness from engaging in protected conduct. Consequently, Gale's attendance at that meeting was neither an adverse action in retaliation against Rudd nor an overt action in support of a conspiracy to retaliate against Rudd.

### 5. Telling McIntire that Rudd "tended to FOIA everything"

According to Rudd, "Gale warned McIntire that Rudd tended to FOIA everything," causing McIntire to destroy or to not keep records of his investigation. (Pl.'s Resp. Br. 35.) Rudd provides no evidence to support this assertion. Rudd claims that "McIntire admitted this at deposition," but Rudd does not cite any particular portion of the deposition that would support this claim. (*See id.*)

Rudd also relies upon a transcript of a call between him and McIntire, in which McIntire states,

> If he gave it to Mr. Meyers then it's a violation of the law and he would be liable because all I can go on is this email right now, and it certainly isn't any kind of a direct order from Chief Shaw to make Mike Wasilewski get this information and

give it to Mr. Meyers. He just simply says, and I think you've seen the email, because *from what I understand you FOIA everything*, he simply says . . .

(7/30/2015 Call Tr., PageID.2741 (emphasis added).)  But this statement does not indicate how McIntire concluded that Rudd "tends to FOIA everything."   Thus, it does not support Rudd's assertion that Chief Gale said something about it to Rudd.

Furthermore, there is no support for Rudd's assertion that McIntire failed to keep records or shaped his investigation according to his "understanding" that Rudd uses the FOIA process. Thus, even if Gale did make this statement, it was neither an adverse action nor an overt action in support of a retaliation conspiracy.

### 6. Orchestrating a "sham" investigation

Rudd apparently believes that McIntire conducted an inadequate investigation into Rudd's allegation that someone improperly disclosed his information from the LEIN to Mark Meyers. However, there is no evidence that Gale had any involvement in the manner in which McIntire conducted his investigation.  Accordingly, there is no basis on which a reasonable jury could infer that Gale retaliated against Rudd with respect to the investigation.

In summary, Chief Gale is entitled to summary judgment for Rudd's retaliation claims against him.

### D. Mayor Nelund

Rudd apparently sues Nelund for his involvement in the cease-and-desist letter, which states that Nelund had asked Hughes to "monitor" Rudd.  Defendants argue that Nelund was not involved in sending the letter and that neither monitoring nor the letter itself were adverse actions.

Defendants are correct that asking an attorney to "monitor" someone is not itself an adverse action.  It has no impact on the individual whatsoever; thus, it could not deter a person from

engaging in protected conduct.  Consequently, the question is whether Nelund's involvement in the cease-and-desist letter subjects him to liability.

### 1. Personal Involvement

As mayor, Nelund presumably had authority to direct Hughes's conduct, but there is no evidence that he was directly involved in creating or sending the letter.  Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  On the other hand, Nelund might be liable for the letter if he "either encouraged [the letter] or in some other way directly participated in it.  At a minimum [Rudd] must show that [Hughes] at least implicitly authorized, approved, or knowingly acquiesced" in the letter.  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quotation marks omitted).

According to his deposition testimony, Nelund learned about Rudd's citizen complaint during a "brief conversation" with Chief Gale.  (Nelund Dep. 10, 18, ECF No. 262-25.)  Gale told Nelund that there was a "complaint" and that Gale was turning it over to the Michigan State Police.  (*Id.* at 10.)  At some point, Nelund learned about the cease-and-desist letter, but he does not recall discussing it with anyone else.  (Nelund Dep. 18, 20.)[3]

The letter itself mentions that Nelund had asked Hughes to "monitor" Rudd, and Hughes apparently sent the letter in connection with that request.  But that does not mean Nelund was aware of the letter.  Even Rudd appears to concede that "[t]he November 15, 2015 letter was not sent at the request of Mayor Nelund."  (Pl.'s Resp. Br. 29 (quoting Defs.' Answers to Pl.'s Disc. Reqs., ECF No. 286-20, PageID.3832).)  Rudd's theory is that Mark Meyers instigated the letter.

---

[3] Defendants contend that Nelund did not become aware of the letter "until way down the road," but Defendants provide no evidence to support this assertion.  (Defs.' Br. 39, ECF No. 262.)  Defendants cite page 13 of Nelund's deposition transcript, but they did not provide that page to the Court.

(*Id.*)  Accordingly, no evidence indicates that Nelund encouraged, approved, or in some other way participated in drafting or sending the letter.[4]  *See Rudd*, 977 F.3d at 519 (dismissing Nelund where the only allegation against him was that the cease-and-desist letter stated that Nelund asked Hughes to monitor Rudd).

### 2. Conspiracy

Moreover, Rudd cannot claim that Nelund conspired with Hughes to retaliate against Rudd because the "intra-corporate conspiracy" doctrine bars such a claim.   Under that doctrine, "'members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment.'"  *Jackson v. City of Cleveland*, 925 F.3d 793, 819 (6th Cir. 2019) (quoting *Jackson v. City of Columbus*, 194 F.3d 737, 753 (6th Cir. 1999)).  The rule applies to § 1983 claims against employees and agents of a city, including the city's attorneys. *See Upton v. City of Royal Oak*, 492 F. App'x 492, 505-07 (6th Cir. 2012).

### 3. Qualified Immunity

Even if Nelund was involved in the letter, he is entitled to qualified immunity.  The first step in that analysis is to determine whether there was a constitutional violation.  *See al-Kidd*, 563 U.S. at 735.  The next step is to determine whether the constitutional right was clearly established, such that it would have been "clear to a reasonable officer [in Nelund's position] that his conduct was unlawful in the situation he confronted."  *Wesby*, 138 S. Ct. at 590.

### (a) Was there a constitutional violation?

As discussed above, Rudd's retaliation claim requires him to show that: (1) he engaged in protected conduct; (2) Defendants took an adverse action against him; and (3) a causal connection exists between the two.

---

[4] Rudd asserts in his response brief that Nelund "passed off" on the letter (Pl.'s Resp. Br. 46), but he cites no evidence to support this assertion.

Here, there is no dispute that the cease-and-desist letter was motivated, at least in part, by Rudd's citizen complaint.  The letter itself mentions "defamatory and disparaging comments" about Mark Meyers, presumably referring to Rudd's comments about Meyers in his citizen complaint. In addition, although no evidence supports Rudd's allegations about Meyers in the citizen complaint, the Norton Shores Defendants do not argue that the citizen complaint was not protected conduct.  Instead, they argue that the cease-and-desist letter was not an adverse action.

Construed in a light most favorable to Rudd, the cease-and-desist letter is best characterized as a threat to take legal action against Rudd for making false statements about Mark Meyers, and to caution him about making similar statements about Meyers in the future.  Defendants argue that "'[m]ere threats . . . are generally not sufficient to satisfy the adverse action requirement[.]'" *Wood v. Eubanks*, 25 F.4th 414, 429 (6th Cir. 2022) (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)).  However, that "is not a hard and fast rule[.]" *Hornbeak-Denton v. Myers*, 361 F. App'x 684, 689 (6th Cir. 2010).  "Even the threat of an adverse action can satisfy this element if the threat is capable of deterring a person of ordinary firmness from engaging in the protected conduct." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010).  The minimum threshold for an adverse action "'is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment.'" *Woods*, 25 F.4th at 429 (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 396 (6th Cir. 1999)). Further, "[w]hether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). "Thus, unless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." *Id.* (quoting *Thaddeus–X*, 175 F.3d at 398).

Defendants also contend that "threats of legal process to defend . . . good faith claims" have been held to not constitute an adverse action. *See Hornbeak-Denton*, 361 F. App'x at 689. But in *Hornbeak-Denton*, "the alleged threats were made by repeated offers to resolve [an] underlying property dispute[.]" *Id.* They were not made solely in response to statements complaining about a public official. It is not hard to see how a threat of legal action could deter such complaints. *Cf. Benison v. Ross*, 765 F.3d 649, 660 (6th Cir. 2014) (concluding that, where a university actually sued the plaintiff, "[a] reasonable individual might have been dissuaded from engaging in protected conduct by the threat of a lawsuit holding her liable for more than $50,000").

Moreover, Defendants do not explain why the City would have had a good-faith basis to pursue a defamation suit on behalf of Meyers. Although the evidence indicates that Rudd's statements about Meyers were false, Meyers was a public official. As such, he would have been required to "prove by clear and convincing evidence that the alleged defamatory communications were made with actual malice." *Kefgen v. Davidson*, 617 N.W.2d 351, 363 (Mich. Ct. App. 2000). In other words, he would have had to show that Rudd made false statements "with knowledge of their falsity or in reckless disregard for the truth." *Id.* That is not an easy showing to make. And on top of that, Meyers would have had to show the existence of harm or "the actionability of the statement[s] irrespective of special harm." *See id.* at 356. It is unlikely that Meyers suffered any reputational harm from statements that Rudd made in a complaint that he sent to the Chief of Police. Thus, a jury could infer that Hughes sent the letter simply to stop Rudd from complaining about Meyers rather than to protect Meyers's reputation.

Defendants compare this case to *Meadows v. Enyeart*, 627 F. App'x 496 (6th Cir. 2015), in which "public officials . . . hired a private attorney to send a cease-and-desist letter." *Id.* at 501. There, the court concluded that the plaintiff could not pursue a retaliation claim under § 1983

because the defendants did not act "under color of state law." *Id.* They hired a private attorney to threaten a private legal action, which is something that "any person" can do. *Id.* That case does not apply here because there is no evidence that Meyers hired a private attorney to threaten Rudd with legal action. Instead, the *City's* attorney made the threat while *working for the City*.

In short, although some case law suggests that the threat of legal action might not rise to the level of an adverse action, the Court believes that a jury could conclude otherwise. A jury could conclude that a letter threatening legal action for criticizing a public official would deter a person of ordinary firmness from exercising his First Amendment rights.

### (b) Was the right clearly established?

"[I]t is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983." *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) (citing cases). It is also well-established that "[t]he freedom of speech . . . protects the right of an ordinary citizen to criticize public officials, . . . without fear of criminal or civil repercussions." *Rudd*, 977 F.3d at 513. On the other hand, "the First Amendment does not protect a person who tells knowing or reckless lies or takes threatening actions." *Id.* at 514.

Here, the relevant question is whether Defendants would have been on notice that sending the cease-and-desist letter in these circumstances was an adverse action in violation of Rudd's First Amendment rights. "Even if a plaintiff suffers an adverse action, a defendant will not be held liable if he could reasonably believe that his conduct would not deter a person from continuing to engage in the protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005).

As discussed above, some cases support Defendants' contention that a threat alone is not an adverse action. In his response to Defendants' motion, Rudd cites no controlling or persuasive authority that would have put Defendants on notice that a threat to take legal action in response to false statements is an adverse action. Thus, even if Nelund authorized the cease-and-desist letter,

Rudd has not satisfied his burden of showing that Nelund is *not* entitled to qualified immunity for that letter.  Thus, for all the foregoing reasons, Nelund is entitled to summary judgment.

### E. Attorney Hughes

Rudd's retaliation claim against Hughes appears to be based on the following actions by Hughes:  (1) sending the cease-and-desist letter; and (2) having a "conversation with the former Chief of Police Daniel Shaw and Mark Meyers concerning enforcement of orders in a domestic relations case."  (Pl.'s Resp. Br. 24, 28.)

#### 1. Sending the cease-and-desist letter

For the reasons discussed above with respect to Defendant Nelund, Hughes is entitled to qualified immunity for his role in sending the cease-and-desist letter.  Even if the letter was an act of retaliation, Hughes is entitled to qualified immunity for that conduct.

#### 2. Conversing with Shaw and Meyers

When asked what conduct and behavior about Rudd prompted Hughes to send Rudd the cease-and-desist letter, Hughes referred to "conduct or behavior of a criminal nature or that improperly interfered with Mr. Meyers'[s] performance of his duties as City Administrator." (Answers to Pl.'s First Disc. Reqs., ECF No. 286-20, PageID.3832.)   When asked how he concluded that Rudd had engaged in such behavior, Hughes referred to a conversation with Shaw and Meyers concerning "enforcement of orders entered in a domestic relationships case."  (*Id.*, PageID.3833.)  The foregoing evidence suggests that Shaw and Meyers had a discussion with Hughes about Rudd's conduct, and that Hughes used this discussion as background for statements he made in the cease-and-desist letter.  But this conversation alone is not evidence of an adverse action by Hughes.

Accordingly, Hughes is entitled to summary judgment for Rudd's retaliation claim. Likewise, Hughes's law firm, William Hughes, PLLC, is also entitled to summary judgment for this claim.

### F.   City of Norton Shores

A local government entity like the City of Norton Shores "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, a municipality may only be liable under § 1983 when its policy or custom causes the injury, regardless of the form of relief sought by the plaintiff. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35-37 (2010) (citing *Monell*, 436 U.S. at 694 (1974)).  In a municipal liability claim, the finding of a policy or custom is the initial determination to be made. *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020); *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996).  The policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity and show that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving,* 330 F.3d 802, 815 (6th Cir. 2003); *Doe*, 103 F.3d at 508-09.

Rudd relies on the principle that "a single unconstitutional act or decision, when taken by an authorized decisionmaker, may be considered a policy and thus subject a [city] to liability." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 260 (6th Cir. 2015) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).  In other words, "municipal liability is appropriate 'where the decisionmaker possesses final authority to establish policy with respect to the action ordered.'" *Id.* (quoting *Pembaur*, 475 U.S. at 481).

> The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.  The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.

*Pembaur*, 475 U.S. at 482-83.

Rudd apparently contends that Nelund, Meyers, and Gale possessed policy-making authority with respect to the letter because Hughes testified that Nelund, Meyers, Gale, or any other "department head" of the city could authorize a letter like the cease-and-desist letter to Rudd. (*See* Pl.'s Resp. Br. 47-48; Hughes Dep. 23, ECF No. 286-22.)  However, Defendants note that there is no evidence that Nelund, Meyers, or Gale approved the letter.

Rudd also implies that Hughes possessed policy-making authority, citing *Bible Believers v. Wayne Cnty.*, 805 F.3d 228 (6th Cir. 2015).  That case is distinguishable.  There, county officials sought legal advice from "corporation counsel" on how to respond to the plaintiffs' presence at a festival.  *Id.* at 260.  Counsel advised the officials that they could threaten the plaintiffs with arrest, and the officials followed that advice.  *Id.*  Under those circumstances, counsel was acting as "chief legal adviser" under authority given to him in Wayne County law.  *Id.*  In contrast, the evidence presented here suggests that Hughes acted on his own discretion.  Rudd points to no law or evidence indicating that Hughes possessed "final policymaking authority" for his actions.  *Cf. Pembaur*, 475 U.S. at 484 (noting that Ohio law gave the county prosecutor authority to issue instructions to county officers).  Indeed, the fact that Nelund, Meyers, or Gale could authorize cease-and-desist letters suggests that they possessed final policymaking authority in this area, not Hughes.  Consequently, Rudd provides no basis for pursuing his retaliation claim against the City of Norton Shores.

## VII. BOLHOUSE DEFENDANTS

Defendants Melissa Meyers, McLean, Baar, and their law firm, Bolhouse, Hofstee & McLean P.C. also seek summary judgment.

### A. Conspiracy

The Bolhouse Defendants were private actors.  They were not employed by a government entity.  Section 1983 permits claims against persons "acting under color of state law," i.e., state officials or those whose conduct is "fairly attributable to the State."  *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  In its opinion, the Court of Appeals noted that Rudd "faces an obvious obstacle to proving that the *private* defendants acted 'under color of' state law because that requirement typically excludes private parties from the statute's reach."  *Rudd*, 977 F.3d at 512.  In order to overcome this obstacle, Rudd must show that the Bolhouse Defendants conspired with state officials to violate his constitutional rights.  *See id.*  These Defendants argue that there is no evidence of such a conspiracy.

#### 1. Melissa Meyers

Melissa Meyers avers that she never had any conversations with the Norton Shores Defendants about Rudd's citizen complaint, except her attorneys and her husband, who told her that she would have to obtain a copy from the city through the FOIA process.  (Melissa Meyers Aff. ¶¶ 21, 40.)  And she obtained a copy of that complaint from the FOIA coordinator, not from Chief Gale or her husband.  (*Id.* ¶ 42.)

Rudd argues that Melissa Meyers learned about the complaint *before* she requested a copy of it from the city because her attorneys allegedly mentioned the contents of the complaint to Rudd before she filed the FOIA request.  (*See* Pl.'s Resp. Br. 10.)  Rudd apparently refers to emails between himself and Gale to support this assertion, but he did not attach those emails to his response.  And in any case, Meyers's affidavit implies that she learned about it from her husband

before she obtained a copy.  (*See* Meyers Aff. ¶ 21 (stating that her husband told her she "would have to FOIA [the complaint] from the City.").)  A conversation between Melissa Meyers and her husband about the citizen complaint is not evidence of a conspiracy to retaliate against Rudd.

Rudd argues that a jury could infer that Gale approved Melissa Meyers's FOIA request in order to explain why she already had access to the citizen complaint.  (*See* Pl.'s Resp. Br. 11.)  But that inference is too speculative to be reasonable.

Rudd also argues that his FOIA request "triggered" the entry of the PPO into the LEIN. (Pl.'s Resp. Br. 11.)  However, the evidence indicates that Melissa Meyers sought that entry.  There is no evidence that she was even aware of Rudd's FOIA request.  Nor is there any evidence that she conspired with a government official to make that entry in retaliation for any of Rudd's protected conduct.  Meyers relied on a court order that, on its face, suggested that the PPO was still in effect.[5]  Strandberg accepted this submission and, after conferring with the court, entered the PPO into the LEIN.  No evidence indicates that Strandberg was acting as part of a conspiracy to retaliate against Rudd for protected conduct.  Rudd argues that Strandberg acted improperly because the PPO did not designate a "law enforcement agency" to enter the PPO into the LEIN, in accordance with Mich. Comp. Laws § 600.2950a(10).  (Pl.'s Resp. Br. 15-16.)  But that statute simply prescribes the contents of a PPO.  It does not purport to govern the entry of a PPO into the LEIN.  Moreover, even if Rudd is correct, he has merely established that Strandberg acted contrary to state law.  Such a violation does not permit a reasonable inference that Strandberg and Meyers conspired to retaliate against Rudd for his protected conduct.

---

[5] Indeed, the state court later "dismissed" the PPO, which might not have been necessary if the PPO had already expired.

### 2. McLean & Baar

Similarly, there is no evidence of a conspiracy between Melissa Meyers's attorneys—McLean and Baar—and any government officials.  McLean issued subpoenas to McIntire and Gale to appear at the contempt hearing but those subpoenas are not evidence of a conspiracy with government officials.  As discussed above, those subpoenas required McIntire and Gale to attend.  McLean testified in her deposition that she never spoke with Gale or McIntire before the contempt hearing.  (McLean Dep. 110, 117-18, ECF No. 289-1.)  She called them as witnesses because she thought they would have knowledge of the false allegations that Rudd had made about Melissa Meyers, and she wanted to present their testimony as evidence that Rudd continued to harass Meyers.  (*Id.* at 110-11.)  Rudd offers no evidence to dispute this testimony.

In short, Defendants Baar, McLean, Melissa Meyers, and their law firm are entitled to summary judgment for Rudd's retaliation claim.

### VIII. SUPPLEMENTAL JURISDICTION

The foregoing analysis resolves the federal claim against the remaining Defendants to that claim.[6]  The only other claims arise under state law.  Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.  *See* 28 U.S.C. § 1367(c)(3) (permitting a court to decline supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction"); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").  "Residual jurisdiction should be exercised only in cases where the 'interests of judicial economy and the

---

[6] In a separate opinion and order, the Court resolved the retaliation claim asserted against Defendant McIntire.

avoidance of multiplicity of litigation' outweigh our concern over 'needlessly deciding state law issues.'" *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (quoting *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993)).

Here, the balance of factors weighs against exercising supplemental jurisdiction. Resolution of Rudd's federal claim has little bearing on his state-law claims. Accordingly, the Court will dismiss the remaining claims without prejudice.

## IX. RUDD'S MOTION

Rudd has a filed a motion for partial summary judgment that focuses on "affirmative defenses" raised by Defendants McLean, Baar, and Melissa Meyers. (*See* ECF No. 266.) In particular, Rudd asks for a finding that he filed his citizen complaint in good faith.

Rudd's motion has no impact on the Court's analysis of Defendants' motions for summary judgment. Further, because these Defendants are entitled to summary judgment for Rudd's retaliation claim, and because all other claims against them will be dismissed, Rudd's motion for partial summary judgment is moot.

## X. CONCLUSION

In summary, Rudd has failed to provide sufficient evidence to establish a genuine issue of material fact regarding his retaliation claim against Defendants under 42 U.S.C. § 1983. Consequently, the Court will grant Defendants' motions for summary judgment as to that claim. The Court declines to exercise supplemental jurisdiction over Rudd's claims arising under state law. The Court will dismiss those claims without prejudice. The Court will also (1) grant

Defendants' motion to strike Rudd's Errata/Notice, (2) deny Rudd's motion to amend his response, (3) deny Rudd's motion for partial summary judgment, and (4) deny all other pending motions as moot.

An order and judgment will enter consistent with this Opinion.


Dated:   March 16, 2022                                /s/ Hala Y. Jarbou
                                                       HALA Y. JARBOU
                                                       UNITED STATES DISTRICT JUDGE